Joseph M. Infante (admitted pro hac vice)
infante@millercanfield.com
Stephen M. Ragatzki (admitted pro hac vice)
ragatzki@millercanfield.com
**MILLER, CANFIELD, PADDOCK AND STONE, PLC**
99 Monroe Avenue NW, Suite 1200
Grand Rapids, MI 49503
Tel: (616) 776-6333 / Fax: (616) 776-6322

Eugene M. Pak (Bar No. 168699)
epak@fennemorelaw.com
Angela Han (Bar No. 317137)
ahan@fennemorelaw.com
**FENNEMORE WENDEL**
1111 Broadway, 24th Floor
Oakland, California  94607
Tel: (510) 834-6600 / Fax: (510) 834-1928

Attorneys for Plaintiffs Hoopes Vineyard LLC,
Summit Lake Vineyard, and Cook's Flat Associates a
California Limited Partnership

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HOOPES VINEYARD LLC, a California limited liability company; SUMMIT LAKE VINEYARDS & WINERY LLC, a California limited liability company; and COOK'S FLAT ASSOCIATES A CALIFORNIA LIMITED PARTNERSHIP, a California limited partnership,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF NAPA,<br><br>Defendant. | Case No. 3:24-cv-6256<br><br>**FIRST AMENDED COMPLAINT** |

COMES NOW the Plaintiffs, HOOPES VINEYARD LLC, SUMMIT LAKE VINEYARDS & WINERY LLC, and COOK'S FLAT ASSOCIATES A CALIFORNIA LIMITED PARTNERSHIP (collectively "Plaintiffs" or "Plaintiff Wineries"), by and through their attorneys, MILLER, CANFIELD, PADDOCK and STONE, P.L.C. and FENNEMORE WENDEL, and for their First Amended Complaint against Defendant, COUNTY OF NAPA, state as follows:

## INTRODUCTION

1.      Defendant County of Napa ("Napa County" or the "County") regulates wineries within the County not based on clear, understandable ordinances, but rather upon an ever-changing patchwork of undocumented policies, procedures, and interpretations. The few written ordinances Napa County does have are so vague that County wineries are unable to decipher what is and is not allowed especially given that Napa County officials uses this vagueness to restrict winery operations as they see fit. Even where ordinances exist, their interpretation consistently changes to arbitrarily eliminate property rights previously acknowledged, without notice or appropriate process, and to the detriment of property owner's business operations.

2.      For example, within the last two years, Napa County has adopted a position as to small wineries, like Plaintiffs, that they "can't have hospitality.  You can't have people onto the grounds, tasting wines, buying merchandise . . . ."  In other words, Napa County seeks to put small wineries out of business by preventing them from selling their wines to customers from their winery property despite decades of these wineries doing just that.

3.      The County's unexplained, ever-evolving interpretations of winery land use entitlements/rights are further in violation of public policy and the Napa County General Plan.

4.      If a winery within the County dares challenge the discretion of Napa County and the restrictions placed on these wineries, it is met with retribution and millions of dollars in costs just to "maintain" the limited operating permissions Napa County was "gracious" enough to allow in the first place.  In many cases, the winery is forced to bargain "down" their existing entitlements (at substantial expense) to avoid closure and/or enforcement action.

MILLER, CANFIELD,
PADDOCK AND STONE,
P.L.C.
ATTORNEYS AT LAW

FIRST AMENDED COMPLAINT                                    CASE NO: 3:24-CV-6256-CRB

5.      Napa County's actions have violated numerous Constitutional rights of County wineries, including Plaintiffs, and it is time they end.

6.      Specifically, the relevant Napa County ordinances, policies and ordinance interpretations violate Plaintiffs' First Amendment rights to free speech and to petition the courts, are an impermissible prior restraint on speech, are a content-based restriction on speech, violate the Dormant Commerce Clause, are void for vagueness, arbitrarily interfere with a constitutionally protected business interest, violate the non-delegation doctrine, take property without just compensation, deny Plaintiffs equal protection of the law, and are preempted by California law.

## THE PARTIES

7.      HOOPES VINEYARD LLC ("Hoopes") is a California limited liability company which leases property located at 6204 Washington Street, Napa, California 94558 (the "Hoopes Property"). Hoopes holds a Type 02 Winegrower license issued by the State of California, as well as a 17 and 20, issued for operations and retail at the subject property. The property was entitled on March 6, 1984 by Napa County as a legal conforming "small winery use permit exemption."

8.      SUMMIT LAKE VINEYARDS & WINERY LLC ("Summit Lake") is a California limited liability company. It owns the real property located at 2000 Summit Lake Drive, Angwin, California 94508 (the "Summit Lake Property"). Summit Lake was approved as a legal conforming "small winery use permit exemption" on March 1, 1984 by Napa County. Summit Lake also holds a Type 02 Winegrower license issued by the State of California.

9.      COOK'S FLAT ASSOCIATES A CALIFORNIA LIMITED PARTNERSHIP dba Smith-Madrone ("Smith-Madrone"), is a California limited partnership. Smith-Madrone owns the real property located at 4022 Spring Mountain Road, Saint Helena, California 94574 (the "Smith-Madrone Property"). The Smith-Madrone property was approved to "build a winery" on October 24, 1973 by Napa County. Smith-Madrone holds a Type 02 Winegrower license issued by the State of California.

10.     Plaintiffs Smith-Madrone, Hoopes, and Summit Lake do not have common ownership, control, or management. .

11.     Plaintiffs Smith-Madrone, Hoopes, and Summit Lake do not share finances.

12.     Plaintiffs Smith-Madrone, Hoopes, and Summit Lake are completely independent businesses whose only commonality is that each is regulated by Napa County.

13.     Defendant COUNTY OF NAPA is a general law county duly organized under the laws of the State of California.

**JURISDICTION AND VENUE**

14.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343 because this case arises under the United States Constitution and 42 U.S.C. § 1983.

15.     This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because these claims are so related to Plaintiffs' federal claims that they form part of the same case or controversy in this judicial district and derive from a common nucleus of operative facts.

16.     This Court has the authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

17.     This Court has the authority to grant injunctive relief under Federal Rules of Civil Procedure 57 and 65.

18.     Napa County is subject to the personal jurisdiction of this Court because it is located within this judicial district.

19.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because (i) Napa County is located within this judicial district and (ii) the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district.

20.     Plaintiffs' claim for attorneys' fees and costs is authorized by 42 U.S.C. § 1988.

**DIVISIONAL ASSIGNMENT**

21.     This action should be assigned to the San Francisco Division or Oakland Division because this action arose in Napa County.

MILLER, CANFIELD,
PADDOCK AND STONE,
P.L.C.
ATTORNEYS AT LAW

FIRST AMENDED COMPLAINT                              CASE NO: 3:24-CV-6256-CRB

1

**FACTUAL ALLEGATIONS**

2        22.      In Napa County, a small winery use permit exemption is a land use by right and is

3    the legal equivalent of a small winery use permit. (Ord. 947, § 4; NCC § 18.08.040(H)(2); NCC §

4    18.16.020(H); NCC § 18.104.040.)

5        23.      Agriculture, an independent land use entitlement, is a land use entitlement by right

6    under all historic versions of the Napa County General Plan and Zoning Codes. (Ord. 186 (1955),

7    Ord. 274 (1968), Ord. 511, § 12201 (1976); NCC § 18.16.020(A).)

8        24.      Land use entitlements run with the land. Wineries are lawful, conforming land use

9    entitlements. (Ord. 947, §§ 1-4; NCC § 18.16.020(G)-(I).)

10       25.      Pursuant to Napa County Code section 12405, in effect between 1976 and 1990,

11   accessory uses for all land use entitlements flow from entitlement in the primary use. (Ord. 511, §

12   12405 ["uses allowed without a use permit or uses permitted upon grant of a use permit shall

13   include any accessory use"].)

14       26.      Accessory uses at wineries were not specified or defined by code until 1990.

15       27.      Instead, lawful accessory uses were defined for all agricultural uses, including

16   wineries, as "any agricultural pursuit[s] or service" and uses were to be "liberally interpreted

17   insofar as they apply to agricultural pursuits and services and shall not be deemed or construed to

18   permit interference with any normal or accessory use. … It is the intention of this section … to

19   provide maximum protection to existing and future agricultural enterprise from restrictions ...

20   including the necessary ... similar uses necessary and incidental thereto." (Ord. 186, Jan. 25,

21   1955, Sec. 102.)

22       28.      In 1991, Napa County amended the General Plan to memorialize the following

23   definition of agriculture: "Agriculture includes the production and processing of food and fiber…

24   In the case of wineries, processing includes tours and tastings, retails sales of wine produced by

25   or for the winery partially or totally form Napa County grapes, activities for the education and

26   development of consumers and members of the public, and limited non-commercial food

27   service."

28

29.     Today, "agriculture" is defined with Napa Code to include "marketing, sales, and accessory uses" at small pre-1990 wineries without a use permit. (NCC § 18.08.040(H)(2); NCC § 18.16.020(H).)

**Hoopes**:

30.     The Hoopes Property is located in the Napa County Agricultural Preserve District and consists of a small vineyard and winery on approximately eight acres.

31.     In 1984, Hopper Creek, the predecessors in interest to Hoopes, obtained a small winery use permit exemption from Napa County and began operating a winery at the Hoopes Property. (**Exhibit 1**.)

32.     Historically, Napa County allowed the public to come to the Hoopes Property, allowed the public to consume wine and picnic on the Hoopes property, and allowed Hoopes to sell wine-related and other items.

33.     When Hoopes leased the property and took over operations from Hopper Creek, it was required to obtain a new license from the State of California's Department of Alcoholic Beverage Control ("ABC"): a Type 02 Winegrowers license.

34.     Part of that application process required that Napa County confirm Hoopes was eligible and confirm whether there were any conditions to be placed on the standard rights given to all Type 02 license holders. Napa County advised the State of California that Hoopes held the necessary "use permit" for its operations and that no special conditions should be placed on Hoopes' Type 02 Winegrowers license.  (**Exhibit 2**.)

35.     When Hoopes leased the property, the Napa County Code stated (and continues to state) that small winery exemptions "shall" have entitlement to "marketing, sales, and accessory uses" without a use permit. (NCC § 18.08.040(H)(2).)

36.     In June 2019, David Morrison, Director of Napa County's Planning, Building, and Environmental Services ("PBES"), confirmed sampling and consumption on the premises was allowed.  (**Exhibit 3**.)

37.    The current Napa County Code further recognizes accessory uses as derivative of entitlement in the primary use for all existing land use entitlements, whether by right or by use permit. (NCC § 18.104.040 (2017).)

38.    A 2012 version of the Napa County Public Winery Database, a database created and maintained by Napa County, demonstrates official recognition of now disputed accessory use entitlements at the Hoopes property (then named Hopper Creek). The publicly disseminated document shows Hoopes is allowed to host Tastings by Appointment without any restriction on the number of daily/weekly/yearly visitors and without any restriction on the number of marketing events or marketing event visitors.  (**Exhibit 4**: 2012 Database.)

39.    The 2015 version of the Winery Database also shows the same entitlements for Hoopes.  (**Exhibit 5**: 2015 Database.)

40.    In 2016, Napa County changed the Winery Database to manipulate entitlements for Hoopes to state that Hoopes was not allowed to conduct Tastings by Appointment, have any visitors whatsoever, or hold any marketing events or marketing event visitors. (**Exhibit 4**: 2016 Database.)

41.    Napa County made this change without notice to Hoopes' predecessor in interest.

42.    Hoopes' predecessor in interest, Dieter Tede, deceased as of 2018, but personally known to Hoopes, communicated he always operated with wine samples and "tastings by appointment" without challenge, and believed they were entitlements that ran with the property.

43.    Hoopes was not aware of the Winery Database documents contained within Exhibits 4-6, and the changes thereto, until it obtained the documents during a nuisance lawsuit filed against it by Napa County which was filed on October 10, 2022 (the "*Napa County v. Hoopes* Lawsuit").

44.    Hoopes sought all versions of the Winery Database in discovery in the *Napa County v. Hoopes* Lawsuit and Napa County responded by denying the existence of the documents and withholding them from production.

FIRST AMENDED COMPLAINT                          CASE NO: 3:24-CV-6256-CRB

45.     Hoopes obtained the various versions of the Winery Documents through Public Records Act requests and from third parties. Specifically, the 2012 and 2015 databases reflecting Hoopes' right to tastings by appointment were not located until after trial, in June 2024.

46.     Napa County admitted by declaration that they had these documents but did not provide them in response to Public Records Act requests or discovery in the *Napa County v. Hoopes* Lawsuit.   (**Exhibit 7**: Gallina Declaration.)

47.     On October 30, 2019, Hoopes obtained a Type 02 Winegrower license; a Type 17 Beer and Wine Wholesaler license; and a Type 20 Off Sale Beer and Wine license from the ABC for the Hoopes Property.

48.     The application included notice to the County of "tasting areas" within the structure, as required for designation to and approval by ABC agents.

49.     The application was subject to public and County notice, and the County was given an opportunity to object to or request condition the 02 license permissions, which include on site consumption of retail purchases.

50.     On August 27, 2019, Terri Abraham, Napa County's Planner, confirmed in writing to the ABC that Hoopes "intended use is allowed and approved" and also that a "use permit" has "been approved."   (**Exhibit 2**.)

51.     The ABC approved and issued the licenses to Hoopes after receipt of Napa County approval and ABC's inspections of the premises.

52.     Between October 2018 and October 2020, the owner of the premises, a related business entity, remodeled portions of the Hoopes Property and Napa County approved all remodel-related building permits, confirmed adequacy of existing infrastructure, and issued final approvals for all floodplain and building permits associated with the renovations. Building inspectors and land use planners approved all existing infrastructure and modifications relating to uses and land uses at issue in this action.

53.     Regardless, Napa County issued Hoopes a "Notice of Apparent Violation" on February 14, 2020, alleging Hoopes was not allowed to engage in "tours and tastings" or "marketing" at the Hoopes Property.

54.     In 2020, Hoopes inquired about applying to increase production at the property and was advised by the County that it could not apply for any permits or alterations to the land use entitlements because the County had determined Hoopes was in violation of its small winery use permit exemption.

55.     Hoopes did not get notice of that determination and was denied a hearing or appeal.

56.     On March 11, 2021, Hoopes obtained an outdoor tastings permit/picnic license for the property from the ABC. In so doing, Hoopes designated the outside tasting "areas" for the property with the ABC. The application and diagram were transmitted to Napa County. The same notice procedure took place as with the Type 02 license. This application was derivative of the Type 02 license but delayed due to COVID.

57.     Napa County did not object to the application (colloquially known as an AB 2004/picnic permit/ABC 257).

58.     As part of the application, the County was notified and a thirty-day public notice period commenced without County or public objection.

59.     After inspection, the ABC confirmed the property was zoned for the use by Napa County and licensed for the use by the ABC.

60.     Napa County was notified of the application and given the opportunity to object or request conditions, but did not object or request conditions.

61.     As part of the application, the ABC determined that the expansion of Hoopes' "existing tasting room" and "picnic area" "will not interfere with nearby residents, churches, schools, hospitals, public playgrounds, is not in conflict with local zoning ordinances, and will not create or aggravate a law enforcement problem." (**Exhibit 8**: March 9, 2021, ABC Correspondence.)

62.     Similarly, on September 25, 2023, the ABC approved an additional tasting room expansion and again concluded that the expansion "will not interfere with nearby residents, churches, schools, hospitals, public playgrounds, is not in conflict with local zoning ordinances,

1    and will not create or aggravate a law enforcement problem." (**Exhibit 9**: September 25, 2023,

2    ABC Correspondence.)

3         63.     On April 20, 2021, the County issued a Second Notice of Apparent violation.

4         64.     On May 21, 2021, Hoopes requested clarification from Napa County on how the

5    02 permit, approved for issuance by Napa County, and issued by the ABC in 2019, allowing for

6    tasting, designating tasting areas, and consumption for all retail purposes, could be reconciled

7    with the Notice of Apparent violation.

8         65.     On October 20, 2022, Napa County filed a lawsuit against Hoopes, and its related

9    entities, alleging that Hoopes' operations were a public nuisance and that Hoopes had engaged in

10   unlawful business practices (the "*Napa County v. Hoopes* Lawsuit").

11        66.     No citations, citizen complaints, or nuisances had ever been reported, issued, or

12   sustained as to Hoopes or its predecessor.

13        67.     It was not until the trial in the *Napa County v. Hoopes* Lawsuit that Napa County

14   officials admitted that they cannot issue winery licenses or regulate the production or retail sale of

15   wine. (**Exhibit 10**: Gallina Trial Transcript, pgs. 501-504.)

16        68.     Previously, in June 2023, Napa County code enforcement confirmed that Hoopes

17   is entitled to unlimited "retail sale" from the premises to consumers. (**Exhibit 11**: Kelli Cahill

18   Dep. at 19.)

19        69.     Napa County does not, and has never, contested that unlimited "retail operations"

20   are allowed at all Plaintiff Wineries.

21        70.     As of the date of this Complaint, the *Napa County v. Hoopes* Lawsuit is still

22   pending.

23        71.     At the County's request, the claims in Hoopes' Cross-Complaint in the *Napa*

24   *County v. Hoopes* Lawsuit were stayed.

25        72.     Those claims remain stayed and no action has been taken on them at the state court

26   level.

27

28

73.     Throughout the *Napa County v. Hoopes* Lawsuit, the County regularly changed its interpretation of its ordinance as to the allowed accessory uses at small wineries/small winery exemptions.

74.     The winery at the Hoopes Property is older than other wineries in the neighborhood. After it began operating in 1984, other wineries opened nearby. The Hoopes Property is now located 400 feet from Bell Wine Cellars and 750 feet from Mira Winery.

75.     Both Bell Wine Cellars and Mira Winery are much larger wineries and Napa County allows these two wineries more expansive operating permissions than it does Hoopes.

76.     Hoopes routinely receives requests from customers, both formally and informally, for tastings, wine by the glass, retail sales, tours, marketing events and other common services provided by wineries.

77.     Hoopes has abated activities Hoopes believes are allowed at the property to avoid enforcement, at great operational expense, but without success in finding compromise with Napa County.

78.     Hoopes has to decline these requests which has cost Hoopes millions of dollars in profits.

79.     The Napa County ordinance, policies and ordinance interpretations have also prevented Hoopes from advertising and marketing its winery which has additionally caused Hoopes to suffer millions of dollars in damages from lost sales.

**Summit Lake**:

80.     On March 1, 1984, the predecessors in interest to Summit Lake obtained a Small Winery Use Permit Exemption from Napa County and began operating a winery. (**Exhibit 12**.)

81.     The Summit Lake Property is located in the Napa County Agricultural Watershed District.

82.     Historically, Napa County allowed Summit Lake to have guests at its property to consume wine, picnic, and sample wine, and allowed Summit Lake to sell wine at its property.

83.     These entitlements are contained within a 2012 version of the Napa County Winery Database which states Summit Lake is allowed Tastings by Appointment and without any limitation on the number of visitors per day/week/year.  (**Exhibit 4**: 2012 Database.)

84.     The 2015 version of the Winery Database contains these same permissions for Summit Lake. (**Exhibit 5**: 2015 Database.)

85.     According to later versions of the Winery Database, at some point in time Napa County, without notice to Summit Lake, took away these entitlements as these later databases state Summit Lake is not allowed to do Tastings by Appointment, is not allowed any visitors whatsoever, and is not allowed any marketing events or marketing event visitors.  (*See* **Exhibit 6**: 2016 Winery Database; **Exhibit 13**: 2019 Winery Database.)

86.     Summit Lake only became aware of the various versions of the Winery Database when those documents were obtained by Hoopes during the *Napa County v. Hoopes* Lawsuit.

87.     Summit Lake only became aware of potential new interpretations of the allowed uses of its property by Napa County when Summit Lake sought other property improvements in recent years.

88.     In 2018, Summit Lake considered increasing wine production at its property and knew that a production increase at the property would potentially require a use permit modification of some kind.

89.     In February 2019, Summit Lake received a form letter from the County advising that winery owners could voluntarily submit to an audit from the County to memorialize and/or clarify allowed uses.

90.     Summit Lake voluntarily submitted to the audit and sought a use permit modification for its planned wine production increase.

91.     In response, Napa County stated that Summit Lake Winery was not entitled to any "visitation" under the small winery exemption, despite nearly forty years of hosting the same, and claimed Summit Lake was in violation of its small winery use permit exemption.

92.     According to Napa County, in order to continue operating as it always had, allowing consumers to taste and consumer wine on site, Summit Lake would have to enter the

Miller, Canfield,
Paddock and Stone,
P.L.C.
Attorneys at Law

1  "use permit compliance program," submit to property inspections, and apply for a new use

2  permit.

3      93.    The County took the position that small winery exemptions are not allowed to

4  "modify" existing entitlements and must re-entitle as a winery to continue to engage in accessory

5  winery uses; that is, give up all winery rights to "add" visitation.

6      94.    The prohibition on "modification" of pre-Winery Definition Ordinance ("WDO")

7  small winery exemptions is not codified, is inconsistent with prior treatment of small winery

8  exemptions, and was a "policy" unknown to Summit Lake prior to its voluntary application to

9  Napa County.

10     95.    In October 2019, Napa County advised Summit Lake that in order to increase

11  production, Summit Lake would need to repave a substantial portion of the road leading to its

12  winery at a cost of over $1 million.

13     96.    This road serves numerous other properties and businesses, some of which have

14  completed more substantial winery upgrades but did not trigger similar improvement

15  requirements.

16     97.    The proportional impact of Summit Lakes' increased use of the road is negligible;

17  indeed, it is not related to the requested "upgrade" in wine production at all.

18     98.    Napa County concedes that there is no limit to the number of customers Summit

19  Lake can have each day to purchase wine to go.

20     99.    Summit Lake intended to increase production and visitation but is unable to afford

21  this road upgrade or justify the expense relative to the requested wine production upgrade.

22     100.   Further, re-entitling as a new winery – as opposed to modification of existing

23  entitlements – would force Summit Lake to abandon valuable pre-WDO land use entitlements

24  associated with its small winery use permit exemption, including unlimited retail sales, and would

25  require Summit Lake to submit to the 75% Napa County grape requirement.

26     101.   Summit Lake communicated it would abandon any requested increased

27  production; however, Napa County indicated that because visitation was "not allowed" and was

28  "in violation" of the existing entitlements, Summit Lake would still be required to upgrade the

MILLER, CANFIELD,
PADDOCK AND STONE,
P.L.C.
ATTORNEYS AT LAW

road and apply for "new use permit" despite its existing entitlements as a legally conforming winery.

102.    On June 3, 2021, Summit Lake requested a reconsideration because it did not believe hosting customers was a new "use," and that even if it were, there was no nexus between the cost and intensity of the upgrade. There was similarly no "intensification" as customers had been coming to the property for four decades.

103.    Summit Lake advised the County that the cost was prohibitive and also that the reduced or eliminated "visitation" threatened viability of the business that had been in operation and reliant thereon for nearly forty years.

104.    On June 4, 2021, the County responded that its position would not change.

105.    On January 11, 2022, Napa County threatened Summit Lake that if it did not agree to the road improvement then its permit modification application would be closed and going forward Summit Lake would not be allowed any visitors to its winery.

106.    Summit Lake is unable to afford the substantial road improvement cost without risking the viability of its winery.

107.    Summit Lake cannot viably operate without customers at the winery.

108.    Historically, Summit Lake operated by receiving customers at its winery with the only known limitation being that those customers needed to make an appointment.  (**Exhibit 14**: Griffin Declaration at 4.)

109.    Summit Lake became aware of changes in Napa County's positions related to small wineries and small winery exemptions in 2023 as part of the *Napa County v. Hoopes* Lawsuit when its owner read an article published in the San Francisco Chronicle.  (*Id*. at 8.)

110.    Summit Lake sought intervention in the *Napa County v. Hoopes* Lawsuit case to defend against Napa County's changed positions.

111.    Napa County opposed intervention by Summit Lake.  In doing so, it took the position that Summit Lake's situation was "not in the least equivalent or even similar to the Hoopes situation."  (**Exhibit 15**: Opposition to Motion to Intervene at 2.)

112. The County continued, "[i]f Summit Lake has unique concerns, then those concerns would be specific to its property or its treatment by the County thus negating its other arguments of having sufficient interest in this litigation to intervene." (*Id*. at 4.)

113. Napa County also stated, "there are significant differences in the cases including the different zoning districts, the type of, and intensity of the, uses made by the respective properties over several decades." (*Id*. at 6.)

114. The County concluded that intervention "should be denied and Summit Lake can file its own action against the County if it wishes." (*Id*. at 7.)

115. On November 20, 2023, the state court held a hearing on the motion to intervene where Napa County's counsel argued: "there's no res judicata or collateral estoppel effect. This is a standalone case … it's not binding on either of the proposed intervenor's as a matter of law, because they're not parties, and they're not in privity." (**Exhibit 16**: Transcript at 6.)

116. Napa County further argued that while the court might make a judgment as to Hoopes, it would be "making a judgement that's not binding on these other cases. As a matter of law, it cannot be binding." (*Id*. at 7.)

117. The County concluded by taking the position that "[t]he court is going to make a determination that's binding on Hoopes, not on anyone else. So, it doesn't conclusively resolve anything with respect to these other wineries." (*Id*. at 22.)

118. The state court denied Summit Lake's motion to intervene and adopted Napa County's argument that "any judgment rendered in the Hoopes action will have no *direct* effect upon any person other than Hoopes." (**Exhibit 17**: State Court Order re Intervention.)

119. An appeal of the decision to deny intervention would not have stayed the underlying action; thus, Summit Lake had no choice but to file this lawsuit.

120. When Summit Lake sought to intervene, the County started to conduct email stings against the winery to intimidate joinder with the Hoopes action.

121. The County further communicated that it believed documents existed that showed Summit Lake may qualify for an exemption from the road upgrades, and it would search for the same, so Summit Lake would presumably have less motivation to join the Hoopes action.

FIRST AMENDED COMPLAINT                                    CASE NO: 3:24-CV-6256-CRB

122.    However, once intervention was denied, the paperwork from the County documenting the exemption was never produced and the County declared the exemption not to exist after all.

123.    To date, Napa County continues to assert that any visitors consuming wine at Summit Lake is a violation of the small winery use permit exemption and that Summit Lake must cease sales/tasting operations or improve the roadway.

124.    The winery located at the Summit Lake Property is older than other wineries (and residences) on the same road. After it began operating in 1984, other wineries opened, including much larger operations nearby: Outpost Wines; Robert Craig Winery; Robert Foley Vineyards; and Black Sears. These are all located less than one mile from Summit Lake. Napa County allows all four neighbors more expansive winery operations than it does Summit Lake.

125.    Summit Lake routinely receives requests from customers, both formally and informally, for tastings, wine by the glass, retail sales, tours, marketing events and other common services provided by wineries.

126.    While Summit Lake has engaged in some limited on-premises sales, it has limited the amount of on-premises sales due to fear of County enforcement which has cost Summit Lake millions of dollars in damages in lost profits.

127.    The Napa County ordinance, policies and ordinance interpretations have also prevented Summit Lake from advertising and marketing its winery which has additionally caused Summit Lake to suffer millions of dollars in damages from lost sales.

128.    In an October 31, 2023, letter, Napa County took the definitive position that it would not grant any exemption to Summit Lake and that if it wishes to re-obtain its historical entitlements, even without any increase in actual or historic use, it would need to agree to improve the road despite acknowledging Summit Lakes' position that "the cost of meeting the RSS requirements is prohibitive." (**Exhibit 18**: 10/31/23 Letter.) This would further require Summit Lake to re-entitle under a new discretionary use permit, giving up all existing pre-WDO rights.

129.    Summit Lake was not aware, until the *Napa County v. Hoopes* Lawsuit, that modifications were not allowed for small winery use permit exemptions, despite historic recognition that small winery exemptions were equivalent to use permits and authorized to modify just like any other winery land use entitlement.  When this policy changed, without a requisite amendment to the code, is unknown; the code states all entitlements with or without a use permit are treated the same and only increases to production at small winery exemptions require a new use permit application.

**Smith-Madrone**:

130.    On May 14, 1971, Smith-Madrone purchased the 200-acre Smith-Madrone Property located in the Napa County Agricultural Watershed District.

131.    On August 15, 1973, Smith-Madrone applied for a land use permit with Napa County to open a winery and the only question on the application was the reason for the use permit.

132.    On October 24, 1973, Smith-Madrone obtained a winery use permit.  (**Exhibit 19**.)

133.    One of the findings of the use permit was that the winery would not provide public tastings and that "private arrangements will be required to visit the winery."  (*Id*. at Finding #6.)

134.    A condition of approval was that "[w]ine tastings be limited to a private, invitation only, basis."  (*Id*. at Condition #7.)

135.    However, the use permit did not place any restrictions on the number of customers Smith-Madrone could see on a daily, weekly, or yearly basis.

136.    The use permit did not place restrictions on the number or type of event Smith-Madrone could host on a daily, weekly, or yearly basis.

137.    The use permit did not limit the number of event customers Smith-Madrone could host on a daily, weekly, or monthly basis.

138.    The use permit did not limit the number of employees Smith-Madrone could have.

139.    Smith-Madrone was one of the first winery use permits issued in Napa County.

140.    Smith-Madrone is older than most wineries (and residences) in the immediate area and in Napa County, generally. After it began operating, other wineries opened, including much

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C. ATTORNEYS AT LAW

1    larger operations nearby. Napa County allows nearby wineries, including Keenan, Barnett,

2    Schweiger, Stony Hill, Vineyard 7&8, Sherwin, Behrens Family, Cain, and Lokoya, more

3    expansive winery operations than it allows Smith-Madrone.

4        141.    Historically, Smith-Madrone has allowed consumers to engage in "tours and

5    tastings" by appointment and has hosted "marketing events" and has been so doing for over 50

6    years.

7        142.    Smith-Madrone has also allowed consumers to purchase wine on the premises and

8    consume wine on the premises.

9        143.    Smith-Madrone is informed that Napa County now has a policy that some wineries

10   are prohibited from private tours and tastings by appointment, are prohibited from marketing

11   wine, and are prohibited from allowing the purchase and consumption of wine on their premises.

12       144.    The 2012 version of the Napa County Winery Database, consistent with Smith-

13   Madrone's use permit, does not contain any limit on the number of visitors allowed to visit

14   Smith-Madrone. (**Exhibit 4**: 2012 Database.)

15       145.    However, thereafter, without explanation, notice, or a hearing, later versions of the

16   Winery Database state that Smith-Madrone is limited to 10 visitors per week and 520 visitors per

17   year.  (**Exhibits 6, 13**.)  Oddly, the same databases do not indicate that Smith-Madrone is allowed

18   a specific number of visitors per day, which, upon information and belief, Plaintiffs believe Napa

19   County interprets as meaning the winery is not allowed any daily visitors.

20       146.    Given the 520 visitors per year limitation, it would take Smith-Madrone 854.4

21   years to see the same number of visitors another Napa County winery is allowed to see in a single

22   year.

23       147.    The 2012 database, consistent with Smith-Madrone's use permit, did not contain a

24   limit on marketing events or marketing event visitors while later versions state that Smith-

25   Madrone is not allowed any marketing events or marketing event visitors.

26       148.    These numbers and limits are not displayed anywhere in the use permit, conditions

27   of approval, or findings for the use permit issued to Smith-Madrone.  (**Exhibit 19**.)

28

149.    Unlike other wineries in Napa County, Smith-Madrone did not receive correspondence regarding Napa County's "Use Permit Compliance Program" but was advised of the letter by other wineries.

150.    Smith-Madrone has not sought a status determination for fear that Napa County engages in a policy and practice to deem long-standing winery entitlements "beyond the scope" of an issued use permit and mandate "compliance" by application for a conditional use permit that is materially more limited than the existing entitlements, and to trade down property uses at great expense.

151.    Smith-Madrone is informed and believes that many participants in the "use permit compliance program" and/or "status determination program" are still navigating the process more than six years after they filed, with consistently changing "goalposts" for "compliance" and at debilitating expense.

152.    Smith-Madrone is informed and believes that wineries that have sought determination and/or contested Napa County's determination of winery entitlements have suffered retaliatory reductions in their uses without explanation or legal authority.

153.    Smith-Madrone routinely receives requests from customers, both formally and informally, for tastings, wine by the glass, retail sales, tours, marketing events, and other common services provided by wineries.

154.    Because of the restrictions placed upon it by Napa County, Smith-Madrone is not able to freely grant these requests which has caused it to lose profits.

155.    The Napa County ordinance, policies and ordinance interpretations have also prevented Smith-Madrone from advertising and marketing its winery which has additionally caused Smith-Madrone to suffer damages from lost sales.

156.    Historically, Smith-Madrone has operated by receiving customers at its winery which might be perceived as marketing events.  (**Exhibit 20**: Smith Declaration at 3.)

157.    Smith-Madrone became aware of changes in Napa County's positions related to small wineries and small winery exemptions as part of the Hoopes state court lawsuit when it read an article published in the San Francisco Chronicle.  (*Id*. at 10.)

MILLER, CANFIELD,
PADDOCK AND STONE,
P.L.C.
ATTORNEYS AT LAW

FIRST AMENDED COMPLAINT                    CASE NO: 3:24-CV-6256-CRB

158.    Smith-Madrone sought intervention in the Hoopes state court case to defend against the changed positions of Napa County.

159.    Napa County opposed intervention by Smith-Madrone. In doing so, it took the position that Smith-Madrone's situation was "not in the least equivalent or even similar to the Hoopes situation." (**Exhibit 21**: Opposition to Motion to Intervene at 3.)

160.    The County continued, "[i]f Smith Madrone has unique concerns, then those concerns would be specific to its property or its treatment by the County thus negating its other arguments of having sufficient interest in this litigation to intervene." (*Id*. at 5.)

161.    And, "there are significant differences in the cases including the different zoning districts, the type of, and intensity of the, uses made by the respective properties over several decades." (*Id*. at 7.)

162.    The County concluded that intervention "should be denied and Smith-Madrone can file its own action against the County if it wishes." (*Id*. at 8.)

163.    The state court adopted the arguments of Napa County and denied intervention to Smith-Madrone finding that "any judgment rendered in the Hoopes action will have no *direct* effect upon any person other than Hoopes." (**Exhibit 17**: State Court Order re Intervention.)

164.    An appeal of the decision to deny intervention would not have stayed the underlying action; thus, Smith-Madrone had no choice but to file this lawsuit.

**California State Laws and Regulations Expressly Allow More Winery Uses Than Napa County and Prohibits Municipal Regulation of Same**:

165.    California Business and Professions Code ("BPC") Section 23358(a)(2) allows wineries with a Type 02 Winegrower license to sell wine and brandy to consumers for consumption off the winegrowers' premises.

166.    BPC Section 23358(a)(3) allows wineries with a Type 02 Winegrower license to sell bottles of wine to consumers for consumption on the winegrowers' premises.

167.    BPC Section 23358(a)(3) does not restrict how such wine is served, *e.g.*, by the sample, by a flight, by the glass or by the bottle.

168. The legislative history of BPC Section 23358(a)(3) expressly confirms sale by the bottle, glass, or sample is expressly allowed.

169. The legislative history of BPC Section 23358(a)(3) further indicates the amendment to the Type 02 permissions was expressly intended to override prohibition on retail consumption at winery premises by local municipalities.

170. BPC Section 23358(a)(4) allows a winery to operate a bona fide eating place on the licensed premises and "[s]ell all beers, wines, and brandies, regardless of source, to consumers for consumption on the premises."

171. Title 4 California Code Regs. § 53 and Food & Saf. Code § 113789(c) exempts wineries from separate licensing as a "food facility."

172. BPC Section 23358(b) states that a "winegrower may also have upon the premises all beers, wines, and brandies, regardless of source, for sale or service only to guests during private events or private functions not open to the general public."

173. BPC Section 23358(c) states that at least fifty percent of the wine a winegrower sells on its licensed premises must be produced by the winegrowers from the conversion of grapes, berries, or other fruit into wine.

174. BPC Section 23358(c) does not dictate the source of the grapes, berries, or fruit a winegrower converts into wine.

175. BPC Section 23358(c) does not dictate the location of production of the wine as long as it is produced by the winegrower.

176. A winegrower may produce that wine on the premises or through a duplicate Type 02 at a different facility.

177. BPC Section 23358(e) provides that counties exercising land use regulatory authority can restrict, but not eliminate, the privileges afforded by section 23358.

178. BPC Section 23358(e) is the only section of the BPC related to wineries where the California Legislature allows a municipality to alter permissions granted by a state wine license.

179.    The alteration may be completed through a request to the California ABC to condition the license upon application or through statute, as long as the alteration does not eliminate the permission.

180.    BPC Section 23356.1 authorizes a winegrower to "conduct winetastings of wine produced or bottled by, or produced and packaged for, the licensee, either on or off the winegrower's premises."

181.    That section also states that the "department may adopt the rules as it determines to be necessary for the administration of this section." *Id*. at 23356.1(d).

182.    Unlike BPC Section 23358, BPC Section 23356.1 does not provide a city or county, such as Napa County, with authority to establish rules related to a winegrower conducting wine tastings.

183.    The State of California has issued the following rules related to wine tastings:

(a)    California law defines a "winetasting" as a "presentation of samples of one or more wines, representing one or more wineries or industry labels, to a group of consumers for the purpose of acquainting the tasters with the characteristics of the wine or wines tasted." Cal. Code Regs., Title 4, § 53.

(b)    California law allows a winegrower to "supply small amounts of bread, crackers, cheeses or nuts to clear the taste buds of the participants between successive samples of wine during a winetasting." Cal. Code Regs., Title 4, § 53.

(c)    "Winetastings may be conducted without charge or for a fee for the public on a premises licensed with a winegrower's license." Cal. Code Regs., Title 4, § 53(a)(1).

(d)    "Winegrowers…may conduct winetastings which are sponsored by a bona fide charitable, fraternal, political, religious, trade, service, or similar private organization" subject to limited conditions. Cal. Code Regs., Title 4, § 53(b).

(e)    While Section 53 contains some restrictions, the rule is clear that "[n]othing in this rule shall prevent the holder of any license which permits the sale and consumption of wine on the premises from holding a winetasting of wines legally acquired, provided the on-sale licensee shall charge for the wines presented in accordance with law."

184.    BPC Section 23386(a) states that a winegrower's license "authorizes the giving away of samples of the alcoholic beverages that are authorized to be sold by the license under the rules that may be prescribed by the department."

185.    BPC Section 23386(a) does not provide Napa County with authority to establish rules related to a winegrower giving away samples.

186.    California courts have long recognized that, "[o]bviously, the use of samples is for the purpose of encouraging the sale of the product." *Tonkin Distributing Co. v. Collins*, 50 Cal. App. 2d 790, 795, 123 P.2d 938 (1942).

187.    California rules allow winegrowers to "sponsor contests, races, tournaments, and other similar activities on or off licensed premises." Cal. Code Regs., Title 4, § 106(i)(2).

188.    No California statute or rule allows Napa County to further restrict, whether by ordinance, policy or interpretation, the provisions of Cal. Code Regs., Title 4, § 106(i)(2).

189.    California Government Code section 65852 states that all zoning regulations "shall be uniform for each class or kind of...use of land throughout each zone...."

190.    Each Plaintiff Winery qualifies as a "winegrower" under the above California statutes and rules and is actively licensed with the State ABC for same.

**The Napa County Code Related to Wineries**:

191.    In 1955, Napa County adopted a comprehensive set of zoning ordinances recognizing that "agriculture is a major industry for the County" and for "protection of agriculture."  (**Exhibit 22**: 1955 Ordinance at Sec. 1.02 (the "Napa County Code" or "NCC").)

192.    Ordinance 186 directed that interpretation of agricultural uses be "liberally interpreted insofar as they apply to agricultural pursuits and services and shall not be deemed or construed to permit interference with any normal or accessory use. … It is the intention of this section … to provide maximum protection to existing and future agricultural enterprise from restrictions ... including the necessary ... similar uses necessary and incidental thereto."

193.    "Agriculture" was authorized as a use by right. Accessory uses were defined as to any "agricultural pursuit[s] or service."

MILLER, CANFIELD,
PADDOCK AND STONE,
P.L.C.
ATTORNEYS AT LAW

FIRST AMENDED COMPLAINT                                    CASE NO: 3:24-CV-6256-CRB

194.    In 1968, the Napa County Code was amended to add an Agricultural Preserve District, where Hoopes is located, which allowed—without the need for a use permit—"wineries" to engage in the "[s]ale of agricultural products grown, raised or produced on the premises" and "[a]ccessory and incidental uses compatible with and necessary to the operation of the above uses." (**Exhibit 23**: Ordinance 274, Sec. P.02.)

195.    Wineries in the Agricultural Watershed, in contrast, such as Summit Lake and Smith-Madrone, were required to obtain a conditional use permit to establish a new winery for the first time. The requirement was prospective in nature. (Former NCC § 12332.)

196.    In 1976, the County established a conditional use permit requirement in the Agricultural Preserve similar to that of the Agricultural Watershed, indicating that all post-1976 winery developments may continue to operate in the Agricultural Preserve and Agricultural Watershed Districts as lawful uses but new wineries must obtain a use permit. (Ord. 511, Jul 27, 1976, § 12332.)

197.    The accessory uses allowed at winery remained undefined and entitled by way of primary entitlement as a winery. (Ord. 511, former NCC §§ 12331, 12405 [accessory uses].)

198.    Conditions of any use permit had to be set forth in the use permit, and after public hearing, or would not be recognized. (Ord. 511, former NCC §§ 12803, 12804, 12805.)

199.    This position is consistent with California law, which prohibits implied conditions on land use permits. *See People v. Venice Suites, LLC*, 71 Cal. App. 5th 715, 724-732 (2021).

200.    In 1980, the Napa County Code was amended to create a use permit exemption for "small wine[ries]," converting production facilities under 20,000 gallons to a use by right without the need to obtain a use permit, known as the Small Winery Use Permit Exemption or Certificate of Exemption. (**Exhibit 24**.)

201.    The 1980 Ordinance defined a "small winery" as "any existing winery or proposed new winery with a maximum annual production capacity of 20,000 gallons of wine" and that met certain criteria including that a "small winery does not conduct public tours, provide wine tastings, sell wine-related items or hold social events of a public nature."  (*Id*. at Section 12048.)

202.    According to the legislative history, the 1980 Ordinance was enacted to alleviate the burden of processing use permits for small wineries, like the previously entitled Smith-Madrone, that had no recognizable environmental impact.

203.    The enactment created a ministerial permit, indicating it was statutorily exempt from any aspect of discretionary review, and declaring "small wineries" CEQA exempt.

204.    The 1980 Ordinance did not include a definition for the terms "retail," "public tours," "wine tastings," "wine-related items," or "social events of a public nature." (*Id.*)

205.    The legislative history confirms that "'by appointment only' was considered a "private tasting" and not public. (**Exhibit 25**: 8/15/79 Meeting Minutes.)

206.    Legislative history indicates that public tastings would not be allowed at the wineries with exemptions, but private tastings would be.

207.    The legislative history also confirms that small wineries were exempt from "road requirements." (*Id.*)

208.    The terms "retail," "public tours," "wine tastings," "wine-related items," or "social events of a public nature" were not defined elsewhere in the Napa County Code at the time, or in subsequent versions.

209.    While the 1980 Ordinance included a definition for a "small winery," it did not include operative ordinances prohibiting a small winery from producing more than 20,000 gallons of wine, conducting public tours, providing wine tastings, selling wine related items or from holding social events of a public nature.

210.    On January 23, 1990, Napa County passed Ordinance 947, the Winery Definition Ordinance (the "WDO"). (**Exhibit 26**.)

211.    The WDO grandfathered in wineries established prior to its enactment, whether by use permit or exemption, and allowed those wineries to continue as legal conforming uses. (*Id.* Section 2 and Section 3.)

212.    The WDO was intended to be prospective only, did not create a retroactive use permit requirement for existing wineries, regardless of how entitled, and did not include a retroactivity clause as to any requirement.

MILLER, CANFIELD,
PADDOCK AND STONE,
P.L.C.
ATTORNEYS AT LAW

213.    The WDO did not eliminate any land use entitlements of existing wineries and recognized all prior existing wineries, whether entitled by right prior to use permit requirements in the relevant zones, or through the exemption, as legally conforming uses. (Ord. 947, Sec. 1-4.)

214.    The only "use" codified as requiring a new "use permit" in the Napa Code is an increase in production.

215.    The WDO eliminated the use permit exemptions for small wineries and eliminated different classes of wineries.

216.    The stated intent behind the WDO was to "protect agriculture and open space as the primary land use in Napa County." (*Id*. at Section 6.)

217.    The WDO expressly declared that small winery use permit exemptions and other existing small wineries entitled by use permit were critical economic contributors to the Napa Valley economy. (*Id*. at Section 2 and Section 3.)

218.    The WDO simplified and broadened the definition of winery and eliminated any distinction between "winery," "small winery exemption," and "small winery."

219.    Post-1990, the WDO treats all wineries as simply "wineries" regardless of size.

220.    The WDO defined a "Winery" to "mean an agricultural processing facility used for: (1) The fermenting and processing of grape juice into wine; or (2) The refermenting of still wine into sparkling wine." (*Id*. at Section 8.)

221.    The WDO also added definitions which were not found in previous versions of the ordinances. (*Id*. at Section 9.)

222.    The WDO did not include  definitions of the terms "retail," "public tours," "wine tastings," "wine-related items," or "social events of a public nature."

223.    In 1991, Napa County amended its General Plan definition of Agricultural Policy to state that "In the case of wineries, [agricultural] processing includes tours and tastings, retail sales of wine produced by or for the winery partially or totally from Napa County grapes, activities for the education and development of consumers and members of the wine trade with respect to wine produced by or at the winery, and limited non-commercial food service…."

MILLER, CANFIELD,
PADDOCK AND STONE,
P.L.C.
ATTORNEYS AT LAW

224.    Agriculture remains a use by right under the current Agricultural Watershed and Agricultural Preserve zoning. (NCC §§ 18.16.020(A), 18.16.030(A), 18.08.040; 18.08.040(H)(2) (marketing, sales, and accessory uses allowed at small wineries without a use permit).

225.    Accordingly, "accessory uses" were expressly allowed by code as derivative of the primary winery entitlement before 1990, and are recognized as lawful accessory winery uses today, and are also as agricultural uses by right.

226.    Agriculture is and always has been codified as a separate use by right in both the Agricultural Watershed and Agricultural Preserve districts.

227.    Like the Small Winery Use Permit Exemption, the WDO defined certain terms but it did not contain operative ordinance sections which affirmatively precluded activities.

228.    The Napa County Code was re-codified in 1994 and carried forward the revisions made by the WDO along with other revisions which have been made since 1994.

229.    The current Napa County Code defines the term "Agriculture" to include "[m]arketing, sales, and other accessory uses that are related, incidental and subordinate to the main agricultural processing use."  NCC Section 18.08.040.

230.    The current Napa Code also expressly recognizes that small winery exemptions "shall" be entitled to "marketing, sales, and accessory uses" without a use permit; *i.e.* by right.

231.    The current Napa County Code defines the term "Marketing of wine" to mean "any activity of a winery which is conducted at the winery on a prearranged basis for the education and development of customers and potential customers with respect to wine which can be sold at the winery on a retail basis pursuant to Chapters 18.16 and 18.20. Marketing of wine may include cultural and social events directly related to the education and development of customers and potential customers provided such events are clearly incidental, related and subordinate to the primary use of the winery. Marketing of wine may include food service, including food and wine pairings, where all such food service is provided without charge except to the extent of cost recovery. Business events are similar to cultural and social events, in that they will only be considered as 'marketing of wine' if they are directly related to the education and development of customers and potential customers of the winery and are part of a marketing

plan approved as part of the winery's use permit. Marketing plans in their totality must remain 'clearly incidental, related and subordinate to the primary operation of the winery as a production facility' (subsection (G)(5) of Sections 18.16.030 and subsection (I)(5) of 18.20.030). To be considered directly related to the education and development of customers or potential customers of the winery, business events must be conducted at no charge except to the extent of recovery of variable costs, and any business content unrelated to wine must be limited. Careful consideration shall be given to the intent of the event, the proportion of the business event's non-wine-related content, and the intensity of the overall marketing plan." NCC Section 18.08.370.

232.    The Napa County Code defines the terms "Tours and tastings" to mean "tours of the winery and/or tastings of wine, where such tours and tastings are limited to persons who have made unsolicited prior appointments for tours or tastings. Tours and tastings may include food and wine pairings, where all such food service is provided without charge except to the extent of cost recovery and is incidental to the tasting of wine. Food service may not involve menu options and meal service such that the winery functions as a café or restaurant." NCC Section 18.08.620.

233.    Vaguely, the Napa County Code defines the terms tour and tastings by using the terms tours and tastings.

234.    The Napa County Code defines the term "Winery" to mean "an agricultural processing facility used for: A. The fermenting and processing of grape juice into wine; or B. The refermenting of still wine into sparkling wine." NCC Section 18.08.640.

235.    There is only one recognized zoning "class" of winery post-1990 and as enacted by the WDO rezoning.

236.    A small winery exemption is the legal, functional equivalent of a small winery use permit. Both are legal conforming uses by express recognition, and accessory uses are derivative of entitlement in the primary use, not a separate "use," by express decree. (NCC § 18.104.040.)

237.    The Napa County Code does not define the terms:

(a)    "Retail"

(b)    "Public tours"

(c)    "Private tours"

1            (d)     "Private tasting"

2            (e)     "Winetastings"

3            (f)     "Wine-related items"

4            (g)     "Social events of a public nature"

5            (h)     "Consumption"

6            (i)     "Marketing events"

7            (j)     "Unsolicited"

8            (k)     "visitor."

238.    The Napa County Code makes clear that any "[u]ses allowed without a use permit or uses permitted upon grant of a use permit shall include any accessory use." NCC Section 18.104.040.

239.    Napa County does not issue permits such as a "tasting permit," "marketing permit," "food permit," or "accessory use permit."

240.    Significantly, all wineries entitled prior to the WDO (1990), like Plaintiffs, were "grandfathered" as legal conforming uses, not legal nonconforming uses, by express decree.

241.    Thus, every winery with either a use permit or exemption may also engage in accessory uses by right.

242.    In defining the term "Agriculture," the Napa County Code recognizes that, for wineries who have obtained either a use permit or an exemption, "[a]griculture shall include…[p]roduction and processing of agricultural products, including agricultural processing facilities [and m]arketing, sales, and other accessory uses that are related, incidental and subordinate to the main agricultural processing use]."  NCC Section 18.08.040.

243.    Thus, every pre-WDO winery is authorized to operate accessory uses as a matter of right as agriculture in addition to being derivative of a land use entitlement through a conditional use permit for a winery, where one exists

244.    Thus, every winery which has either a use permit or an exemption, like Plaintiffs, has the ability to engage in "Marketing, sales, and other accessory uses that are related, incidental and subordinate to the main agricultural processing use" with or without a use permit.

MILLER, CANFIELD,
PADDOCK AND STONE,
P.L.C.
ATTORNEYS AT LAW

245.     Thus, each Plaintiff winery may engage in "Marketing of Wine" as defined by NCC Section 18.08.370.

246.     As discussed above, Napa County now takes the position—articulated for the first time in the *Napa County v. Hoopes* Lawsuit—that Plaintiff Wineries, as well as other wineries, are prohibited from freely engaging in marketing of wine.

247.     For the first time, in 2024, the County took the position that 18.08.040(H)(2) requires a use permit despite the language of the ordinance.

248.     In the *Napa County v. Hoopes* Lawsuit, the County, for the first time, took the position that although picnic permissions administered by the State of California are administrative approvals, they would require an entire new winery entitlement by way of use permit for small winery exemptions.

249.     As discussed above, Plaintiff Wineries are unable to decipher what the County deems a "marketing event," which subjects Plaintiffs to uncertainty in their business operations due to the threat of costly enforcement should Plaintiffs err in their interpretation of a marketing event as opposed to Napa County's subjective interpretation of the same term.

250.     The Napa County Code also recognizes that some accessory uses at a winery include tours and tastings, as defined in NCC Section 18.08.620, and sale of wine related products.  *See* NCC Section 18.16.030 and NCC Section 18.20.030.

251.     Despite the Napa County Code allowing Plaintiff Wineries to engage in the above-described uses, Napa County now takes the position that Plaintiff Wineries are prohibited from engaging in these uses and has issued code violations to wineries in Napa County on this issue.

252.     Plaintiff Wineries are aware of recent code enforcement actions against other wineries over the past couple of years by Napa County and have responded by curtailing their activities to avoid targeted enforcement by Napa County and putting their businesses at risk.

253.     Even though the Napa County Code allows Plaintiff Wineries to engage in the above-described uses, Napa County currently declares that small winery use permit exemptions— legally conforming wineries by express decree—are prohibited from uses authorized other "small wineries" or pre-WDO and post-WDO wineries entitled by "use permit" (as opposed to "use

permit exemption") such as "tastings by appointment" and "marketing of wine" without obtaining a new winery entitlement.

254.    Despite the Napa County Code allowing Plaintiff Wineries to engage in the above-described uses, Napa County now prohibits small winery use permit exemptions from sale of wine, items, or agricultural products not "produced" on the premises, but does not place a similar prohibition on other wineries.

255.    The Napa County Code also requires that for all wineries established after the date the ordinance was codified, "at least seventy-five percent of the grapes used to make the winery's still wine, or the still wine used by the winery to make sparkling wine, shall be grown within the county of Napa." NCC Section 18.104.250(B).

256.    For wineries established prior to the codification of the ordinance, if they wish to expand, seventy-five percent of the grapes used to make still or sparkling wine as a result of the expansion must be grown in Napa County. NCC Section 18.104.250(C).

257.    Recently, Napa County has taken the position that a winery operating under a small winery exemption, like Plaintiffs Hoopes and Summit Lake, cannot modify its permit and, instead, must surrender its rights and apply for a winery use permit and subject to all restrictions therein. This would greatly limit some existing winery entitlements, including exemption from the 75% rule or unlimited "retail" consumer sales.

258.    This new, uncodified policy has dissuaded Hoopes and Summit Lake from applying for production increases which they might otherwise have applied for.

259.    In the Hoopes state court case, Napa County took the position that it was illegal for wineries like Plaintiffs to sell wine unless that wine is made from grapes grown only within Napa County and, in the case of small winery exemptions, the grapes were limited to grapes grown on property, and "produced" on property. (**Exhibit 27**: Second Amended Complaint at 45.)

260.    In 2022 Napa County created a new type of winery, a micro-winery, which provided more uses, rights, and entitlements to micro-wineries than allowed to Plaintiff wineries despite micro-wineries being much smaller in both production and infrastructure. NCC Section 18.08.377. For example, a micro-winery has the following restrictions and uses:

1        (a)     Product capacity of no more than 5,000 gallons of wine.

2        (b)     Maximum indoor space of 5,000 sq. ft.

3        (c)     Up to 20 daily trips for visitors, employees and deliveries.

4        (d)     Tours and tastings between the hours of 9:00am and 6:00 pm.

**Napa County Has Admitted That Many Ordinance Terms Are Vague and Ambiguous**:

261.    The *Napa County v. Hoopes* Lawsuit brought to light the fact that Napa County is either enforcing its ordinances in direct contravention of the plain language of the Napa County Code or is using the inherent vagueness in the Napa County Code to change historical interpretations of those ordinances in such a way as to violate the constitutional rights of Plaintiffs.

262.    These undefined, ever-changing, and uncodified interpretations became known through the *Napa County v. Hoopes* Lawsuit; they are not derivative of ordinance enactments, consistent with the General Plan, codified, nor consistent with the plain language of the Napa Code or California law.

263.    Napa County maintains multiple active definitions of the term "small winery," that are all distinct:

        (a)     A "small winery" "does not conduct public tours, provide winetastings, sell wine related items, or hold social events of a public nature." NCC Section 18.08.600(c).

        (b)     "[S]mall wineries" are those "that produce a small quantity of wine using grapes mostly grown on site and host a limited number of small marketing events each year." (**Exhibit 28**: Napa County General Plan, Policy AG/LU 16.)

        (c)     "Small wineries," for the purposes of determining whether a development or use permit modification, has no environmental impact, and is thus exempt is defined to include the following:

            (i)     Less than 5,000 square feet excluding caves;

            (ii)     Will involve either no cave excavations or excavation sufficient to create no more than 5,000 additional square feet;

            (iii)     Will produce 30,000 gallons or less per year;

- 32 -

1            (iv)    Will generate less than 40 vehicle trips per day and 5 peak hour

2 trips except on those days when marketing events are taking place;

3            (v)    Will hold no more than 10 marketing events per year, each with no

4 more than 30 attendees, except for one wine auction event with up to 100 persons in attendance.

5            (vi)    And will hold no temporary events.  (**Exhibit 29**: Class 3 CEQA

6 Exemption, Napa Local Exemption Classification, (2020).)

7     264.    In its General Plan, the County acknowledged that the following terms are vague

8 and required further definition: "small wineries," a "small quantity of wine," "small marketing

9 events," and "mostly grown on site." (**Exhibit 28**: General Plan, Action Item, AG/LU – 16.1.)

10 These definitions have not been resolved.

11     265.    Napa County's restrictive interpretation of "tours and tastings," "marketing," and

12 ad-hoc restriction of other hospitality activities, defined and/or not defined, is inconsistent with

13 the agricultural policy of the County General Plan demanding generous support of these primary

14 agricultural uses, which are also inconsistently codified as entitlements by right.

15     266.    Napa County has not endeavored to clarify this ambiguity and instead uses the

16 ambiguity to oppress wineries like Plaintiffs.

17     267.    Even Napa County acknowledges the vagueness.  For example, in responding to

18 Requests for Admissions in the *Napa County v. Hoopes* Lawsuit, Napa County objected to

19 requests using the term "tasting" because the term was "vague and ambiguous."  (**Exhibit 30**:

20 March 9, 2023 Resp. to RFA at Requests 29, 32, 44, 45.)

21     268.    Specifically, Napa County objected to a request asking it to "[a]dmit that the Napa

22 County Code only prohibits 'tastings' without prior appointment" because the "Request is vague

23 and ambiguous, particularly based upon the quoted use of the word 'tastings.'" (*Id*. at Request

24 32.)

25     269.    Napa County officials have also admitted that the "Napa County Code includes no

26 definition of the term 'tasting.'" (**Exhibit 31**: August 8, 2023 RFA Responses at 16.)

27

28

270.    Napa County admits that various different acts have been expressed through the word "tastings"; namely, private and public tastings are different "things," but neither term was or ever has been defined in the County Code.

271.    Napa County concedes that the term "retail" in the NCC is vague and ambiguous.

272.    Napa County admits that wineries have unlimited "retail operations" but ad-hoc regulates retail operation throughout Napa County, without apparent legal authority.

273.    For example, Napa County admits that only the State of California can license "retail" sales of wine and "where they can have tastings." (**Exhibit 10**: Gallina Trial Transcript at 503-504.)

274.    In the same Hoopes lawsuit, Napa County objected to a request to "[a]dmit that the Napa County Code does not define what 'retail' permissions at pre-WDO wineries means" because the request was "incomprehensible, vague and ambiguous, particularly based upon the quoted use of the word 'retail.'" (**Exhibit 30**: Request to Admit 31.)

275.    Napa County has admitted that the "small winery use permit exemption application does not define 'retail sales.'" (**Exhibit 31**: Request to Admit 19.)

276.    Napa County has conceded that the term "consumption" is vague and ambiguous. "Consumption" does not appear in the NCC, but the County takes the official position that any form of "consumption" at a small winery use permit exemption is a "tour and tasting."

277.    In the *Napa County v. Hoopes* Lawsuit, Napa County objected to a request to "[a]dmit that the picnic bill allows consumption on winery premises" because the request was "vague and ambiguous, particularly based upon the quoted use of the word 'consumption.'" (**Exhibit 30**: Request to Admit 31.)

278.    Napa County denied a request to "[a]dmit that onsite consumption is not a tour or tasting." (*Id*. at Request to Admit 66.)

279.    "Consumption" is expressly allowed at all Plaintiff Wineries though the State ABC Type O2 licenses. Consumption is not defined under California state law as equivalent to a "tasting."

280.    Napa County concedes that the term "wine related" in the NCC is vague and ambiguous.

281.    In the *Napa County v. Hoopes* Lawsuit, Napa County objected to request to "[a]dmit there is no definition of 'wine related' items in the Napa County Code" because the request was "vague and ambiguous, particularly based upon the quoted phrase 'wine-related.'" (*Id*. at Request to Admit 85.)

282.    Napa County concedes that the term "visitors" in the NCC is vague and ambiguous.

283.    In the *Napa County v. Hoopes* Lawsuit, Napa County objected to a request to request to admit using the term "visitors" because Napa County believed the request was "vague and ambiguous because the word 'visitors' is not defined." (**Exhibit 31**: Request to Admit 2.)

284.    In a May 26, 2016, email obtained during the Hoopes lawsuit, Napa County officials discussed that that term "visitors," at least as it relates to small winery use permit exemptions, "does not mean tours/tastings but rather business-related visitors (deliveries, sales people, etc.)" (**Exhibit 32**: May 26, 2016 Email.)

285.    Charlene Gallina, the Napa County Planning Supervisor, testified under oath that after "[r]eviewing the ordinance, reviewing regulation - - or, you know, reviewing the ordinances, the WDO, discussions with County counsel, interpretation, also interpretation by the manager, how we presented those documents to the Planning Commission," she interpreted the term "visitors" to mean people in the trade such as restaurant/store owners who might come to a winery to "purchase cases of wine so that they could have in their restaurant or at the liquor store or at the grocery store." (**Exhibit 33**: Gallina Deposition Testimony at 69-71.)

286.    Ms. Gallina confirmed that retail wine sales "are not limited" in any way at small winery exemptions and that an "unlimited" number of people can come on to the property and buy a bottle of wine." (**Exhibit 10**: Gallina Trial Transcript at 501.)

287.    Ms. Gallina was designated as the person who could speak on behalf of Napa County regarding the Winery Definition Ordinance, the Winery Database and code enforcement. *Id*. at 22-23.

288.    In 2010, the County enacted Ordinance 1340 allowing retail of wine-related items at all wineries and made no distinction between wineries entitled by use permit or by right.

289.    In 2015, Code Enforcement Supervisor Linda St. Claire admitted to the Board of Supervisors that there was no workable distinction between wine-related and non-wine related, or reasonable way for code enforcement to consistently enforce this provision.

290.    Napa County does not maintain records related to an "[o]fficial County working definition of 'wine related' and 'non-wine related items.'" (**Exhibit 34**: August 28, 2023, letter.)

291.    For the first time during the *Napa County v. Hoopes* Lawsuit, the County took the position that wine-related items would require a new winery use permit, but could not explain how enactment of Ordinance 1340 could require new entitlements for small winery use permit exemptions, but not other wineries.  (**Exhibit 27**: Second Amended Complaint at 4.)

292.    Napa County does not maintain records related to an "[o]fficial definition or internal working definitions and documents reflecting the same of 'visitor' and/or 'visitation' at winery operations."  (**Exhibit 34**.)

293.    Napa County does not maintain records related to "definitions or working enforcement and permitting distinctions between 'small winery exemptions' and 'full blown winery.'" (*Id*.)

294.    Napa County does not maintain a "[l]ist of wineries with permission to host picnics." (*Id*.)

295.    Napa County does not maintain a "[l]ist of all wineries with permission to sell items other than wine." (*Id*.)

296.    Napa County does not maintain a "[l]ist of all wineries with permission to sell wine-related items." (*Id*.)

297.    Napa County code does not identify standards for determining visitation levels, or set numbers or intensity provisions.

298.    Napa County has not historically interpreted the silence as to limits in pre-WDO use permits or entitlements by right as prohibiting marketing or visitation; rather, the County acknowledged these documents were completely irrelevant. (**Exhibit 35**: Opus One Permit.)

299.    In the case of Opus One, Napa County noted that its use permit did not delineate any set level of visitation or marketing events.  The County concluded that this did not mean that no visitation or marketing events were allowed it just meant that the County would need to look at past practices of Opus One and its infrastructure ("physical improvements") to determine the number of customers and events the property could support.  (*Id.*)

300.    Just like Opus One's permit, Smith-Madrone's permit does not delineate any set level of visitation or marketing events.  (**Exhibit 19**.)

301.    Despite this, Napa County has treated Smith-Madrone differently than it has treated Opus One.

302.    In determining that some County wineries may not provide wine tasting, Napa County relies upon the definition contained within NCC 18.08.600.  (**Exhibit 36**: March 9, 2023, Interrogatory Response 4.)

303.    In determining that Plaintiff Wineries are prohibited from "holding social events of a public nature," Napa County relies upon the definition contained within NCC 18.08.600.  (*Id.* at Interrogatory Response 40.)

304.    Definitional sections of ordinances are not operative law.  *See, e.g., Isaacson v. Brnovich*, 610 F. Supp 3d 1243, 1252 (D. Ariz. 2022) (definition in a statute "is not by itself operative law"); *Hamilton v. Brown*, 4 Vet. App. 528, 536 (U.S. Ct. Vet. App. 1993) ("[d]efinitions, whether statutory or regulatory, are not themselves operative provisions of law."); *Aguayo v. Jewell*, No. 13-CV-1435-BAS KSC, 2014 WL 6473111, at *16 (S.D. Cal. Nov. 18, 2014), aff'd, 827 F.3d 1213 (9th Cir. 2016); *see also Hawaii v. Off. of Hawaiian Affs.*, 556 U.S. 163, 175 (2009) ("whereas" clauses and preamble language are not operative).

305.    According to Napa County, using social media for marketing purposes is a violation of the Napa County Code.  (**Exhibit 36**: Interrogatory Response 11.)

306.    According to Napa County, if a Napa County winery "offers visitors access to the winery's interior and exterior," the winery has provided the visitor with a "public tour" which is in violation of the Napa County Code.  (*Id.* at Interrogatory Response 37.)

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C. ATTORNEYS AT LAW

307.    This interpretation is inconsistent with the County's position that an unlimited number of consumers can enter the winery property to buy wine.

308.    Napa County's changing interpretations of its ordinances and terms, interpretation of those terms in such a way as to take away vested rights of Plaintiffs, enforcement of these new definitions and restrictions upon Plaintiffs and/or similarly situated wineries to Plaintiffs, came to light only after Napa County brought the *Napa County v. Hoopes* Lawsuit in October 2022.

309.    It was during the *Napa County v. Hoopes* Lawsuit that Napa County was finally required to take definitive positions on what was allowed and not allowed by its ordinances and to admit that its terms were vague and/or admit to its changing interpretation of terms aided by ambiguity in its ordinances that it sought to exploit.

**Napa County Was Aware of Constitutional Issues With the Napa County Code and the County's Interpretations Thereof**:

310.    Napa County has been advised both that its ordinances and the way it interpreted those ordinances were unconstitutional.

311.    On October 16, 1989, in relation to the proposed Winery Definition Ordinance, Napa County's Chief Deputy Legal Counsel wrote a memorandum to the Board of Supervisors regarding legal issues with the Winery Definition Ordinance.  (**Exhibit 37**.)

312.    That memorandum outlined a number of federal and state constitutional issues as well as statutory issues:

(a)    Equal Protection: The memo discussed that a provision which would regulate retail sales based on the source of the grapes used in the wine sold would be subject to an Equal Protection claim because there was no rational relationship between the provision and "any legitimate state purpose."  (*Id*. at p. 1-2.)

(b)    Non-Uniform Zoning Ordinances:  The memorandum discussed the discrepancy between the right to engage in "public tours, public promotional activities, winery guest picnic areas, and display and sale of wine-related items" at existing wineries and newly established wineries because "state law does not permit local agencies to adopt discriminatory

1   rules for the same type of future uses (wineries) on essentially similar properties within the same

2   zoning districts." (*Id.* at 2.)

3          (c)     Commerce Clause:  The memorandum discussed the legality of the Winery

4   Definition Ordinance's requirement that a winery utilize at least 75% grapes grown in Napa

5   County.  *Id.* at p. 3-4.  On this issue, Napa's counsel determined the restriction would likely be

6   legal based on the appellation regulations and a legal opinion received from the law firm of

7   Townsend and Townsend.  (*Id.* at 4.)

8          313.    In an October 26, 2009, Memorandum (**Exhibit 38**), Napa County again

9   recognized that the Napa County Code and interpretations thereof were problematic and

10  potentially violated the Constitutional rights of wineries:

11         (a)     Napa County recognized that "events are protected under the First

12  Amendment of the US Constitution." *Id.* at 3.

13         (b)     Napa County recognized that "it has not always been clear whether

14  business meetings and similar events qualify as marketing events…. [For example,] business

15  meetings have a marketing objective (e.g. a wine tasting or education event scheduled for a group

16  of bankers as a part of a corporation retreat), have often been considered marketing events…."

17  *Id.* at 2.

18         (c)     "[P]lanning staff understands that the prohibition on cultural and social

19  events and the issues surrounding business meetings…are themselves based on interpretations of

20  code language. In the case of cultural and social events, County staff and policy makers have

21  routinely interpreted birthday parties, weddings, etc. to be cultural and social events that are

22  'unrelated to...education and development' of the persons and groups called out in the definition

23  of 'marketing.'" *Id.* at 3.

24         (d)     "In the case of business meetings, County staff and policy makers have

25  interpreted some business meetings as falling within the definition of 'marketing,' while

26  acknowledging that the practice of hosting other business meetings can be considered a

27  commercial activity outside the definition of 'marketing.' Careful consideration should be given

28  to legal issues and potentially preferable alternatives before using an administrative interpretation

MILLER, CANFIELD,
PADDOCK AND STONE,
P.L.C.
ATTORNEYS AT LAW

1    to clarify when business meetings are acceptable. While there is no phrase in the code expressly

2    describing these meetings as not falling within the definition of marketing (as there is for social

3    and cultural events), there is still the disadvantage that an administrative interpretation can be

4    reversed … whenever the composition of the Commission or the Board changes." *Id*.

5    314.    In a September 2, 2015 Board agenda letter, Napa County recognized that its

6    ordinances "as written are imprecise in that they do not provide any specific means for

7    quantifying either remoteness or production, and/or do not indicate how these criteria relate to

8    marketing and visitation proposals." (**Exhibit 39**.)

9    315.    The September 2, 2015 Board agenda letter continued: "The vague language does

10   not provide clarity for staff or the Commission in how to analyze projects for consistency with the

11   guidelines. It also creates uncertainty for both the applicant and the public in giving any

12   indication of what will be approved or denied.  Finally, the guidelines do not provide any

13   meaningful guidance to the Planning Commission in how to weigh these factors and come to a

14   decision on what level of visitation and marketing programs are in the public interest." (*Id*.)

15   316.    Based on the vagueness, it was recommended that Napa County move from a

16   subjective standard to calculate visitation to an objective standard which would be based upon

17   things like infrastructure.  (*Id*.)

18   317.    The memorandum advised that Napa County would not allow data and historical

19   operations get in their ways as "data by itself cannot create a direction for policy, because policies

20   reinforce social values in the future and shouldn't be based solely on what has happened in the

21   past." (*Id*.)

22   318.    Napa County recognized that "[n]one of the major wine-producing counties in

23   California regulate the number of visitors on a daily, weekly, monthly, or annual basis….

24   Generally, if tasting room visitation is regulated, it's limited based on the tasting room size

25   (maximum number of square feet or as a percentage of the winery development footprint), or on

26   the maximum number of visitors allowed at any one time." (*Id*.)

27   319.    The County also recognized that wineries were the only businesses it regulated in

28   this manner: "[Napa County doesn't] regulate other businesses in the same way. A major retailer

like Costco is not limited to the number of customers it can serve in a day, nor are restaurants like Brix or Mustard, nor are hotels like Meadowood or Springhill Suites. These businesses are limited by the size or their retail space, or the number of tables and chairs, or the number of hotel rooms." (*Id.*)

320.    The County recognized that its current approach was unworkable and suggested it could follow what other California Counties have done and regulate wineries based on objective factors like "parking area," "size of tasting rooms and other hospitality area (patios, lawns, cases)," and "number of tasting room visitors that may be allowed at any one time." (*Id.*)

321.    Despite being made aware that its ordinances and interpretations thereof were unconstitutional, Napa County did not remedy the deficiencies and, instead, continued to enforce the unconstitutional ordinances against Plaintiffs, as well as other wineries, and created additional interpretations of the ordinances which also violated the constitutional rights of Plaintiffs.

322.    Upon information and belief, in 2022, David Morrison admitted to staff that many ordinances of the WDO were unconstitutional and would not withstand legal challenge.

**Napa County Utilizes Ambiguity in the Ordinances to Violate the Constitutional Rights of Plaintiffs.**

323.    Napa County's interpretation of its ordinances related to wineries is ever changing and Napa County staff even to this day cannot provide consistent definition of terms and/or identify what activities are allowed and not allowed.

324.    In the *Napa County v. Hoopes* Lawsuit, Napa County took the position that small winery use permit exemption wineries and small wineries were not allowed to conduct any activities typical at a winery and could not even sell wine from their winery. (**Exhibit 40**: Complaint at 17-19.)

325.    In the *Napa County v. Hoopes* Lawsuit, Napa County took the position that the sale of wine was a "commercial use flatly prohibited." (*Id.*)

326.    This new interpretation by Napa County is directly contradicted by Ordinance Section 18.08.040 which defines the sale of agricultural products, like wine, as agriculture.

327.    That same ordinance states that small wineries and small winery use permit exemptions, like Plaintiffs, are allowed, as agriculture, "Marketing, sales, and other accessory uses that are related, incidental and subordinate to the main agricultural processing use." Ordinance Section 18.08.040(H)(1)-(2).

328.    Napa County, in the *Napa County v. Hoopes* Lawsuit, has changed its interpretation of its ordinances to take away Plaintiffs' right to "Marketing, sales, and other accessory uses that are related, incidental and subordinate to the main agricultural processing use" and now takes the position that any sale of agricultural products is a "commercial use flatly prohibited."

329.    In the *Napa County v. Hoopes* Lawsuit, Napa County took the position that serving customers "glasses of Hoopes wine to taste in an effort by Hoopes to induce those [customers] to purchase wine" is illegal.  (**Exhibit 27**: Second Amended Complaint at 40.)

330.    In the *Napa County v. Hoopes* Lawsuit, Napa County took the position that "experience fees" and "times table fees" were "euphemisms for tours and tastings" and flatly prohibited.  (**Exhibit 27**: Second Amended Complaint at 38.)

331.    In the *Napa County v. Hoopes* Lawsuit, Napa County took the position that it was illegal for wineries like Plaintiffs to distribute "marketing materials" "seeking to induce" potential customers to visit a winery "to taste and purchase wine."  (**Exhibit 27**: Second Amended Complaint at 39.)

332.    In the *Napa County v. Hoopes* Lawsuit, Napa County took the position that it was illegal for wineries like Plaintiffs to "explain[] the background" of their wines in order to induce customers to purchase wine.  (**Exhibit 27**: Second Amended Complaint at 41.)

333.    In the *Napa County v. Hoopes* Lawsuit, Napa County took the position that it was illegal for wineries like Plaintiffs to produce brandy.  (**Exhibit 27**: Second Amended Complaint at 46.)

334.    In the *Napa County v. Hoopes* Lawsuit, Napa County took the position that it was illegal for wineries like Plaintiffs to sell wine unless that wine is made from grapes grown only within Napa County and, in the case of small winery exemptions, the grapes were limited to

grapes grown on property, and "produced" on property. (**Exhibit 27**: Second Amended Complaint at 45.)

335.    During a June 30, 2023 deposition, Kelli Cahill, a Napa County Planner who was in a code enforcement role from 2017 to 2022, was asked how the term "tasting" is defined and she responded, "I'm not sure. I believe the county has a definition." (**Exhibit 11**: Cahill Dep. at 18.)

336.    Ms. Cahill was also asked to define what the term "event" meant in relation to a winery and she responded, "Marketing of wine." (*Id*. at 19.)

337.    Ms. Cahill testified Napa County code enforcement officers are not provided any training at to what is and is not allowed under a California Type 02 license as that is the "state's jurisdiction." (*Id*. at 29-30.)

338.    Ms. Cahill testified that it was Napa County's code enforcement department's position that in order for a state law, specifically California's Picnic Bill, to apply to a Napa County winery, that winery must go through a permit modification to have the state law "included as part of a use permit." (*Id*. at 39-40.)

339.    During a June 30, 2023 deposition, Napa County conceded that "there is no limitation on the number of people that can come to Hoopes Winery and buy wine." (*Id.* at 47.)

340.    During a June 30, 2023 deposition, Kelli Cahill testified she was "not sure" whether there is a distinction between a public and a private tasting. (*Id.* at 47.)

341.    During a June 30, 2023 deposition, Kelli Cahill testified she was "not sure" whether there is a distinction between a tasting by appointment and a tasting not by appointment. (*Id.* at 47.)

342.    During a June 30, 2023 deposition, Napa County conceded that some small winery use permit exemptions allow tasting but Ms. Cahill could not remember "the specific type of tastings" or why some could and some could not. (*Id.* at 50-51.)

343.    This testimony implies that the term "tastings" is not all encompassing as including any time a person consumes wine, but in fact is more limited.

344.    As of June 30, 2023, according to Napa County, a winery with a small winery use permit exemption is not allowed to go through a use permit modification.  (*Id.* at 51.)

345.    As of June 30, 2023, according to Napa County, wineries are allowed to sell "wine-related accessories," but Napa County code enforcement officers don't know what the term means.  (*Id.* at 72.)

346.    As of June 30, 2023, Napa County takes the position that Plaintiffs are not allowed to "advertis[e] for people to come to the property to taste [] or drink."  (*Id.* at 101.)

347.    As of June 30, 2023, Napa County takes the position that the only music allowed at wineries is "[n]on-amplified background music."  (*Id.* at 102.)

348.    As of June 30, 2023, Napa County concedes that whether a specific event will be approved or not comes down to "discretion."  (*Id.* at 104.)

349.    As of June 30, 2023, Napa County concedes that whether a marketing event is allowed to occur on a particular property is based on the "content" of the activity, "who participates in that activity," and "how the activity is being conducted." (**Exhibit 10**: Gallina Trial Transcript at 511.)

350.    Wine glasses and corkscrews are allowed for sale at wineries but Napa County code enforcement officer do not know whether things like t-shirts and baseball hats qualify as wine related. (**Exhibit 11**: Cahill Dep. at 137.

351.    When the *Napa County v. Hoopes* Lawsuit finally got to trial in early 2024, Napa County had adopted an even stricter position as to small wineries when it made the following statement to the media as it related to small wineries: "[small wineries] can't have hospitality. You can't have people onto the grounds, tasting wines, buying merchandise . . . ."  (**Exhibit 41**.)

352.    Plaintiffs were not aware of the interpretation and enforcement by Napa County described above until, at the earliest, when Napa County filed the *Napa County v. Hoopes* Lawsuit on October 20, 2022; however, the scope of the new policies and interpretations was not revealed until deposition and trial testimony conducted between June 2023 and February 2024.

**Disparity of Rights for Napa Wineries**:

353.    Wineries in Napa County have varied permissions from the County with respect to the services they are allowed to offer and the number of customers allowed at each winery.

354.    These permissions are ever evolving and have changed over the years based on changing interpretations of ordinances, terms, and permitting documents by Napa County such that Napa County's position as to the permissions for each Plaintiff, as well as other wineries, is different today than it was two years ago, five years ago, ten years ago, etc.

355.    Napa County prohibits some, but not all, wineries within the County from offering public tastings at their winery.

356.    Napa County prohibits some, but not all, wineries within the County from offering private tastings at their winery.

357.    Napa County prohibits some, but not all, wineries within the County from offering tastings by appointment at their winery.

358.    Napa County prohibits some, but not all, wineries within the County from selling wine for on-premises consumption at their winery.

359.    Napa County prohibits some, but not all, wineries within the County from playing music at their winery.

360.    Napa County prohibits some, but not all, wineries within the County from hosting private social events at their winery.

361.    Napa County prohibits some, but not all, wineries within the County from hosting public social events at their winery.

362.    Napa County prohibits some, but not all, wineries within the County from hosting private business events at their winery.

363.    Napa County prohibits some, but not all, wineries within the County from hosting public business events at their winery.

364.    Napa County prohibits some, but not all, wineries within the County from hosting private marketing events at their winery.

MILLER, CANFIELD,
PADDOCK AND STONE,
P.L.C.
ATTORNEYS AT LAW

FIRST AMENDED COMPLAINT                                   CASE NO: 3:24-CV-6256-CRB

365.    Napa County prohibits some, but not all, wineries within the County from hosting public marketing events at their winery.

366.    Napa County prohibits some, but not all, wineries within the County from hosting private cultural events at their winery.

367.    Napa County prohibits some, but not all, wineries within the County from hosting public cultural events at their winery.

368.    Napa County prohibits some, but not all, wineries within the County from hosting meetings at their winery.

369.    Napa County prohibits some, but not all, wineries within the County from having customers come to their winery.

370.    Napa County prohibits some, but not all, wineries from hosting weddings at their winery.

371.    Napa County prohibits some, but not all, wineries from hosting weddings receptions at their winery.

372.    Napa County prohibits some, but not all, wineries from selling wine at their winery that was produced at other licensed facilities operated by the same winegrower.

373.    Napa County prohibits some, but not all, wineries from selling retail items at their winery.

374.    Napa County prohibits some, but not all, wineries from selling anything "not produced on site" at their winery.

375.    Napa County prohibits some, but not all, wineries from selling wine-related items at their winery.

376.    Napa County prohibits some, but not all, wineries from selling non-wine related items at their winery.

377.    Napa County dictates the number of customers who may come to a winery each day, week, and year.

378.    Napa County dictates the number of employees a winery may employ.

FIRST AMENDED COMPLAINT                         CASE NO: 3:24-CV-6256-CRB

379.    Napa County determines whether an event is allowed at a winery based on the content of the event.

380.    As to the above paragraphs 355 through 379, it is unclear into which category, the haves or the have nots, Plaintiffs fall into given Napa County's ever-changing interpretation and enforcement.

381.    The Winery Database is an "active database" which has both a "public facing version" and a secret Napa County version.  (**Exhibit 11**: Cahill Dep. at 50.)

382.    While Plaintiffs are aware of the Winery Database, including the versions attached to this First Amended Complaint, Napa County maintains "a couple databases" though these other databases have not been shared with Plaintiffs.  (*Id*. at 50.)

383.    Napa County has never produced to Plaintiffs the secret version of the Winery Database nor these other "couple databases."

384.    A 2019 Napa County Winery Database (**Exhibit 13**), shows the disparity in permissions for wineries in Napa County.  At the time, there were 491 wineries in Napa County and Napa County's interpretation at that time as to the visitors each were allowed varied greatly:

   (a)    99 wineries are not allowed to have any visitors.

   (b)    46 wineries are allowed to have between 1 and 10 visitors per week.

   (c)    85 wineries are allowed to have between 11 and 50 visitors per week.

   (d)    68 wineries are allowed to have between 51 and 100 visitors per week.

   (e)    134 wineries are allowed to have between 101 and 500 visitors per week.

   (f)    24 wineries are allowed to have between 501 and 1,000 visitors per week.

   (g)    31 wineries are allowed to have between 1,001 and 8,544 visitors per week.

385.    According to the Winery Database, the average number of weekly visitors across all wineries is 281 visitors per week.

386.    Of course, as discussed above, it is unclear what the County means by the term "visitor" as the term is not defined in the Napa County Code and the County's interpretation of that term has changed over the years and has likely changed since the 2019 Winery Database was published.

MILLER, CANFIELD,
PADDOCK AND STONE,
P.L.C.
ATTORNEYS AT LAW

FIRST AMENDED COMPLAINT                                    CASE NO: 3:24-CV-6256-CRB

387.    The 2019 Napa County Database shows that Napa County's interpretation at that time as to the ability to have marketing events varied greatly:

(a)    151 wineries are not allowed any marketing events per year.

(b)    56 wineries are allowed between 1 and 5 marketing events per years.

(c)    72 wineries are allowed between 6 and 10 marketing events per year.

(d)    130 wineries are allowed between 11 and 50 marketing events per year.

(e)    53 wineries are allowed between 51 and 175 marketing events per week.

(f)    13 wineries are allowed between 176 and 400 marketing events per year.

(g)    9 wineries are allowed between 401 and 832 marketing events per year.

(h)    2 wineries are allowed between 1,130 and 1,673 marketing events per year.

(i)    1 winery is allowed 4,612 marketing events per year.

(j)    This last winery could have 12.6 marketing events per day which is more events in one day than 159 wineries are allowed to have in a year.

388.    The 2019 Napa County Winery Database shows that Napa County's interpretation at that time as to the ability to have marketing event visitors also varied greatly:

(a)    148 wineries are not allowed any marketing event visitors.

(b)    27 wineries are allowed between 1 and 100 marketing event visitors per year.

(c)    61 wineries are allowed between 101 and 250 marketing event visitors per year.

(d)    76 wineries are allowed between 251 and 500 marketing event visitors per year.

(e)    45 wineries are allowed between 501 and 1,000 marketing event visitors per year.

(f)    95 wineries are allowed between 1,001 and 5,000 marketing event visitors per year.

(g)    20 wineries are allowed between 5001 and 10,000 marketing event visitors per year.

FIRST AMENDED COMPLAINT                    CASE NO: 3:24-CV-6256-CRB

(h)    18 wineries area allowed between 10,001 and 50,000 marketing event visitors per year.

(i)    1 winery is allowed up to 95,400 marketing event visitors per year.

(j)    This last winery is allowed more marketing event visitors per year than 378 Napa wineries combined.

389.    Again, as discussed above, it is unclear what the County means by the term "marketing event visitors" as the term is not defined in the Napa County Code and the County's interpretation of that term has changed over the years and has likely changed since the 2019 Winery Database was published.

390.    "Marketing of wine" was not defined prior to 1990 and has never been defined vis-à-vis the term "event," or by "number" of "events" or "attendees" within the Napa County Code.

391.    There are no known "event" or "marketing guidelines" other than those relating to appropriate "content."

392.    As for Napa County's interpretation at that time as to total visitors allowed at wineries, the disparity is massive:

(a)    81 wineries are not allowed to have any visitors at their tasting room or marketing events.

(b)    4 wineries are allowed to have up to 100 visitors per year at their tasting room or marketing events.

(c)    64 wineries are allowed to have between 101 and 1,000 visitors per year at their tasting room or marketing events.

(d)    122 wineries are allowed to have between 1,001 and 5,000 visitors per year at their tasting room or marketing events.

(e)    83 wineries are allowed to have 5,001 and 10,000 visitors per year at their tasting room or marketing events.

(f)    61 wineries are allowed to have between 10,001 and 25,000 visitors per year at their tasting room or marketing events.

1        (g)     36 wineries are allowed to have between 25,001 and 50,000 visitors per

2  year at their tasting room or marketing events.

3        (h)     17 wineries are allowed to have between 50,001 and 100,000 visitors per

4  year at their tasting room or marketing events.

5        (i)     22 wineries are allowed to have between 100,001 and 539,688 visitors per

6  year at their tasting room or marketing events.

7        (j)     One winery is allowed more visitors in one year than 170 wineries

8  combined.

9     393.    The distinction between the number of visitors, marketing event visitors, and

10  marketing events allowed is not based upon objective criteria such as acreage, building size, or

11  parking spaces as the 2019 Napa County Winery Database shows that wineries with similar

12  building sizes, and parking spaces have drastically different allowances for visitors.

13     394.    For example, one winery with 75 parking spaces and a 96,200 sq. ft. building is

14  allowed 6,280 visitors per year while another winery with 75 parking spaces and a 56,215 sq. ft

15  building is allowed 118,700 visitors per year. These two wineries were approved approximately

16  one year apart.  Another winery has 22 parking spaces and is allowed 146,000 visitors per year.

17     395.    As discussed above, sometime between 2012 and 2016, Napa County revised its

18  Winery Database to change the permissions for county wineries without notice to those wineries

19  and in many instances removing permissions for wineries.

20     396.    On August 11, 2015, David Morrison, Director of Planning, Building, and

21  Environmental Services ("PBES"), communicated to the Board of Supervisors that PBES

22  conducted a "multi-month" audit of the winery database, but has refused to disclose the audit

23  details, trail, directive for the "audit," who had access to the database, who completed the audit,

24  what standards were used, or what changes were made to the public or to property owners. In

25  response to Public Records Act requests, the Department declared in general terms that these

26  documents were not maintained or did not exist.

27     397.    For example, between 2012 and 2016, Napa County changed the permissions for

28  the following wineries from "tastings by appointment" to no tastings allowed: Alta Vineyard

Cellar, Amizetta Vineyards, Baldacci Family Vineyards, Cain Cellars, Combs Brothers Cellars, David Busby Winery, Domaine Montreaux, El Molino, Winery, Frisinger Vineyards, Hakanson Winery, Hopper Creek Winery, Kates Vineyard, Kongsgaard Winery, La Vallette Winery, Mt. Veeder Winery, Obrien Family Vineyard, Sears Winery, Simone Winery, Stags Leap Winery (Doumani 1), Stags Leap Winery (Doumani 5), Summit Lake Vineyards, Villa Helena, Villa Ragazzi and Volker Eisele Family Estate. (**Exhibits 4-6, 13**.)

398.    Napa County has provided no explanation for the modifications, or standards for "new" interpretation of the historic entitlements, and in some cases, seemingly took and implemented recommendations from members of the public.

**Napa County Enforces Its Unconstitutional Ordinances and Policies**:

399.    On August 22, 2017, Napa County adopted a policy wherein it vested authority, in its "sole discretion," with the County Director of Planning to oversee a program to determine the "extent of existing entitlements" for existing wineries.

400.    These "status determinations" are "ministerial decisions" whereby discretion is placed within Napa County officials which then results in an appeal where "the decision may be overturned only upon a finding of an erroneous factual determination or processing error." (**Exhibit 42**: Cain Appeal.)

401.    These "ministerial decisions" included Napa County staff making decisions, not based on any objective standards, but instead based on their subjective "opinions," "interpretations," conclusions, and beliefs based on staff's review of historical documents. (*Id.*)

402.    Napa County staff is not trained on how to interpret historical documents.

403.    Napa County staff is not trained on how to interpret the Napa County Code.

404.    If a winery did not voluntarily submit to a status determination, code enforcement is based on the data input in the Winery Database and code enforcement interpretation of pre-WDO permits; a subject in which they are not trained.

405.    A code enforcement officer's interpretative status determination is not currently subject to a hearing or appeal, yet their determination is considered final with respect to the ability to seek new permits and/or how the winery may operate for the next "year."

MILLER, CANFIELD,
PADDOCK AND STONE,
P.L.C.
ATTORNEYS AT LAW

406.    Napa County has utilized these two policies to strip wineries, like Plaintiffs, of uses, rights, and entitlements without due process.

407.    Napa County has also made the process of modifying a use permit so expensive that wineries in Napa County cannot go through the process without risking the financial viability of their business.

408.    Napa County has more recently, since the *Napa County v. Hoopes* Lawsuit commenced in October 2022, communicated that small winery exemptions cannot be modified, so wineries must give up winery operations to obtain new primary use entitlements, and thereby risking all entitlements to a discretionary use permit process for all the entitlements they already possess, including new entitlements sought.

409.    This process is also incredibly time consuming with permit modifications often taking more than five years to complete.

410.    In a 2016 Board Agenda Letter, Napa County's Director of Planning conceded that Napa County is unsure of the vested rights at each winery in the County.  (**Exhibit 43**.)

411.    During the *Napa County v. Hoopes* Lawsuit, the Napa County Planning Supervisor admitted that entitlements for wineries entitled by right, prior to any use permit requirements, were never recorded or interpreted, other than as reflected in application documents. (**Exhibit 33**.)

412.    "We were terrible, I have to agree, we were terrible in notating exactly what entitlements were, and so we've had to go back to the application and look at the requests to see what they asked for because the final approval letter didn't identify what their visitation and marketing program was. They just said you get a 20,000 gallon winery and that's it, and then a building that's 5,000 or 10,000 square feet."  (*Id.* at 70-71.)

413.    Upon information and belief, in recent years Napa County staff, without authority, decided that it would now view winery application documents as dictating, for example, the number of customers wineries like Plaintiffs could have despite historically the term visitors not referring to customers.

414.    Where these limits come from, however, is arbitrary.

415.    In some reviews, the limits are imposed from "supplemental" application forms, in some cases from review of pre-WDO infrastructure, in some cases from certificates of exemption applications (which were not required to vest use permit exemptions), and in some cases based on "proof" of historic levels (although, this method of proof is denied for others, like occurred with Summit Lake and Smith-Madrone).

416.    In some cases, visitors are approved by average daily trips which indicate a concern with impact based on vehicular traffic.

417.    In some cases, visitors are based on septic systems which indicates a concern with domestic wastewater.

418.    However, neither vehicular traffic nor septic were regulated in connection with hospitality before 1990 or reviewed in connection with CEQA exempted small wineries at the time of entitlement.

419.    While Napa County now views application documents as dictating winery permissions, Napa County determined in a 1989 memo that these application documents were irrelevant and not even necessary.  (**Exhibit 44**.)

420.    Despite being unsure of the uses, rights, and entitlements for each winery in the County, Napa County has enforced varied and vague restrictions on County wineries, including Plaintiffs.

421.    County officials actively monitor the social media accounts of County wineries, including Plaintiffs, looking to find alleged violations. (See, e.g., **Exhibit 45**, Declaration of Akenya Robinson-Webb, Napa County's Code Compliance Supervisor; **Exhibit 11**: Cahill Dep.)

422.    County officials have conducted undercover operations, wherein they pretend to be regular customers, and seek to induce County wineries into offering services which the County believes are in violation of the service these wineries, including Plaintiffs, are allowed to offer.

423.    Following Smith-Madrone's and Summit Lake's efforts to intervene in the *Napa County v. Hoopes* Lawsuit, Napa County sent undercover agents to Summit Lake and Smith-Madrone in retaliation and seeking to "find" ordinance violations.

424.    Napa County's enforcement actions against Hoopes and other wineries are well-

known amongst County wineries, including Plaintiffs, and have had a chilling effect on their actions, to avoid the ire of Napa County.

425.    Plaintiffs have actively engaged with the County to find a workable solution, provided all requested documents, and expended substantial funds in furtherance of a solution and to avoid litigation.

426.    The County induced good faith reliance that the County would provide a path to resolution through the voluntary "compliance" and/or timely responses, but the County has instead used the program to demand unsupportable, unlawful, and unworkable demands to continue existing operations and/or abandonment of existing entitlements.

427.    Plaintiffs reasonably relied on these promises in continuing to make adjustments, and artificially abate lawful behavior to appease County officials, even absent legal authority requiring the same, to find a resolution.

428.    The County was not motivated to "gain compliance," but rather force unlawful upgrades for existing entitlements the County knew or should have known the Plaintiffs could not or did not need to undertake.

429.    As part of this process and the process for any new wineries, Napa County defers to the subjective interest of neighboring landowners and special interest groups to dictate the permissions allowed to wineries like Plaintiffs.

430.    In other instances, Napa County has advised applicant wineries or vineyards that they must first negotiate with third parties, including special interest groups, before Napa County will review and approve an application.

431.    In some instances, Napa County includes private yet interested third parties in enforcement efforts against wineries, including trade organizations, by sharing investigative materials and internal enforcement communications therewith.

432.    Napa County has consistently and deliberately withheld public records, historic documents and internal communications which conflict with their interpretative positions at that time.

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C. ATTORNEYS AT LAW

FIRST AMENDED COMPLAINT                                    CASE NO: 3:24-CV-6256-CRB

433.    Napa County has intimidated wineries and lawyers disagreeing with their land use interpretations by stating that the winery will not be able to afford legally disputing the county's interpretation.

434.    Napa County has advised applicants that they "should" agree to dedicate land for conservancy and easements, pay money to public projects and/or voluntarily agree to reduce the number of visitors or size of facilities to appease third-party interests and those of the County.

435.    It has been reported in the media that the Department of Justice is investigating Napa County (whether that includes staff or County Supervisors is unclear.)

436.    It has also been reported that the Department of Justice is looking into communications Napa County officials have had with road paving companies.

437.    It is yet unclear whether Napa County's recent policy decision to apply its road and street standards to small wineries when they have previously been determined by Napa County to be exempt is somehow related to the communications with road paving companies the Department of Justice is reviewing.

**FIRST CLAIM FOR RELIEF**
**FACIAL CHALLENGE TO VIOLATION OF FREEDOM OF SPEECH UNDER THE FIRST AND FOURTEENTH AMENDMENTS (42 U.S.C. § 1983)**

438.    Plaintiffs incorporate and reallege the preceding paragraphs as if fully restated herein.

439.    The First Amendment to the United States Constitution prohibits the abridgement of the freedom of speech.

440.    The protections of the First Amendment have been extended through the Fourteenth Amendment to prohibit the abridgement of the freedom of speech and freedom of expression by state and local governments.

441.    Persons violating the First and Fourteenth Amendments under color of state law are liable under 42 U.S.C. § 1983.

442.    Napa County has violated Plaintiffs' freedom of speech by restricting both expressive and commercial speech.

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C. ATTORNEYS AT LAW

443.    For a regulation of commercial speech to be constitutional, courts apply a four-part test: 1) if the speech concerns lawful activity and is not misleading; 2) the asserted governmental interest must be substantial; 3) the regulation must directly advance the governmental interest asserted; and 4) the regulation must not be more extensive than is necessary to serve that interest. *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York*, 447 U.S. 557, 566 (1980).

444.    It is lawful for Plaintiffs, holders of Type 02 Winegrower licenses issued by the State of California, to "[s]ell wine to consumers for consumption on the premises."  BPC § 23358(a)(3).

445.    It is lawful for Plaintiffs, holders of Type 02 Winegrower licenses issued by the State of California, to "have upon the premises all beers, wines, and brandies, regardless of source, for sale or service only to guests during private events or private functions not open to the general public."  BPC § 23358(b).

446.    California law prohibits a local government from eliminating the privilege afforded Plaintiffs to sell wine, beer, brandies, etc. for consumption upon Plaintiffs' licensed premises.  BPC § 23358(e).

447.    The California ABC has advised that Section 23358 "expands a winegrower's (Type 02) license privileges by allowing the sale of wine to the general public for consumption on the master (or production) premises. A winegrower will be allowed to sell wine to patrons by-the – bottle or by-the-glass for consumption in approved, licensed areas."  (**Exhibit 46**: ABC Industry Advisory.)

448.    California law defines a winetasting as "a presentation of samples of one or more wines, representing one or more wineries or industry labels, to a group of consumers for the purpose of acquainting the tasters with the characteristics of the wine or wines tasted."  Cal. Code Regs., Title 4, § 53.

449.    It is lawful for Plaintiffs, holders of Type 02 Winegrower licenses issued by the State of California, "to conduct winetastings of wine produced or bottled by, or produced and packaged for, the licensee, either on or off the winegrower's premises."  BPC § 23356.1.

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
ATTORNEYS AT LAW

FIRST AMENDED COMPLAINT                                    CASE NO: 3:24-CV-6256-CRB

450.    It is lawful for Plaintiffs, holders of Type 02 Winegrowers licenses issued by the State of California, to give away samples of wine they produce to consumers on their licensed premises.  BPC § 23386.

451.    It is lawful for Plaintiffs, holders of Type 02 Winegrowers licenses issued by the State of California, to instruct consumers which "may include, without limitation, the history, nature, values, and characteristics of the product, and the methods of presenting and serving the product."  *Id*.

452.    It is lawful for Plaintiffs, holders of Type 02 Winegrowers licenses issued by the State of California, to instruct consumers which "may include the furnishing of not more than three tastings to any individual in one day." *Id*.

453.    It is lawful for Plaintiffs, holders of Type 02 Winegrowers licenses issued by the State of California, to "[i]n addition to furnishing wines as provided herein, licensees may supply small amounts of bread, crackers, cheeses or nuts to clear the taste buds of the participants between successive samples of wine during a winetasting."  Cal. Code Regs., Title 4, § 53.

454.    It is lawful for Plaintiffs, holders of Type 02 Winegrowers licenses issued by the State of California, to conduct winetastings "without charge or for a fee for the public" on their licensed premises. Cal. Code Regs., Title 4, § 53(1)(a).

455.    Napa Code expressly authorizes "accessory uses," "marketing," and "sales" upon entitlement as a winery; but Napa County does not honor this express legal recognition as to Plaintiffs.

456.    Napa County officials have stated small winery exemptions might be able to have private tastings, but have not disclosed who, what, when where or why, and has interpreted that Plaintiffs do not fall within this population despite entitlement through the same legal mechanism.

457.    Napa County acknowledges retail permissions, but ad-hoc regulates what "retail" means, and effectively eliminates the acknowledged right to retail sales by regulating to prohibit "any access" by the public and/or necessary "acts" consistent with retail sales.

458.    Plaintiffs wish to invite guests to their businesses and/or maintain their businesses as generally open to the public for the express purpose of advertising and promoting the products

Plaintiffs have for sale with the intent of completing a sale of their products to consumers who visit their businesses.

459.    Plaintiffs are afraid to exercise entitlements and rights they believe are already entitled to the property, and authorized pursuant to state licenses, for fear of retribution and unauthorized law enforcement by Napa County. This has chilled exercise of lawful entitlements and rights.

460.    Plaintiffs wish to invite guests to their businesses and/or maintain their businesses as generally open to the public for the express purpose engaging in product demonstrations to allow customers to taste Plaintiffs' products with the primary intent that these customers will purchase Plaintiffs' products at that time and/or sign up for Plaintiffs' wine clubs so that Plaintiffs may sell additional products to these customers throughout the year.

461.    Activities which seek to "have prospects enter their stores and purchase Plaintiffs' products . . . [are] commercial speech." *FF Cosmetics FL Inc. v. City of Miami Beach, Florida*, 129 F. Supp. 3d 1316, 1321 (S.D. Fla. 2015).

462.    Product demonstrations are commercial speech because they are "essentially an advertisement" of products and the motivation for engaging in the speech is purely economic. *Am. Future Sys., Inc. v. Pennsylvania State Univ.*, 752 F.2d 854, 857 (3d Cir. 1984); *Bd. of Trustees of State University of New York v. Fox*, 492 U.S. 469 (1989).

463.    Napa County's ordinances and policies violate Plaintiffs' First Amendment free speech rights by prohibiting and/or restricting political, cultural, charitable, and other forms of events and gatherings.

464.    Napa County concedes that activities which bring potential customers to a winery are for the purpose of "marketing of wine."

465.    Napa County's ordinances and policies violate Plaintiffs' First Amendment free speech rights by, among other restrictions, prohibiting and/or restricting Plaintiffs' ability to engage in commercial speech which is no more than speech proposing a commercial transaction.

466.    Despite ongoing litigation in the *Napa County v. Hoopes* Lawsuit, an attorney for Napa County went "undercover" on April 19, 2023 and visited Plaintiff Hoopes, by appointment, seeking to find ordinance violations.

467.    What Napa County's attorney found was commercial speech.

468.    When the undercover attorney was served a chardonnay at Hoopes, a server for Hoopes "described this chardonnay, including what grapes were used and where the grapes were grown and a little about the history of this wine and its high rating. She also answered questions while holding the bottle in front of us and then left to allow us to enjoy the wine." (**Exhibit 47**: Kreisberg Letter.)

469.    "This process was repeated for each of the wines." (*Id.*) "For each, she poured a small amount of wine in our glass, described the wine and its grape composition and characteristics while holding the bottle for us to see, and answering any questions we might have. For many of the wines, she indicated where the grapes were grown, including grapes grown by the Hoopes Vineyard in the Atlas Peak are among their grape growing properties. For the Syrah's, Livia provided two different size glasses so we could compare them side by side without confusing which glass was which. These were marked for easy identification as well." (*Id.*)

470.    This activity—commercial speech—was successful as the attorney purchased several bottles of wine at the end of his trip.

471.    Napa County further requires that permit applicants "shall submit to the county a fully executed indemnification agreement agreeing to defend, indemnify, release and hold harmless the county from any claim, action, or proceeding brought against the county to attack, set aside, void or annul the approval based on the county's failure to comply with the requirements of any federal, state, or local law, including but not limited to general plan and zoning requirements, or both. The indemnification shall include damages awarded against the county, if any, costs of suit, attorneys' fees and other expenses incurred in connection with such action." NCC Section 1.30.030(A).

472.    But under 42 U.S.C. § 1988, even if Napa County were determined to be the prevailing party in a lawsuit under 42 U.S.C. § 1983, Napa County is only entitled to recover its

- 59 -

costs and attorneys' fees if the litigation was "unreasonable, frivolous, meritless, or vexatious." By attempting to make the payment of attorneys' fees and costs mandatory, Napa County violates Plaintiffs' First Amendment right to petition the courts by attempting to chill meritorious litigation under the threat of costs and attorneys' fees. *See S. Bay Rod & Gun Club, Inc. v. Bonta*, 646 F. Supp. 3d 1232, 1241–44 (S.D. Cal. 2022).

473.    Plaintiff Wineries are in, or have threatened, litigation with Napa County for which they have experienced retaliation from Napa County.

474.    Napa County attempted to intimidate both by engaging in undercover stings after litigation began.

475.    As to Hoopes and Summit Lake, the County initiated code enforcement actions on other residential properties to intimidate the parties and apply pressure to settle.

476.    Napa County refused to address legal disputes with Hoopes via the codified administrative procedure and forced Summit Lake and Smith-Madrone to file costly actions believing this would be cost prohibitive and/or dissuade same from vindicating their rights.

477.    Napa County misled Summit Lake into believing they would find a resolution never-before disclosed prior to intervention and revoked any intention after intervention was denied by the state court.

478.    The requirement to indemnify Napa County chills Plaintiffs' First Amendment Right to petition the courts.

479.    These First Amendment violations have caused Plaintiffs damages.

480.    These violations of Plaintiffs' rights are ongoing and continuing to date.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court:

(a)    Enter a judgment declaring that, on their face and as applied, the ordinances, policies and/or ever-changing ordinance interpretations violate the United States Constitution;

(b)    Enjoin Napa County, its employees, officers, and agents, from enforcing the ordinances, policies and/or ever-changing ordinance interpretations permanently and preliminarily while this litigation is pending;

MILLER, CANFIELD,
PADDOCK AND STONE,
P.L.C.
ATTORNEYS AT LAW

(c)    Award Plaintiffs actual, compensatory, punitive, nominal, and special damages in an amount to be proven at trial, plus prejudgment interest on those amounts;

(d)    Award Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action pursuant to 42 U.S.C. § 1988; and

(e)    Grant such other and further relief as this Court deems just and proper.

**SECOND CLAIM FOR RELIEF**
**AS-APPLIED CHALLENGE TO VIOLATION OF PLAINTIFFS' FREEDOM OF SPEECH UNDER THE FIRST AND FOURTEENTH AMENDMENTS (42 U.S.C. § 1983)**

481.    Plaintiffs incorporate and reallege the preceding paragraphs as if fully restated herein.

482.    The First Amendment to the United States Constitution prohibits the abridgement of the freedom of speech.

483.    The protections of the First Amendment have been extended through the Fourteenth Amendment to prohibit the abridgement of the freedom of speech and freedom of expression by state and local governments.

484.    Persons violating the First and Fourteenth Amendments under color of state law are liable under 42 U.S.C. § 1983.

485.    Plaintiffs wish to invite guests to their businesses and/or maintain their businesses as generally open to the public for the express purpose of advertising and promoting the products Plaintiffs have for same with the intent of completing a sale of their products to consumers who visit their businesses.

486.    Plaintiffs wish to invite guests to their businesses and/or maintain their businesses as generally open to the public for the express purpose engaging in product demonstrations to allow customers to taste Plaintiffs' products with the intent that these customers will purchase Plaintiffs' products at that time and/or sign up for Plaintiffs' wine clubs such the Plaintiffs may sell additional products to these customers throughout the year.

487.    Napa County's ordinances, policies and ever-changing ordinance interpretations, as applied to each Plaintiff, violate Plaintiffs' First Amendment free speech rights by, among

1    other restrictions, prohibiting and/or restricting Plaintiffs' ability to engage in commercial speech

2    which is no more than speech proposing a commercial transaction.

3        488.    Napa County's ordinances, policies and ever-changing ordinance interpretations,

4    as applied to each Plaintiff, violate Plaintiffs' First Amendment free speech rights by prohibiting

5    and/or restricting political, cultural, charitable, and other forms of events and gatherings.

6        489.    Plaintiff Wineries are in, or have threatened, litigation with Napa County for

7    which they have experienced retaliation from Napa County.

8        490.    This has violated Plaintiffs' First Amendment Right to petition the courts.

9        491.    Napa County's violations of Plaintiffs' constitutional rights are ongoing and

10    continue to date.

11        492.    These First Amendment violations have caused Plaintiffs damages.

12        WHEREFORE, Plaintiffs respectfully request that this Honorable Court:

13        (a)    Enter a judgment declaring that, on their face and as applied, the

14    ordinances, policies and/or ever-changing ordinance interpretations violate the United States

15    Constitution;

16        (b)    Enjoin Napa County, its employees, officers, and agents, from enforcing

17    the ordinances, policies and/or ever-changing ordinance interpretations permanently and

18    preliminarily while this litigation is pending;

19        (c)    Award Plaintiffs actual, compensatory, punitive, nominal, and special

20    damages in an amount to be proven at trial, plus prejudgment interest on those amounts;

21        (d)    Award Plaintiffs their reasonable costs, including attorneys' fees, incurred

22    in bringing this action pursuant to 42 U.S.C. § 1988; and

23        (e)    Grant such other and further relief as this Court deems just and proper.

**THIRD CLAIM FOR RELIEF**
**PRIOR RESTRAINT OF SPEECH**
**(42 U.S.C. § 1983)**

26        493.    Plaintiffs incorporate and reallege the preceding paragraphs as if fully restated

27    herein.

28

494.    "The term prior restraint is used 'to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur.'"  *Alexander v. United States*, 509 U.S. 544, 550 (1993) (citation omitted).  There is a "heavy presumption" against the constitutional validity of prior restraints. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). If a licensing statute places "unbridled discretion in the hands of a government official or agency, [it] constitutes a prior restraint and may result in censorship." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988).

495.    The relevant Napa County ordinances, policies and ordinance interpretations unconstitutionally require Plaintiffs to obtain governmental approval before speaking.

496.    Approval is at the unbridled discretion of Napa County and is not a matter of routine.

497.    For example, to have a cultural, business, or social event at a winery, Plaintiffs are required to obtain approval from Napa County regarding the purpose and intent of the event, by way of submission of a "marketing plan," before "marketing events" can take place.

498.    To engage in these popular consumer activities at wineries, Plaintiffs have been advised they must apply for a temporary "event" permit to be approved ex ante by the County based on content.

499.    However, some ordinance interpretations in active use by the County prohibit any temporary "events" at small wineries even upon application.

500.    Plaintiffs intend on holding cultural, business, or social event at their wineries but the requirement to obtain prior approval from Napa County has infringed on their constitutional rights.

501.    The requirement to get governmental pre-approval is an unlawful prior restraint and has caused Plaintiffs damages.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court:

(a)    Enter a judgment declaring that, on their face and as applied, the ordinances, policies and/or ever-changing ordinance interpretations violate the United States Constitution;

(b)     Enjoin Napa County, its employees, officers, and agents, from enforcing the ordinances, policies and/or ever-changing ordinance interpretations permanently and preliminarily while this litigation is pending;

(c)     Award Plaintiffs actual, compensatory, punitive, nominal, and special damages in an amount to be proven at trial, plus prejudgment interest on those amounts;

(d)     Award Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action pursuant to 42 U.S.C. § 1988; and

(e)     Grant such other and further relief as this Court deems just and proper.

### FOURTH CLAIM FOR RELIEF
### CONTENT-BASED SPEECH RESTRICTIONS
### (42 U.S.C. § 1983)

502.    Plaintiffs incorporate and reallege the preceding paragraphs as if fully restated herein.

503.    It is a fundamental precept of the First Amendment that the government cannot favor one private speaker over another. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995).

504.    Accordingly, content-based restrictions are "presumptively invalid." *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009).

505.    An especially "egregious" form of content-based discrimination is that which excludes a viewpoint from the marketplace of ideas. *Rosenberger*, 515 U.S. at 829.

506.    "One reliable way to tell if a law restricting speech is content based is to ask whether enforcement authorities must 'examine the content of the message that is conveyed' to know whether the law has been violated." *Otto v. City of Boca Raton, Florida*, 981 F.3d 854, 862 (11th Cir. 2020) (quoting *McCullen v. Coakley*, 573 U.S. 464, 479 (2014)).

507.    The Napa County Code recognizes that "Marketing of Wine" includes activities and events intended to educate consumers about wine that is offered.  NCC Section 18.08.370.

508.    The Napa County Code allows business events for the marketing of wine but in determining whether to approve a business event at a winery, the ordinances state that "[c]areful

MILLER, CANFIELD,
PADDOCK AND STONE,
P.L.C.
ATTORNEYS AT LAW

1   consideration shall be given to the intent of the event, the proportion of the business event's non-

2   wine-related content, and the intensity of the overall marketing plan." *Id.*

3       509.    Napa County has interpreted the Napa County Code in such a way as to include a

4   content restriction.

5       510.    Napa County has issued interpretative guidance as how it determines what is an

6   allowed social, cultural, and business event. (**Exhibit 48**.)

7       511.    That interpretive guidance explicitly states that this determination is made based

8   on the content of the advertising and message at the event: "Since the adoption of the Winery

9   Definition Ordinance in 1990, Napa County Code has allowed activities for the education and

10  development of customers and potential customers at wineries under the definition of 'marketing

11  of wine.' Cultural and social events that are unrelated to education and development are explicitly

12  not permitted, while cultural and social events that are directly related to education and

13  development have always been allowed. Business events are similar to cultural and social events,

14  in that they are only permitted as part of 'marketing of wine' if they are directly related to the

15  education and development of customers and potential customers of the winery and are part of an

16  approved marketing plan that in its totality is 'clearly incidental, related and subordinate to the

17  primary operation of the winery as a production facility'"  NCC Section 18.16.030(G)(5) and

18  NCC Section 18.20.030 (I)(5).

19      512.    Napa County's Planning Supervisor testified in the *Napa County v. Hoopes*

20  Lawsuit that Napa County uses the interpretive guidance to determine whether an event at a

21  winery is allowed.  (**Exhibit 10**: Gallina Trial Transcript at 511.)

22      513.    The guidance then gives "some examples of marketing events, including cultural

23  and social events that the County considers directly related to education and development of

24  consumers. These events fall within the definition of 'marketing of wine.' In each case, the

25  example describes the intent of the event, the wine-related content, and the non-wine related

26  content."  (**Exhibit 48**.)

27      514.    The guidance also gives "some examples of business events that the County

28  considers directly related to education and development of consumers, and therefore fall within

FIRST AMENDED COMPLAINT                              CASE NO: 3:24-CV-6256-CRB

1   the definition of 'marketing of wine.' In each case, the example describes the intent of the event,

2   the wine-related content. and the non-wine related content."

3   515.    Napa County is clear that whether an event is allowed to occur at a winery is

4   entirely dependent on the "intent of the event" as well as the wine and non-wine "content."

5   (a)    For example, Charlene Gallina admitted that the County determines

6   whether "marketing" is allowed based on content of the "event" – a term not used in the

7   definition of marketing – who attends, and what takes place.

8   (b)    For example, as to Hoopes, the County indicated that Hoopes could not

9   advertise wine by association with animals, although both are uses allowed in the AP, because

10  Kelli Cahill did not think farm animals were "wine related."

11  (c)    Kelli Cahill unilaterally determined that land use entitlements prohibit a

12  winery from advertising activities conducted off site, and at other properties, severely chilling

13  social media advertising of winery operations and events, generally and globally, with no

14  connection to the subject property.

15  516.    Thus, Napa County determines whether an event is allowed based on the content

16  of the marketing at the event which violates the Plaintiffs' First Amendment rights.

17  517.    Napa County takes the position that small wineries are prohibited from any and all

18  "marketing events" *and* "temporary events," including "events" [seemingly, any gathering of any

19  size] with political, philanthropic, commercial, and/or religious object.

20  518.    Plaintiffs intend on hosting events at their wineries but the content-based

21  restriction on those events placed by Napa County has infringed on Plaintiffs' constitutional

22  rights.

23  519.    Napa County's content-based speech restrictions have caused Plaintiffs to suffer

24  damages.

25  WHEREFORE, Plaintiffs respectfully request that this Honorable Court:

26  (a)    Enter a judgment declaring that, on their face and as applied, the

27  ordinances, policies and/or ever-changing ordinance interpretations violate the United States

28  Constitution;

(b)     Enjoin Napa County, its employees, officers, and agents, from enforcing the ordinances, policies and/or ever-changing ordinance interpretations permanently and preliminarily while this litigation is pending;

(c)     Award Plaintiffs actual, compensatory, punitive, nominal, and special damages in an amount to be proven at trial, plus prejudgment interest on those amounts;

(d)     Award Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action pursuant to 42 U.S.C. § 1988; and

(e)     Grant such other and further relief as this Court deems just and proper.

**FIFTH CLAIM FOR RELIEF**
**VIOLATION OF DUE PROCESS UNDER THE FOURTEENTH AMENDMENT**
**(42 U.S.C. § 1983)**

520.    Plaintiffs incorporate and reallege the preceding paragraphs as if fully restated herein.

521.    The Due Process Clause of the Fourteenth Amendment of the U.S. Constitution provides that no state may "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1.

522.    The Fourteenth Amendment has been construed to provide rights to both substantive and procedural due process.

523.    "Where a [business] permit has been properly obtained and in reliance thereon the permittee has incurred material expense, he acquires a vested property right to the protection of which he is entitled." *O'Hagen v. Bd. of Zoning Adjustment*, 19 Cal. App. 3d 151, 158 (1971).

524.    "When a municipal ordinance regulates a useful business enterprise, it is subject to scrutiny by the courts with a view to determining whether the ordinance is a lawful exercise of the police power, or whether it amounts to unwarranted and arbitrary interference with the constitutional rights to carry on a lawful business, to make contracts, or to use and enjoy property." *Safeway Inc. v. City and County of San Francisco*, 797 F. Supp. 2d 964, 969 (N.D. Cal. 2011) (citing *Dobbins v. Los Angeles*, 195 U.S. 223, 235–36 (1904) and *Lawton v. Steele*, 152 U.S. 133, 137 (1894)).

525.    Napa County enforces arbitrary and vague laws against Plaintiffs which interfere with their constitutional rights to carry on a lawful business.

526.    Napa County has engaged in ever-changing interpretations of the Napa County Code to restrict the rights of Plaintiffs to carry on their lawful business.

527.    Further, "[i]t is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

528.    The vagueness doctrine reflects two related requirements. First, "laws [must] give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Id*. Second, the vagueness doctrine demands that laws "provide explicit standards for those who apply them" to avoid "arbitrary and discriminatory enforcement." *Id*.

529.    As alleged above, the Napa County Code related to wineries is vague on its face and Napa County has admitted the ordinances are vague.

530.    As discussed above, Napa County has utilized this vagueness to implement various interpretations of those ordinances over the years as the County sees fit to satisfy its policy positions at those times.

531.    Definitional sections of ordinances are not operative law.

532.    As discussed above, Napa County enforces definitional ordinances as if they are operative law which violates the Plaintiffs' due process rights.

533.    As discussed above, Plaintiffs cannot identify what conduct is permitted or prohibited conduct due to lack of operative or even definitional guidance and because Napa County's interpretation of those ordinances change day-to-day, most recently in the *Napa County v. Hoopes* Lawsuit.

534.    Plaintiffs cannot identify what conduct is permitted due to inconsistent enforcement for the same conduct and as to similarly situated properties.

535.    The Napa County Code fails to provide explicit standards for those who apply them which then allows Napa County official to engage in arbitrary and discriminatory enforcement.

MILLER, CANFIELD,
PADDOCK AND STONE,
P.L.C.
ATTORNEYS AT LAW

536.    For example, some pre-WDO wineries are allowed to engage in weddings, consumer and trade education, fundraisers, cooking classes, cooking demos, and other hospitality content, like music concerts, without enforcement action.

537.    Membership in certain private trade organizations allows some wineries to engage in marketing activities prohibited at wineries not member to those trade organizations.

538.    Plaintiffs cannot make sense of what is allowed and what is not allowed at their wineries based on what is openly and notoriously allowed at similarly situated wineries, but on information and belief, enforced as prohibited at others.

539.    For example, weddings, fundraisers, and music concerts are openly allowed at various pre-WDO wineries, and not specified as permitted by any pre-WDO winery entitlement because this was not the practice at the time. Regardless, Napa County pled in the *Napa County v. Hoopes* Lawsuit that Hoopes violated local ordinances by playing music at its property, hosting fundraisers, political events, or raising money for charity.

540.    The County indicated these activities were prohibited because these activities are not wine-related.

541.    As recently as October 2022 in the *Napa County v. Hoopes* Lawsuit, Napa County has changed its interpretation of its ordinances to the detriment of Plaintiffs.

542.    The County takes the position that unlimited retail customers can come to small winery properties and buy wine, but just not drink the wine. This distinction is not readily identifiable from any ordinance.

543.    For example, Kelli Cahill determined that any consumption on a property is a "tasting" and that use of the word in social media without more is a violation of the land use entitlement.  (**Exhibit 11**: Cahill Dep.)

544.    Akenya Robinson-Webb, Napa County's highest ranking supervising code enforcement officer, indicated that use of the word "experience" was a violation of the "tours and tastings provision" even though she could not define the terms tastings or tours. (**Exhibit 49**.)

545.    Other code enforcement officers acknowledged that "private tasting" and "public tasting" are distinct but could not explain whether a winery was entitled for one, but not the other.

546.    "Marketing of wine" is sometimes regulated by number of "events," without consideration of content, sometimes with consideration of content, and sometimes regulated by number of visitors or the identity of those visitors.

547.    However, "marketing of wine" is not defined in connection with "events" or "number of visitors."

548.    Plaintiff Hoopes was advised that it could not allow customers to celebrate birthdays or other special occasions at the property, even if this customer made a standard reservation and Hoopes was unaware of the customer's purpose, because this would be in violation of "marketing of wine."

549.    Additionally, as discussed above, sometime between 2012 and 2016, Napa County revised its Winery Database and removed permissions for Plaintiffs without providing Plaintiffs of notice of the change or the opportunity to challenge the change in permissions.

550.    During this time, Napa County did not establish standards, policies, procedures, or training to guide this mid-2010's interpretation of existing property entitlements and/or ensure uniform interpretation of decades old entitlements.

551.    While Napa County has advised Plaintiffs that they could "voluntarily" seek a review of the "uses" and "rights" each are entitled to, Napa County engages in this "review" in an arbitrary and discriminatory way seeking to punish wineries like Plaintiffs.

552.    Napa County has made this review process so expensive that wineries are not financially able to complete the process.

553.    Napa County has recently communicated through the *Napa County v. Hoopes* Lawsuit that property owners—buyers and sellers—will not definitively know the scope of their entitlements unless they participate in this "program" and subject themselves to the County's interpretation of same.

554.    As to all voluntary participants in the status determination program, Napa County has rejected without exception the founding owners' interpretation of their entitlements and forced all voluntary applicants for the status determination program into the "use permit

MILLER, CANFIELD,
PADDOCK AND STONE,
P.L.C.
ATTORNEYS AT LAW

1  compliance program" after finding all in violation of other permit as ex post interpreted by the
2  County.

3      555.    The County has used the "admissions" of these violations of property entitlements
4  to force property upgrades, or demanded that wineries cease operations or face litigation.

5      556.    Winery buyers have been severely penalized for "misinterpreting" the scope of
6  entitlements despite decades of operation in the same manner.

7      557.    This has chilled business operations, diminished property values, and impacted the
8  free transfer of business assets/property, including for Plaintiffs.

9      558.    Additionally, Napa County intentionally makes the status determination (and
10  resulting use permit compliance program) process time consuming, often taking several years to
11  complete, to further deter wineries from attempting to gain additional permissions or even defend
12  existing entitlements.

13      559.    Additionally, Napa County applies its Road and Street Standards in an arbitrary
14  and capricious manner specifically designed to violate the Due Process rights of wineries in Napa
15  County, including Plaintiffs.

16      560.    The Napa County Code defines agriculture to include wineries and the sale of wine
17  products.  NCC Section 18.08.040.

18      561.    Specifically, for those wineries like Plaintiffs who have been granted a use permit
19  or a small winery exemption, agriculture includes "Production and processing of agricultural
20  products, including agricultural processing facilities" and "Marketing, sales, and other accessory
21  uses that are related, incidental and subordinate to the main agricultural processing use."  NCC
22  Section 18.08.040(H).

23      562.    Despite the express grant of "accessory uses" without a use permit, as both part of
24  a small winery exemption and a defined agricultural use, which is a use by right, Napa County
25  interprets application of this ordinance contingent on an implied "use permit" requirement.

26      563.    Yet in the Road and Street Standards, Napa County defines an agricultural road to
27  include all types of agricultural uses except a winery.  (**Exhibit 50**: Section 14(i).)

28

MILLER, CANFIELD,
PADDOCK AND STONE,
P.L.C.
ATTORNEYS AT LAW

564.    Under those standards, an agricultural road must contain a ten-foot-wide drivable surface and four feet of shoulder. (*Id.* at Section 15.)

565.    At the time "small wineries" were entitled in the 1980s they were expressly recognized as exempt from road standards applying to other winery developments.

566.    Presumably, Napa County in its Road and Street Standard implicitly redefines a winery as a non-agricultural "commercial" use in order to hold it to the higher road standard.

567.    However, this determination is not contained within the standard.

568.    Such a determination would also conflict with the definition of commercial use in the Napa County Ordinances which specifically excludes the growing, processing, and ultimate sale of agricultural products and all necessary accessory uses from the definition of a commercial use.  NCC Section 18.08.170.

569.    Thus, the Road and Street Standards do not apply to wineries.

570.    Napa County is aware that it has incorrectly applied its Road and Street Standard against wineries and agricultural roads.  Napa County officials recognized in a June 8, 2022, email that "[b]ased on our local definition [of agriculture], all wineries would be exempt from the State Minimum Fire Safe Regulations [and thus the Road and Street Standards]. This is a loophole I have been aware of and have conveyed to many of you." (**Exhibit 51**.)

571.    Despite this recognition, Napa County has applied the Road and Street Standards against numerous wineries, including Plaintiffs, and has incorrectly forced these wineries to spend tens of millions of dollars.

572.    In 2023, Napa County advised Summit Lake that the Road and Street Standards did not apply to Summit Lake only to thereafter change course and take the position that the Road and Street Standards did apply to Summit Lake.  (**Exhibit 18**.)

573.    Napa County also applies its Road and Street Standards related to installation of left turn lanes in an arbitrary and capricious manner.  (**Exhibit 50**: Road and Street Standards Section 17.)

574.    For example, Napa County has demanded wineries pay for and install left turn lanes on public roads to increase its daily allowed visitors by just a few visitors.

MILLER, CANFIELD,
PADDOCK AND STONE,
P.L.C.
ATTORNEYS AT LAW

FIRST AMENDED COMPLAINT                                      CASE NO: 3:24-CV-6256-CRB

575. However, Napa County does not apply its Road and Street Standard uniformly and, upon information and belief, only applies its standards to some but not all wineries and also not to other types of property.

576. County wineries have inquired why Napa County does not apply the standards uniformly and Napa County has replied that it does not apply the standards uniformly because it believes it does not have to apply the standards to all types of properties and to all wineries and that it has the discretion to pick and choose when and if the standards are applied.

577. Thus, Napa County applies its standards arbitrarily.

578. Napa County's vague and arbitrary enforcement of its ordinances, standards, and policies has a chilling effect because Plaintiffs face the prospect of their businesses being shut down if Napa County determines that Plaintiffs are operating as a nuisance. *See* NCC 18.144.040.

579. Napa County's vague and arbitrary enforcement of its ordinances and policies have caused Plaintiffs to suffer damages.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court:

(a)    Enter a judgment declaring that, on their face and as applied, the ordinances, policies and/or ever-changing ordinance interpretations violate the United States Constitution;

(b)    Enjoin Napa County, its employees, officers, and agents, from enforcing the ordinances, policies and/or ever-changing ordinance interpretations permanently and preliminarily while this litigation is pending;

(c)    Award Plaintiffs actual, compensatory, punitive, nominal, and special damages in an amount to be proven at trial, plus prejudgment interest on those amounts;

(d)    Award Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action pursuant to 42 U.S.C. § 1988; and

(e)    Grant such other and further relief as this Court deems just and proper.

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
ATTORNEYS AT LAW

FIRST AMENDED COMPLAINT                    CASE NO: 3:24-CV-6256-CRB

**SIXTH CLAIM FOR RELIEF**
**DUE PROCESS – NON-DELEGATION DOCTRINE**
**(42 U.S.C. § 1983)**

580.    Plaintiffs incorporate and reallege the preceding paragraphs as if fully restated herein.

581.    In those rare instances where Napa County considers granting or modifying a use permit, Napa County requires the consent of third parties including special interest groups as a condition to receiving or modifying the use permit.

582.    For example, Plaintiffs are aware of at least two recent instances where Napa County has conditioned the issuance of a use permit on the approval of third parties.

583.    This approval includes a requirement that the property owner agree to dedicate large portions of land for conservancy which dedication is disproportional to any impact the project would have.

584.    Wineries that are members of a private trade organization are automatically granted more and larger "marketing events" denied to non-member wineries.

585.    Napa County has regularly invited private trade organizations to participate in property code enforcement actions and provide opinions on ongoing code enforcement actions.

586.    Such conduct violates the non-delegation doctrine which the Supreme Court has applied to protect private property owners from an unfair and standardless process that empowered other private property owners, "solely for their own interest, or even capriciously," to determine the kind of use to which the former could put their property. *See Eubank v. City of Richmond*, 226 U.S. 137, 143–44 (1912); *Young v. City of Simi Valley*, 216 F.3d 807 (9th Cir. 2000); *Rice v. Village of Johnstown, Ohio*, 30 F. 4th 584 (6th Cir. 2022).

587.    This policy and practice of Napa County is unconstitutional both facially and as applied to Plaintiffs as Plaintiffs either have been subject to such delegation or have refrained from applying for permits or modifications due to the delegation of authority to third parties.

588.    Plaintiffs have suffered damages from Napa County's unlawful delegation.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court:

MILLER, CANFIELD,
PADDOCK AND STONE,
P.L.C.
ATTORNEYS AT LAW

FIRST AMENDED COMPLAINT                                CASE NO: 3:24-CV-6256-CRB

1              (a)     Enter a judgment declaring that, on their face and as applied, the Napa

2    County policy of third-party approval of use permits violates the United States Constitution;

3              (b)     Enjoin Napa County, its employees, officers, and agents, from enforcing

4    the policy permanently and preliminarily while this litigation is pending;

5              (c)     Award Plaintiffs actual, compensatory, punitive, nominal, and special

6    damages in an amount to be proven at trial, plus prejudgment interest on those amounts;

7              (d)     Award Plaintiffs their reasonable costs, including attorneys' fees, incurred

8    in bringing this action pursuant to 42 U.S.C. § 1988; and

9              (e)     Grant such other and further relief as this Court deems just and proper.

## SEVENTH CLAIM FOR RELIEF
## DORMANT COMMERCE CLAUSE
### (Discrimination Against Interstate Commerce)
### (42 U.S.C. § 1983)

13       589.    Plaintiffs incorporate and reallege the preceding paragraphs as if fully restated

14   herein.

15       590.    The dormant Commerce Clause prohibits economic protectionism—that is,

16   regulatory measures designed to benefit in-state economic interests by burdening out-of-state

17   competitors. *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 98 (1994); *New Energy

18   Co. v. Limbach*, 486 U.S. 269, 273 (1988).

19       591.    Laws which require wineries to use a minimum percentage of local grapes are per

20   se invalid unless the restriction passes strict scrutiny. *Alexis Bailly Vineyard, Inc. v. Harrington*,

21   482 F. Supp. 3d 820, 824 (D. Minn. 2020) (state law requiring use of majority Minnesota grapes

22   per se invalid); *Wineries of the Old Mission Peninsula Ass'n v. Peninsula Twp.*, No. 1:20-cv-

23   1008, 2022 WL 2155097, at *7-9 (W.D. Mich. June 3, 2002) (ordinance requiring use of 85% in-

24   Township grapes *per se* invalid.)

25       592.    The Napa County Code requires that for all wineries established after the date the

26   ordinance was codified, "at least seventy-five percent of the grapes used to make the winery's

27   still wine, or the still wine used by the winery to make sparkling wine, shall be grown within the

28   county of Napa." NCC Section 18.104.250(B).

593.    For wineries established prior to the codification of the ordinance, if they wish to expand, seventy-five percent of the grapes used to make still or sparkling wine as a result of the expansion must be grown in Napa County.  NCC Section 18.104.250(C).

594.    In 2022, Napa County created a new type of winery, a micro-winery, which also requires the use of at least seventy-five percent Napa County grapes.

595.    By requiring seventy-five percent of the grapes that wineries in Napa County process to be grown in Napa County, the Napa County Code is discriminating on its face against grapes grown in other popular wine-growing regions like Sonoma County, Oregon, Michigan, Europe, Australia, and Argentina.

596.    This facial discrimination is designed to protect Napa County agriculture from economic competition from other wine-growing regions.

597.    The Napa County Code discriminates against interstate commerce in violation of the Commerce Clause, Article I, § 8, Clause 3, of the United States Constitution, by favoring, and mandating in-County products and persons over out-of-County products and persons.

598.    Hoopes has been regularly advised that it can resolve its code enforcement activities if it simply applies for the more-restrictive micro-winery permit, despite its existing entitlements as a pre-WDO winery.

599.    In part, Hoopes has opted not to apply for this restrictive permit, or made any other change in production, because of the more restrictive grape and production requirements that would negatively impact its operation.

600.    Because the County now takes the position that Summit Lake, Hoopes, and other similarly situated small winery exemptions cannot modify their entitlements (even though this was regularly allowed historically), both Summit Lake and Hoopes would have to give up all winery entitlements and apply for new winery entitlements.

601.    According to the County, even modification for "visitors" or sale of "olive oil" without application for increases in production would thus subject all production at small winery exemptions to the 75% rule.

602.    Napa County also has a policy prohibiting sale of wine and other agricultural products "not produced on site" at small wineries even though many Napa wineries operate state licensed wineries in other locations outside of Napa County and are legally allowed to transfer that product to other licensed locations.

603.    This is enforced even though the agricultural policy of the general plan and Napa Code allow sale of wine made by *or for* the winery without any limitation.

604.    Similarly, many wineries have relationships with agricultural growers outside of Napa County and seek to purchase agricultural products from those growers rather than just Napa County growers.

605.    The production capacity of Napa Wineries far exceeds Napa grape production, and thus, cannot sustain all wineries in supply; thus, it is not sustainable to artificially limit wine businesses to an agricultural supply that does not exist.

606.    This restriction disproportionately impacts small wineries like Plaintiffs.

607.    Napa County did not require pre-WDO wineries to amortize the unconditioned grape sourcing privilege; accordingly, large Napa wineries continue to process substantial volumes of grapes grown outside Napa County without limitation on volume. The volume of wine they can produce from non-Napa grapes is not static; rather, it continues to grow in volume.

608.    Due to recent fires, or other regular crop issues, small wine producers have been forced to search for grapes outside Napa or dispense with producing any wine (and forfeiting all annual revenue) in the event of fire.

609.    Napa County has recently taken the position that wineries cannot produce alternative grape-based products if not "wine" even if made *from* wine and made to avoid a financial loss from a contaminated harvest.

610.    In the *Napa County v. Hoopes* Lawsuit, Napa County alleged that small wineries and small winery exemptions like Plaintiffs who use "non-Napa grapes in its production of its wines" violated controlling ordinances. (**Exhibit 27**: Paragraphs 22-23.)

611.    Mid-way through the *Napa County v. Hoopes* Lawsuit, Napa County advised Hoopes that Hoopes could not sell wine it produced from other vineyards or at other facilities at

- 77 -

their small winery; Hoopes was only allowed to sell wine from grapes grown on site and produced on site at the small winery exemption.

612.    The County could not define "produced on site,"

613.    Napa County also advised Hoopes that it could not store wine-based brandy distilled at other facilities, even though Hoopes' winemaker Type 02 license allows for use and storage of brandy in winemaking.

614.    Napa County also advised Hoopes that it could not sell agricultural products made from Hoopes produce, but packaged at a licensed co-packing facility, because these items were grown, but not "produced," on site. This included tomato sauce made from tomatoes grown on property, chocolate made from fruit and wine produced by Hoopes, and vinegar produced from Hoopes wine. This included wine that was not suitable for sale as wine, but could be recycled to recover revenue, due to crop/fire contamination in Napa.

615.    Summit Lake and Smith-Madrone only became aware of these positions of Napa County through the *Napa County v. Hoopes* Lawsuit.

616.    Plaintiffs wish to expand their operations but do not wish to be subject to the unconstitutional grape source requirements in NCC Section 18.104.250(B) and NCC Section 18.104.250(C).

617.    Plaintiffs therefore are entitled to a declaratory judgment that the Napa County Code discriminates against out-of-County products and persons are unconstitutional under the dormant Commerce Clause.

618.    Plaintiffs will suffer irreparable harm if Napa County is allowed to enforce the unconstitutional ordinances.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court:

(a)    Enter a judgment declaring that, on its face and as applied, the Napa County ordinances, policies and/or ever-changing ordinance interpretations violate the United States Constitution;

1            (b)      Enjoin Napa County, its employees, officers, and agents, from enforcing

2    the ordinances, policies and/or ever-changing ordinance interpretations permanently and

3    preliminarily while this litigation is pending;

4            (c)      Award Plaintiffs actual, compensatory, punitive, nominal, and special

5    damages in an amount to be proven at trial, plus prejudgment interest on those amounts;

6            (d)      Award Plaintiffs their reasonable costs, including attorneys' fees, incurred

7    in bringing this action pursuant to 42 U.S.C. § 1988; and

8            (e)      Grant such other and further relief as this Court deems just and proper.

9
                                  **COUNT VIII**
10
                    **DORMANT COMMERCE CLAUSE**
        **(Excessive Burden on Interstate Commerce)**
11
                    **(42 U.S.C. § 1983)**

12          619.      Plaintiffs incorporate and reallege the preceding paragraphs as if fully restated

13    herein.

14          620.      Even if this Court were to find that the Napa County Code does not discriminate

15    on its face against interstate commerce, the seventy-five percent grape requirement is still invalid

16    because it places an excessive burden on interstate commerce in excess of the putative benefit to

17    Napa County in violation of the Commerce Clause, Article I, § 8, Clause 3, of the United States

18    Constitution, by favoring, and mandating in-County products and persons over out-of-County

19    products and persons.

20          621.      As explained above, many wineries have relationships with agricultural growers

21    outside of Napa County and seek to purchase agricultural products from those growers rather than

22    just Napa County growers.

23          622.      The production capacity of Napa Wineries far exceeds Napa grape production, and

24    thus, cannot sustain all wineries in supply; thus, it is not sustainable to artificially limit wine

25    businesses to an agricultural supply that does not exist.

26          623.      This restriction disproportionately burdens small wineries like Plaintiffs.

27          624.      The burden imposed on small wineries like Plaintiffs far exceeds any putative

28    local benefit to Napa County.

MILLER, CANFIELD,
PADDOCK AND STONE,
P.L.C.
ATTORNEYS AT LAW

FIRST AMENDED COMPLAINT                      CASE NO: 3:24-CV-6256-CRB

1    625.    Plaintiffs wish to expand their operations but do not wish to be subject to the

2    unconstitutional grape source requirements in NCC Section 18.104.250(B) and NCC Section

3    18.104.250(C).

4    626.    Plaintiffs therefore are entitled to a declaratory judgment that the ordinances

5    discriminate against out-of-County products and persons are unconstitutional under the

6    Commerce Clause.

7    627.    Plaintiffs will suffer irreparable harm if Napa County is allowed to enforce the

8    unconstitutional ordinances.

9    WHEREFORE, Plaintiffs respectfully request that this Honorable Court:

10    (a)    Enter a judgment declaring that, on their face and as applied, the Napa

11    County ordinances, policies and/or ever-changing ordinance interpretations violate the United

12    States Constitution;

13    (b)    Enjoin Napa County, its employees, officers, and agents, from enforcing

14    the ordinances, policies and/or ever-changing ordinance interpretations permanently and

15    preliminarily while this litigation is pending;

16    (c)    Award Plaintiffs actual, compensatory, punitive, nominal, and special

17    damages in an amount to be proven at trial, plus prejudgment interest on those amounts;

18    (d)    Award Plaintiffs their reasonable costs, including attorneys' fees, incurred

19    in bringing this action pursuant to 42 U.S.C. § 1988; and

20    (e)    Grant such other and further relief as this Court deems just and proper.

**NINTH CLAIM FOR RELIEF**
***NOLLAN* AND *DOLAN* TAKING**
**(42 U.S.C. § 1983)**

23    628.    Plaintiffs incorporate and reallege the preceding paragraphs as if fully restated

24    herein.

25    629.    The Fifth Amendment's Takings Clause provides: "nor shall private property be

26    taken for public use, without just compensation."

27    630.    The Takings Clause applies to state and local governments.  *See, e.g., Knick v.*

28    *Twp. of Scott, Pennsylvania*, 588 U.S. 180, 189 (2019).

MILLER, CANFIELD,
PADDOCK AND STONE,
P.L.C.
ATTORNEYS AT LAW

FIRST AMENDED COMPLAINT                    CASE NO: 3:24-CV-6256-CRB

631.    When the government physically appropriates property or interferes with an owner's right to exclude others from it without paying just compensation, a *per se* taking has occurred.

632.    With regard to government permits, the United States Supreme Court has established a two-part test modeled on the Unconstitutional Conditions Doctrine:  First, the permit condition must have an "essential nexus" to the government's land-use interest.  *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 837 (1987).  Second, permit conditions must have rough proportionality to the development's impact on the land-use interest.  *Dolan v. City of Tigard*, 512 U.S. 374, 391 (1994).

633.    This test applies regardless of whether the condition requires the landowner to relinquish property or requires the landowner to pay a monetary exaction.  *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 612-615 (2013).

634.    Napa County applies both a formal and informal policy to take property from winery use permit applicants in violation of their constitutional rights.

635.    These takings did not occur as a result of passage of ordinances, but rather based on new or inconsistent interpretations of ordinances identified in the first instance to impact Plaintiffs within the last two years in the *Napa County v. Hoopes* Lawsuit.

636.    While the Code only lists production as triggering a use permit requirement for pre-WDO wineries, Napa County has recently interpreted the Code to require these infrastructure improvements, including road and septic improvements regardless of qualified "intensification" or "use" including *de minimis* addition of one visitor or one employee, or desire to sell olive oil and t-shirts bearing a winery's name.

637.    Napa County has nevertheless admitted that some of the changes that trigger these "exactions" do not have substantial impact on either traffic or wastewater (or any legitimate government purpose) and have no nexus to the proposed "use."

638.    For example, Napa County has recognized that less than 40 average vehicular daily trips have no legally recognizable "environmental impact" for the purposes of CEQA, that even "substantial" increases in "visitors" and employees have no substantial impact on domestic

- 81 -

1   wastewater, that winery "visitor" traffic does not cause traffic problems; rather, it is connected to

2   commuters, that vitiation, number of employees, and "what" and how much can be sold are not

3   considered in connection with any other business, retail, or commercial operations throughout the

4   County, just to name a few.

5       639.    The County admits that unlimited retail customers can come to small winery

6   properties and buy wine, but just not try the wine. This distinction is not readily identifiable from

7   any ordinance and has no identifiable government purpose. This results in a taking of the right to

8   retail, which cannot be reasonably carried out and eliminates a right granted by the state in

9   connection to retail sale, already conveyed and in use.

10      640.    This interpretation also confirms there is no proportional impact to a small winery

11  seeking to add a few more customers per day for on-premise consumption when that winery is

12  already allowed to have an unlimited number of customers per day to purchase wine to go.

13      641.    Napa County requires wineries to submit to at least three unlawful conditions

14  before it will consider issuing or amending winery permits.

15      642.    First, NCC Section 18.104.250 requires all wineries formed after 1990 or any

16  winery that wishes to "expand beyond their winery development area" to source at least 75% of

17  their grapes from within Napa County.  As explained in Counts VII and VIII, this requirement

18  violates the Dormant Commerce Clause.

19      643.    Second, NCC Section 1.30 requires all wineries submitting new applications to

20  indemnify Napa County from legal challenges to a potential permit issuance:

21          (a)     Applicants "shall submit to the county a fully executed indemnification

22  agreement agreeing to defend, indemnify, release and hold harmless the county from any claim,

23  action, or proceeding brought against the county to attack, set aside, void or annul the approval

24  based on the county's failure to comply with the requirements of any federal, state, or local law,

25  including but not limited to general plan and zoning requirements, or both. The indemnification

26  shall include damages awarded against the county, if any, costs of suit, attorneys' fees and other

27  expenses incurred in connection with such action."  NCC Section 1.30.030(A).

28

1          (b)      Even if an applicant winery chooses not to sign the indemnification

2    agreement, the ordinance forces the applicant to indemnify the County anyway. *See* NCC Section

3    1.30.040.

4          644.    Third, Napa County forces applicants to pay exorbitant costs to improve roadways

5    in a disproportionate manner to the applicant's proposed use.

6          645.    Napa County requires small wineries to submit to one unique unlawful condition

7    before it will consider issuing or amending any winery entitlement; namely, *give up* all winery

8    entitlements and submit to a new discretionary use permit (that may or may not issue), despite the

9    equivalent legal status of use permit exemptions (uses by right) and use permits under California

10   law, to make any change whatsoever. This interpretation of the code is not codified and is

11   effective of unknown date.

12         646.    These exactions also include the imposition of impermissible impact fees. *See*

13   *Sheetz v. County of El Dorado, California*, 601 U.S. 267 (2024).

14         647.    These requirements are applied to all wineries for any modification, inclusive of

15   sale of wine-related products in addition to wine, regardless of its relationship to the above

16   requirements.

17         648.    For example, Plaintiff Summit Lake applied for a winery use permit from Napa

18   County.  As a condition to approval of that use permit application, Napa County demanded that

19   Plaintiff Summit Lake pay for the improvement of a one mile stretch of road at a cost of

20   approximately $1 million.

21         649.    Summit Lake was also forced to spend millions of dollars on studies and attorneys'

22   fees as part of its use permit application.

23         650.    Even though Hoopes is already entitled with unlimited retail wine sales, Hoopes

24   was advised that it would have to install a new septic system to sell wine glasses, sell t-shirts, sell

25   non-wine agricultural products from its farm, or to charge any type of fee to enter the property.

26   This was despite prior approval of Hoopes' septic system for continued use as production and

27   retail winery facility.

28

651.    Hoopes was also advised that to avoid costly litigation it should give up its winery entitlements and apply for a micro-winery permit.

652.    Hoopes was later advised it should submit to a small winery ordinance use permit, a new "entitlement" with unknown benefit to an existing small winery.

653.    In each situation, the application would trigger the impact fees, indemnification, forfeiture of existing winery entitlements, could be denied arbitrarily, and reduced the entitlements below which Hoopes is informed and believe already exist at the property.

654.    Smith-Madrone wishes to expand its operations but the exaction requirements of Napa County, such as road improvements and grape requirements, make these expansions not economically viable.

655.    Upon information and belief, Napa County has placed similar exaction demands on other Napa County wineries.

656.    Upon information and belief, Napa County's extractions are so prolific as to be an official policy of Napa County.

657.    Napa County's exaction practices have caused Plaintiffs to refrain from seeking use permits or amendments from Napa County.

658.    Napa County's required exactions are not proportional to the alleged impact of the expanded permissions for each winery.

659.    All Plaintiffs wish to expand their operations but have refrained from doing so because of the County's exactions.

660.    Similar requirements were struck down as an unconstitutional exaction in *Alliance for Responsible Planning v. Taylor*, 63 Cal. App. 5th 1072, 1085 (2021).

WHEREFORE, Plaintiffs respectfully request that this Honorable Court:

(a)    Enter a judgment declaring that Napa County's exactions are a taking in violation the United States Constitution;

(b)    Enjoin Napa County, its employees, officers, and agents, from enforcing the exaction policy on any Wineries in Napa County;

(c)     Award Plaintiffs actual, compensatory, punitive, nominal, and special damages in an amount to be proven at trial, plus prejudgment interest on those amounts;

(d)     Award Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action pursuant to 42 U.S.C. § 1988; and

(e)     Grant such other and further relief as this Court deems just and proper.

**TENTH CLAIM FOR RELIEF**
**REGULATORY TAKING**
**(Fifth and Fourteenth Amendments)**
**(42 U.S.C. § 1983)**

661.    Plaintiffs incorporate and reallege the preceding paragraphs as if fully restated herein.

662.    As alleged above, Napa County has enacted a series of ordinances which deprive Plaintiffs of the full use of their property.

663.    These ordinances are "not reasonably necessary to the effectuation of a substantial public purpose." *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 127 (1978).

664.    As alleged above, the stated purposes for the ordinances and/or Napa's changing interpretation of those ordinance are violations of Plaintiffs' First Amendment rights and the Commerce Clause.

665.    The Plaintiffs have a property right in the uses entitled by right, established over the years at their wineries, as well as uses allowed by California law.

666.    As discussed above, sometime between 2012 and 2015, Napa County revised its Winery Database to take property rights from the Plaintiffs without just compensation.

667.    Further, each Plaintiff possess a Winegrowers licensed issued by the State of California which is a valuable property right. *See Dash, Inc. v. Alcoholic Beverage Control Appeals Bd.*, 683 F.2d 1229, 1233 (9th Cir. 1981) ("Under California law, a liquor license issued pursuant to the Alcoholic Beverage Control act is a valuable property right.").

668.    As discussed above, Napa County, through its ordinances, policies and ever-changing ordinance interpretations, interferes with this property right by limiting how Plaintiffs may utilize their property.

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
ATTORNEYS AT LAW

669.    For example, the County admits that unlimited retail customers can come to small winery properties and buy wine, but just not drink the wine. This distinction is not readily identifiable from any ordinance, prohibiting consumption of wine at a facility licensed to produce, serve, and sell wine has no identifiable or stated government purpose, and yet the prohibition unreasonably interferes with the ability to sell wine.

670.    Plaintiffs did not learn of Napa County's admissions until the *Napa County v. Hoopes* Lawsuit.

671.    Plaintiffs will suffer irreparable harm if Napa County is allowed to enforce the unconstitutional ordinances, and policies and ever-changing ordinance interpretations.

672.    Plaintiffs have suffered damages from Napa County's unlawful deprivation of the full use of Plaintiffs' property rights.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court:

(a)    Enter a judgment declaring that, on their face and as applied, the ordinances,  policies, and ever-changing ordinance interpretations violate the United States Constitution;

(b)    Enjoin Napa County, its employees, officers, and agents, from enforcing the ordinances,  policies and ever-changing ordinance interpretations permanently and preliminarily while this litigation is pending;

(c)    Award Plaintiffs actual, compensatory, punitive, nominal, and special damages in an amount to be proven at trial, plus prejudgment interest on those amounts;

(d)    Award Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action pursuant to 42 U.S.C. § 1988; and

(e)    Grant such other and further relief as this Court deems just and proper.

**ELEVENTH CLAIM FOR RELIEF**
**EQUAL PROTECTION**
**(42 U.S.C. § 1983)**

673.    Plaintiffs incorporate and reallege the preceding paragraphs as if fully restated herein.

FIRST AMENDED COMPLAINT                                    CASE NO: 3:24-CV-6256-CRB

674.    The U.S. Constitution, Article XIV, clause 2, states that no "state shall ... deny any person within its jurisdiction the equal protection of the laws." Due to the Supremacy Clause, noncompliance with the Government Tort Claims Act is not a procedural bar. *See Williams v. Horvath* (1976) 16 Cal. 3d 834, 842.

675.    Government Code section 65852, states that all zoning regulations "shall be uniform for each class or kind of...use of land throughout each zone...."

676.    Because all wineries in Napa County are consolidated into a single use, all wineries within the same zoning district must be subject to the same zoning regulations and allowed all uses and accessory uses derivative of the primary use as a winery. *See, e.g., Neighbors in Support of Appropriate Land Use v. County of Tuolume*, 157 Cal. App. 4th 997, 1009-10 (2007).

677.    Napa County violates the equal protection provisions of the federal constitution when it proscribes different "uses" and "accessory uses" to land zoned as a "winery" within the same zone.

678.    Uniformity in zoning requires all uses and accessory uses that remain lawful uses at wineries be allowed at all wineries, including any winery prior to enactment of the Winery Definition Ordinance.

679.    Napa County Code Section 18.08.620 "tours and tastings" and/or Napa County's ever-changing interpretation of that ordinance, on its face and as applied violates the Equal Protection clause of the U.S. Constitution. US Const. Amend. XIV.

680.    Napa County Code Section 18.08.370 "marketing of wine" and/or Napa County's ever-changing interpretation of that ordinance on its face and as applied, violates the Equal Protection clause of the U.S. Constitution. US Const. Amend. XIV.

681.    Napa County Code Section 18.08.600(C) and/or Napa County's ever-changing interpretation of that ordinance, on its face and as applied, violates the Equal Protection clause of the U.S. Constitution. US Const. Amend. XIV.

682.    Napa County Code Section 18.08.600(C) and/or Napa County's ever-changing interpretation of that ordinance, on its face and as applied, creates at least two classes of licensed

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C. ATTORNEYS AT LAW

wineries: small wineries and other wineries, although the class of "winery" is one-class post-Winery Definition Ordinance.

683.    Napa County Code Section 18.08.600(C) and/or Napa County's ever-changing interpretation of that ordinance, on its face and as applied, disadvantages small wineries, declared important businesses in the County, by prohibiting them from engaging in tours, offering wine tastings, selling wine-related items, and hosting of public events, which are designated by statute as critical economic functions of all wineries.

684.    Napa County Code Section 18.20.020(H) and/or Napa County's ever-changing interpretation of that ordinance, on its face and as applied, violates the Equal Protection clause of the U.S. Constitution. U.S. Const. Amend. XIV.

685.    Napa County Code Section 18.20.020(H) and/or Napa County's ever-changing interpretation of that ordinance, on its face and as applied, creates at least two classes of licensed small wineries: small wineries with use permits and wineries with small winery use permit exemptions although the class of "winery" is one-class post-rezoning by way of Winery Definition Ordinance.

686.    Napa County Code Section 18.20.020(H) and/or Napa County's ever-changing interpretation of that ordinance, on its face and as applied, disadvantages wineries with small winery use permit exemptions.

687.    Napa County arbitrarily recognizes tasting and marketing rights at some pre-Winery Definition Ordinance wineries, but not others.

688.    Napa County Code Section 18.20.030(G) and/or Napa County's ever-changing interpretation of that ordinance, on its face and as applied, violates the Equal Protection clause of the U.S. Constitution. U.S. Const. Amend. XIV.

689.    Napa County Code Section 18.20.030(G) allows wineries with a use permit to engage in "marketing of wine" as the term is defined in Napa County Code Section 18.08.3704, but does not state whether wineries with exemptions may market wine (or how).

690.    Napa County Code Section 18.20.030(G) and/or Napa County's ever-changing interpretation of that ordinance, on its face and as applied, creates at least two classes of licensed

- 88 -

1    small wineries: wineries with use permits and wineries with small winery use permit exemptions

2    that conflicts with the unitary class of winery enacted pursuant to the Winery Definition

3    Ordinance.

4       691.    Napa County Code Section 18.20.030(G) and/or Napa County's ever-changing

5    interpretation of that ordinance, on its face and as applied, disadvantages wineries with small

6    winery use permit exemptions.

7       692.    By ordering some wineries, like Plaintiffs, not to "market" their licensed wine

8    business, or conduct "tours and tastings" short of application for a "new" permit for the primary

9    use as winery, Napa County singles out, penalizes and treats these wineries differently from other

10   similarly situated wineries.

11      693.    Napa County has no rational basis for singling out some wineries for lawful uses

12   of their properly licensed winery when it allows other similarly situated wineries to engage in

13   these same uses.

14      694.    Napa County's actions are not reasonably necessary to achieve a legitimate

15   government purpose.

16      695.    Napa County's unequal treatment of wineries in Napa County has caused Plaintiffs

17   to suffer damages.

18      WHEREFORE, Plaintiffs respectfully request that this Honorable Court:

19      (a)    Enter a judgment declaring that, on their face and as applied, the Napa

20   County ordinances,  policies and ever-changing ordinance interpretations violate the United

21   States Constitution;

22      (b)    Enjoin Napa County, its employees, officers, and agents, from enforcing

23   the ordinances, policies, and ever-changing ordinance interpretations permanently and

24   preliminarily while this litigation is pending;

25      (c)    Award Plaintiffs actual, compensatory, punitive, nominal, and special

26   damages in an amount to be proven at trial, plus prejudgment interest on those amounts;

27      (d)    Award Plaintiffs their reasonable costs, including attorneys' fees, incurred

28   in bringing this action pursuant to 42 U.S.C. § 1988; and

MILLER, CANFIELD,
PADDOCK AND STONE,
P.L.C.
ATTORNEYS AT LAW

1    (e)    Grant such other and further relief as this Court deems just and proper.

2    **TWELFTH CLAIM FOR RELIEF**
**STATE AND FEDERAL PREEMPTION**
3

4    696.    Plaintiffs incorporate and reallege the preceding paragraphs as if fully restated

5    herein.

6    697.    In California, "[a] county or city may make and enforce within its limits all local,

7    police, sanitary, and other ordinances and regulations not in conflict with general laws." Cal.

8    Const. art. XI, § 7.

9    698.    When a county ordinance conflicts with a general state law, the county ordinance

10   is void. *See, e.g., O'Connell v. City of Stockton*, 41 Cal. 4th 1061, 1067 (2007).

11   699.    California law gives licensed winegrowers the privilege to "[s]ell wine and brandy

12   to consumers for consumption off the premises where sold." BPC § 23358(a)(2).

13   700.    California law gives licensed winegrowers the privilege to "[s]ell wine to

14   consumers for consumption on the premises." BPC § 23358(a)(3).

15   701.    BPC Section 23358(a)(3) does not restrict how such wine is served, e.g., by the

16   sample, by a flight, by the glass or by the bottle. Indeed, the legislative history of the bill

17   expressly confirms sale by the bottle, glass, or sample is expressly allowed.

18   702.    BPC Section 23358(a)(4) allows a winery to operate a bona fide eating place on

19   the licensed premises and "[s]ell all beers, wines, and brandies, regardless of source, to

20   consumers for consumption on the premises."

21   703.    BPC Section 23358(b) states that a "winegrower may also have upon the premises

22   all beers, wines, and brandies, regardless of source, for sale or service only to guests during

23   private events or private functions not open to the general public."

24   704.    BPC Section 23358(c) states that at least fifty percent of the wine a winegrower

25   sells on its licensed premises must be produced by the winegrowers from the conversion of

26   grapes, berries, or other fruit into wine.

27   705.    BPC Section 23358(c) does not dictate the source of the grapes, berries, or fruit a

28   winegrower converts into wine.

MILLER, CANFIELD,
PADDOCK AND STONE,
P.L.C.
ATTORNEYS AT LAW

706.    BPC Section 23358(c) does not dictate the location of production of the wine as long as produced by the winegrower.

707.    BPC Section 23358(e) provides that counties exercising land use regulatory authority can restrict, but not eliminate, the privileges afforded by section 23358.

708.    BPC Section 23358(e) is the only section of the BCP related to wineries where the California Legislature provided a local government with this limited authority.

709.    BPC Section 23356.1 authorizes a winegrower to "conduct winetastings of wine produced or bottled by, or produced and packaged for, the licensee, either on or off the winegrower's premises."

710.    That section also states that the "department may adopt the rules as it determines to be necessary for the administration of this section." *Id*. at 23356.1(d).

711.    The State of California has issued the following rules related to wine tastings:

712.    California law defines a "winetasting" as a "presentation of samples of one or more wines, representing one or more wineries or industry labels, to a group of consumers for the purpose of acquainting the tasters with the characteristics of the wine or wines tasted." Cal. Code Regs., Title 4, § 53.

713.    California law allows a winegrower to "supply small amounts of bread, crackers, cheeses or nuts to clear the taste buds of the participants between successive samples of wine during a winetasting."  Cal. Code Regs., Title 4, § 53.

714.    "Winetastings may be conducted without charge or for a fee for the public on a premises licensed with a winegrower's license."  Cal. Code Regs., Title 4, § 53(a)(1).

715.    "Winegrowers…may conduct winetastings which are sponsored by a bona fide charitable, fraternal, political, religious, trade, service, or similar private organization" subject to limited conditions.  Cal. Code Regs., Title 4, § 53(b).

716.    While Section 53 contains some restrictions, the rule is clear that "[n]othing in this rule shall prevent the holder of any license which permits the sale and consumption of wine on the premises from holding a winetasting of wines legally acquired, provided the on-sale licensee shall charge for the wines presented in accordance with law."

MILLER, CANFIELD,
PADDOCK AND STONE,
P.L.C.
ATTORNEYS AT LAW

717.     BPC Section 23386(a) states that a winegrower's license "authorizes the giving away of samples of the alcoholic beverages that are authorized to be sold by the license under the rules that may be prescribed by the department."

718.     BPC Section 23386(a) does not provide Napa County with authority to establish rules related to a winegrower giving away samples.

719.     The California Senate has recognized that the change made in AB 2004, the "Picnic Bill" "essentially allowed a winegrower to sell wine to consumers by-the-bottle or by-the-glass for consumption in approved, licensed areas."   (**Exhibit 52**.)

720.     California rules allow winegrowers to "sponsor contests, races, tournaments, and other similar activities on or off licensed premises."  Cal. Code Regs., Title 4, § 106(i)(2).

721.     Tours and wine tastings are a means for wineries to sell wine to consumers for consumption on and off premises.

722.     Napa County Code Section 18.08.600 and/or Napa County's ever-changing interpretation of that ordinance conflicts with California law because Napa County Code Section 18.08.600 does not allow for licensed winegrowers to sell wine for on- and off-premises consumption while BPC § 23358(a) specifically allows for licensed winegrowers to sell wine for on- and off-premises consumption.

723.     Napa County Code Section 18.08.600 and/or Napa County's ever-changing interpretation of that ordinance cannot be reconciled with BPC § 23358(a).

724.     Napa County Code Section 18.08.600 and/or Napa County's ever-changing interpretation of that ordinance is preempted by BPC § 23358(a).

725.     BPC §§ 23358(a)(4) and 23038 allow California wineries to operate a bona fide eating place to serve food, wine, and beer to guests for compensation.

726.     These sections do not require guests to have made an appointment.

727.     Napa County Code Section 18.08.620 and/or Napa County's ever-changing interpretation of that ordinance is preempted by BPC § 23358(a) and 23038 in that it requires that any food provided by provided without charge and prohibits food service which "involve menu options and meal service such that the winery functions as a café or restaurant."

MILLER, CANFIELD,
PADDOCK AND STONE,
P.L.C.
ATTORNEYS AT LAW

728.    Other ordinances and formal and informal policies and ever-changing interpretations of Napa County, such as NCC Sections 18.08.370, 18.16.030, 18.20.020 and 18.20.030 and interpretation thereof, also are preempted by California law such as restrictions on marketing, advertising, events, contests races, and other similar activities as well as restrictions on where wine must be manufactured.

729.    For example, there is no Napa County ordinance which dictates the:

(a)    The number of customers Plaintiffs may see per day, week or year;

(b)    The number of employees Plaintiffs may have;

(c)    The number of "visitors" allowed at a winery, or that defines what a visitor "is"

(d)    The number of "marketing events" permitted at wineries;

(e)    What production of wine "is," or how volume of wine or grape source is determined and monitored;

(f)    How many cars can transit to a winery;

(g)    What winery operations are allowed;

(h)    What business meetings and events can take place at a winery unrelated to retail and direct-to-consumer hospitality,

730.    Regardless, Napa County applies restrictions on Plaintiffs which are preempted by California law.

731.    California courts have recognized that "impos[ition] of unique requirements on individual establishments licensed to sell alcoholic beverages would contravene the goal of uniform administration and enforcement of the state's liquor laws." *See Tryon v. DBS Enterprises, Inc.*, No. D045656, 2006 WL 234728, * 8 (Cal. Ct. App. Feb. 1, 2006) (unpublished).

732.    Napa County admits it is not legally authorized to regulate winery operations, or license same

733.    Napa County admits it is not authorized to regulate the sale of alcohol, storage, or transfer of wine, or where "tastings can occur," or license same,

MILLER, CANFIELD,
PADDOCK AND STONE,
P.L.C.
ATTORNEYS AT LAW

FIRST AMENDED COMPLAINT                                    CASE NO: 3:24-CV-6256-CRB

734.    Napa County's authority is limited to identifying where wineries may operate, but is prohibited from regulating production, sale, or distribution by federal and state laws.

735.    However, Napa County utilizes a policy and interprets local ordinances in such a way which place unique requirements and restrictions on wineries in Napa County with regard to the sale of alcoholic beverages and business operations of licensed wineries.

736.    Such a policy conflicts with and contravenes the goal of uniform administration and enforcement of the state's liquor laws.

737.    The California Legislature declared a statewide interest in uniform building codes and enacted legislation expressing an intent to generally preempt the field of building standards. *California Apartment Assoc. v. City of Fremont*, 97 Cal. App. 4th 693, 697 (2002).

738.    The California Building Code expressly states that it applies to all businesses in the state and that a local government may only modify its standards by making an express finding that the modification is necessary due to "climatic, topographical or geological conditions" with those findings being filed with the California Building Standard Commission.  *See* Cal. Build. Code § 1.1.8 et seq.

739.    The California Business Code was explicitly adopted by Napa County and incorporated into its ordinances.  *See* Napa County Code Section 15.12.010.

740.    The only modifications referenced in the Napa County Code to the California Building Code related to wineries applies to construction and occupancy of wine caves which is not relevant to this case.

741.    Generally, per the California Building Code, the occupancy load for a winery tasting room is one person per fifteen square feet.  *See* Cal. Build. Code § 1004.1.

742.    Thus, Napa County's unilateral restriction of Winery occupancy (visitors) is preempted by California law.

743.    Federal Law has exclusive jurisdiction to regulate the production, storage, contents, source of grapes, and labeling of wine.

MILLER, CANFIELD,
PADDOCK AND STONE,
P.L.C.
ATTORNEYS AT LAW

FIRST AMENDED COMPLAINT                                CASE NO: 3:24-CV-6256-CRB

744.    All Napa County ordinances intending to or purporting to (through interpretation) define wine production, what wine "is," how wine may or must be "produced," what constitutes wine production, and how or who may sell it, are preempted by federal law.

745.    Napa County attempts to use privileged TTB (federal) tax records to further regulate wine production and penalize wineries for refusing to turn over admittedly privileged documents the TTB itself will not disclose to local agencies.

746.    As discussed above, Napa County has routinely utilized varying interpretations of its ordinances to restrict the rights of wineries like Plaintiffs.

747.    In the *Napa County v. Hoopes* Lawsuit, Napa County for the first time took positions regarding its interpretation of its ordinance related to wineries and Plaintiffs which are preempted by California law.

748.    Further, during the *Napa County v. Hoopes* Lawsuit, Napa County conceded that it did not consider whether its interpretations conflicted with California law.

749.    Napa County's requirements and interpretations were not known or stated prior to the *Napa County v. Hoopes* Lawsuit and even changed during that case.

750.    For example, in the *Napa County v. Hoopes* Lawsuit, Napa County took the position that in order to take advantage of California's "Picnic Bill," Plaintiffs were required to obtain a permit from Napa County.

751.    But Napa County's new position regarding the "Picnic Bill" was a complete change in policy from a December 2010 document in which Napa County had stated that "no Modification would be necessary" where "on-site consumption is proposed to occur entirely within existing tasting room space." (**Exhibit 53**: Use Permit Modification Guidance.)

752.    Napa County's new position was also a complete change in policy regarding the sale of wine-related products, where the County had previously stated that "So long as the sale of wine-related products occurs entirely within existing legal tasting room space (as opposed to any approved 'production' area), no Modification is generally necessary to allow it." (*Id.*)

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
ATTORNEYS AT LAW

753.    Therefore, before the *Napa County v. Hoopes* Lawsuit, there was no need for Plaintiffs to bring a preemption claim because Napa County had advised all county wineries that the permissions contained in the "Picnic Bill" were automatically applied to all wineries.

754.    Plaintiffs have suffered damages from Napa County's violations of California and Federal law.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court:

(a)    Enter a judgment declaring that Napa County Code Sections 18.08.370, 18.08.600, 18.08.620, 18.16.030, 18.20.020 and 18.20.030 and/or Napa County's ever-changing interpretations of those ordinances are preempted by California and Federal law;

(b)    Enjoin Napa County's enforcement of Napa County Code Sections 18.08.370, 18.08.600, 18.08.620, 18.16.030, 18.20.020 and 18.20.030 and/or Napa County's ever-changing interpretations of those ordinances;

(c)    Enter a judgment declaring that Napa County's restriction on the number of visitors at each winery is preempted by the California Building Code;

(d)    Enjoin Napa County from enforcing a limit on winery visitation/occupancy which is different than the occupancy calculations set forth in the California Building Code;

(e)    Award Plaintiffs actual, compensatory, punitive, nominal, and special damages in an amount to be proven at trial, plus prejudgment interest on those amounts;

(f)    Award Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action; and

(g)    Grant such other and further relief as this Court deems just and proper.

**THIRTEENTH CLAIM FOR RELIEF**
**FIRST AMENDMENT RETALIATION (42 U.S.C. § 1983)**

755.    Plaintiffs incorporate and reallege the preceding paragraphs as if fully restated herein.

756.    On October 20, 2022, Napa County filed the *Napa County v. Hoopes* Lawsuit.

757.    Napa County filed a motion for temporary restraining order and preliminary injunction in the *Napa County v. Hoopes* Lawsuit.

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C. ATTORNEYS AT LAW

FIRST AMENDED COMPLAINT                              CASE NO: 3:24-CV-6256-CRB

1    758.    Hoopes opposed Napa County's request for a TRO and preliminary injunction.

2    759.    The Superior Court issued a tentative ruling for November 17, 2022 denying Napa

3    County's request for preliminary injunction.

4    760.    On December 5, 2022, Hoopes Family Winery Partners, LP and Hoopes Vineyard,

5    LLC filed a cross-complaint against Napa County in the *Napa County v. Hoopes* Lawsuit.

6    761.    Hoopes' decision to file a cross-complaint in the *Napa County v. Hoopes* Lawsuit

7    constitutes conduct protected by the First Amendment to the United States Constitution.

8    762.    Akenya Robinson-Webb, Code Compliance Supervisor for Napa County, was a

9    declarant and witness for Napa County in the *Napa County v. Hoopes* Lawsuit complaint.

10    763.    On December 14, 2022, Ms. Robinson-Webb issued Citation #CE20-00016

11    against property with the address 1350-1380 Yount Mill Road, Napa, CA 94558.  (**Exhibit 54**.)

12    764.    1350-1380 Yount Mill Road was not the subject of the *Napa County v. Hoopes*

13    Lawsuit.

14    765.    Instead, Lindsay Hoopes, owner of Hoopes Vineyard, LLC, was residing at 1350

15    Yount Mill Road with her family in December 2022.

16    766.    In Citation #CE20-00016, Ms. Robison-Webb wrote that "It has come to the

17    attention of the Napa County Planning Building & Environmental Services Department, Code

18    Compliance Unit ("Department") that the above referenced property may be in violation of the

19    Napa County Code and the California Building and Residential Codes."

20    767.    Ms. Robinson-Webb issued Citation #CE20-00016 against 1350-1380 Yount Mill

21    Road "to request an inspection of the referenced structures to determine if these or other

22    violations exist on your property."

23    768.    Ms. Robinson-Webb further wrote "failure to respond as directed could result in

24    further enforcement action by this Department."

25    769.    Napa County's decision to issue citation #CE20-00016 directed at Ms. Hoopes'

26    personal residence was substantially motivated as a response to Hoopes' decision to file a cross-

27    complaint in the *Napa County v. Hoopes* Lawsuit.

28

770.    Napa County's issuance of citation #CE20-00016 caused Hoopes to suffer actual injury and was designed to chill a person of ordinary firmness from continuing to defend against Napa County's allegations and from pursuing a cross-complaint against Napa County.

771.    On September 7, 2023 and September 8, 2023, respectively, Smith-Madrone and Summit Lake moved to intervene in the *Napa County v. Hoopes* Lawsuit to assert claims against Napa County for Due Process and Equal Protection violations and declaratory relief.

772.    Smith-Madrone's and Summit Lake's motions to intervene were motivated in part to clarify the existing rights that those wineries possessed.

773.    Smith-Madrone's and Summit Lake's motions to intervene constitute conduct protected by the First Amendment to the United States Constitution.

774.    Napa County opposed Smith-Madrone's and Summit Lake's attempts to intervene in the *Napa County v. Hoopes* Lawsuit.

775.    In its opposition to Smith-Madrone's motion to intervene, Napa County represented to the Superior Court of the State of California, County of Napa that Smith-Madrone's "motion should be denied and Smith-Madrone can file its own action against the County if it wishes."

776.    In its opposition to Summit Lake's motion to intervene, Napa County represented to the Superior Court of the State of California, County of Napa that Summit Lake's "motion should be denied and Summit Lake can file its own action against the County if it wishes."

777.    In addition to its opposition to Smith-Madrone's and Summit Lake's motions to intervene in the *Napa County v. Hoopes* Lawsuit, Napa County employees conducted undercover entrapment operations at Smith-Madrone's and Summit Lake's properties to investigate the uses Smith-Madrone and Summit Lake made of their wineries.

778.    Specifically, on October 2, 2023, a Napa County agent—posing undercover with no information to identify that he represented Napa County—emailed a representative for Smith-Madrone and wrote: "I am having my Birthday party on October 21st 2023 and I want it to be held at your venue.  Also I would like to know if you accept credit cards for payment.  I await your urgent response."

MILLER, CANFIELD,
PADDOCK AND STONE,
P.L.C.
ATTORNEYS AT LAW

FIRST AMENDED COMPLAINT                    CASE NO: 3:24-CV-6256-CRB

779.    When the undercover agent did not respond to a request for clarification from Smith-Madrone's representative, Smith-Madrone's representative asked "by chance are you with Napa County?"

780.    The undercover agent responded "Yes."

781.    Undercover agents for Napa County sent similar emails to Summit Lake.

782.    Napa County's undercover entrapment operations were substantially motivated as a response to Smith-Madrone's and Summit Lake's motions to intervene in the *Napa County v. Hoopes* Lawsuit.

783.    Napa County's undercover entrapment operations were designed to deter Smith-Madrone and Summit Lake from pursuing their motions to intervene and engaging in their traditional uses.

784.    Napa County's undercover entrapment operations caused Smith-Madrone and Summit Lake to suffer injuries that would chill a person of ordinary firmness from continuing to engage in that activity.

785.    In response to the undercover entrapment operations, Smith-Madrone and Summit Lake have reduced or altogether eliminated uses that they traditionally pursued for decades for fear of enforcement by Napa County.

786.    The reduction and/or elimination in traditional uses has caused Smith-Madrone and Summit Lake to suffer damages.

787.    In addition to the undercover entrapment operations, Napa County has threatened to shut down Summit Lake following Summit Lake's motion to intervene if Summit Lake did not comply with the Napa County Road and Street Standards.

788.    On October 31, 2023, despite prior representations from Napa County that Summit Lake was exempt from the Road and Street Standards, Napa County counsel Jason Dooley wrote to Summit Lake's attorney that Napa County would apply the Road and Street Standards to Summit Lake.

789.    In the same October 31, 2023 communication, Mr. Dooley confirmed that Napa County was aware that the "cost of meeting the RSS requirements is prohibitive."

790.    Napa County's change of position regarding the applicability of the Road and Street Standards to Summit Lake was also made in retaliation for Summit Lake's attempt to intervene in the *Napa County v. Hoopes* Lawsuit.

791.    Upon information and belief, Napa County has taken additional retaliatory actions against Hoopes, Smith-Madrone, and Summit Lake.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court:

(a)    Award Plaintiffs their actual, compensatory, punitive, nominal, and special damages in an amount to be proven at trial, plus prejudgment interest on those amounts;

(b)    Award Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action pursuant to 42 U.S.C. § 1988; and

(c)    Grant such other and further relief as this Court deems just and proper.

**FOURTEENTH CLAIM FOR RELIEF**
**INJUNCTIVE RELIEF**

792.    Plaintiffs incorporate and reallege the preceding paragraphs as if fully restated herein.

793.    Plaintiffs are likely to succeed on the merits of their lawsuit.

794.    Plaintiffs will be irreparably harmed if an injunction does not issue preventing Napa County from continuing to enforce the ordinances, policies and ever-changing ordinance interpretations.

795.    Napa County will not be harmed if it is prohibited from enforcing its illegal ordinances, policies and ever-changing ordinance interpretations on Plaintiffs.

796.    Issuance of a preliminary injunction preventing Napa County from continuing to enforce its illegal ordinances, policies and ever-changing ordinance interpretations will serve the public interest.

797.    Plaintiffs have no adequate remedy at law.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court:

(a)    Enjoin Napa County, its employees, officers, and agents, from enforcing the Napa County Code Sections 18.08.370, 18.08.600, 18.08.620, 18.16.030, 18.20.020 and

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
ATTORNEYS AT LAW

18.20.030 as well as its formal policies, informal policies and/or ever changing ordinance interpretation placed on Plaintiffs as described above permanently and preliminarily while this litigation is pending;

(b)    Award Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action; and

(c)    Grant such other and further relief as this Court deems just and proper.

Respectfully submitted,

Dated: December 5, 2024                    MILLER, CANFIELD, PADDOCK
                                           AND STONE, P.L.C.


By: */s/ Joseph M. Infante*
    Joseph M. Infante,
    Attorneys for Plaintiffs

Dated: December 5, 2024                    FENNEMORE WENDEL


By: */s/ Eugene M. Pak*
    Eugene M. Pak
    Attorneys for Plaintiffs

FIRST AMENDED COMPLAINT                    CASE NO: 3:24-CV-6256-CRB