# Exhibit 3

NAPA COUNTY
CONSERVATION, DEVELOPMENT AND PLANNING COMMISSION
1121 First Street
Napa, California

MINUTES
December 19, 1979

The NAPA COUNTY CONSERVATION, DEVELOPMENT AND PLANNING COMMISSION met in regular session on December 19, 1979 in the Board of Supervisors' Meeting Room, Carither's Building, Napa, California, at 10:12 A.M. with the following members in attendance: C. Lilleberg; V. Fershko; L. Hawkley; S.Snowden, Chairman. Absent: W. Beckstoffer. Ex-Officio and Advisory Members present: J. Hickey, P. Crundall, C. Lober, W. Selleck, T. Cave.

Commissioner Snowden led the salute to the flag.

Approval of the Minutes of November 7, 1979 was deferred to the end of the meeting as Commissioners had not had time to read them.

PACIFIC UNION COLLEGE USE PERMIT REQUEST (#U-147980)

Public Hearing:
CEQC Tape, Track #6

Request to expand the existing laundry with a 1,640 square foot addition located on a 75.13 acre parcel on the east side of Howell Mountain Road at it's intersection with Angwin Avenue within a PD District. (Assessor's Parcel #24-410-11).

Public hearing opened at 10:13 A.M.

Senior Planner Crundall presented the Department Report and Recommendation.

Recommendation:

Environmental: None. Categorically exempt.

Planning: Approval, with Findings, and subject to Conditions of Approval #1, #2, #3, #4, #9

Speakers:

Proponents: J. Krussow, Assistant Business Mgr. representing Pacific Union College present to answer questions

Opponents: None

Other: None

Public hearing closed.

Action:

MOTION BY FERSHKO, SECONDED BY LILLEBERG

for approval, with Findings and subject to Conditions of Approval #1, #2, #3, #4, #9.

This motion carried on the following vote:

APPROVED

AYES: Lilleberg, Fershko, Hawkley, Snowden
NOES: None
ABSTAIN: None
ABSENT: Beckstoffer

Note: Beckstoffer present at 10:18 A.M.

PROPOSED ORDINANCE AMENDMENTS TO PERMIT CONSTRUCTION OF "SMALL WINERIES" WITHOUT USE PERMIT APPROVAL IN AP AND AW DISTRICTS

Public Hearing:
CEQC Tape, Track #6
Continued from: August 15, 1979, September 19, 1979, October 17, 1979 and November 7, 1979 by the Commission

Proposed Ordinance Amendments to permit the construction of "small wineries" without use permit approval in all AP (Agricultural Preserve) and AW (Agricultural Watershed) Districts.

The Planning Director reviewed his memorandum dated December 19, 1979 with the Commission and presented the Department Recommendation.

Recommendation: That the Commission complete the public hearing and recommend:

1) That the Board of Supervisors adopt a Negative Declaration in regard to the proposed zoning ordinance changes.

2) That the Board of Supervisors approve the zoning ordinance amendments as recommended and direct County Counsel's Office to prepare the necessary ordinance for Board adoption.

3) That the Board of Supervisors approve the Small Winery Design Criteria, as recommended, and direct the County Counsel's Office to prepare the necessary Resolution for Board adoption.

Speakers:

Bob Dwyer
Napa Valley Grape Growers

Bob Long
Sage Canyon
St. Helena, CA.

General Discussion:

Hickey noted one change: a small winery means a winery with a maximum annual production capacity of 20,000 gallons of wine and is located on a parcel of land 6 acres or larger in size.

Page 2 of the Recommended County Zoning Ordinance Amendments, under Zoning District Changes - A-3 has been changed. It originally read one small winery per legal lot. It now reads "One small winery per parcel." The concern with the legal lot definition was that you could get into additional subdivisions, etc., and what they are trying to avoid is a situation where one owner might suggest he wanted to put five wineries on one piece of land.

Hickey said in regard to B-3, it now reads: "One small winery per parcel."

Under Access Roads, Hickey said the Environmental Protection Section reviewed the traffic loading figures on these highways to see if there could be any modification. 2-A, "Access shall be off a road other than the following:" Number 1 was modified to read: "State Highway 29 between Yountville and St. Helena," as opposed to Calistoga. Item 5 would be moved up under 1, so it would read: "A dead-end road extending from the preceding named road." In other words, 2, 3, and 4 would not carry that proviso - only 1. This is based on recent traffic loading figures released by CALTRANS. Hickey further explained that under Access Roads, A-2, A-3 and A-4 would remain the same. A-5 would be combined with A-1.

Snowden said what they are now talking about would not be a part of the ordinance. It would be subject to revision just by resolution. Hickey said that was correct. He added it would be part of the ordinance in that it references it and would be adopted by the Board of Supervisors. It would not be incorporated in the Ordinance.

Hickey said Item 2-D, Access Road Requirements (right-of-way improvements), #1 reads: "Access road requirements for a small winery when the winery is the only facility other than related residential structures served by the access road shall be the same as for a single-family residence built on the same parcel under the same conditions." Number 2 reads: "Access road requirements for a small winery when the winery is only one of two or more parcels or uses served by the same access road shall be determined by the County Public Works Department."

Under Setbacks and Density, 4-B, Hickey said the Department tried to clarify it. It had previously read: "A minimum separation between wineries of 2,000 ft." Department understood Commission to mean a minimum road frontage separation so that wording was added to clarify the intent.

Snowden said on 4-B they were talking about too many driveways being close to each other. Crundall said people were concerned with the corridor effect. Snowden felt 4-B should read as follows: "Maintenance of a minimum road frontage separation between access roads or driveways to wineries of at least 2,000 ft."

Under Building Sites, Hickey said 5-A reads: "All construction related ground disturbing activities shall be limited to the period between April 15 to October 15." Previous discussion raised the issue that those dates, April 15th to October 15th, were not firmed. However, the Department did not see that the Commission had reached any concensus to modify those dates. Those are the usual accepted dates for construction period. An applicant requesting review by the Board for modification could get this modified.

On Page 4, under Signs, there was considerable discussion at the last meeting about not being able to find a winery on dark or stormy nights as the original concept the Commission had incorporated was there should only be signs on the winery buildings. The Department is recommending the County standard ordinance requirement for on-site signs would apply to a small winery. This means the sign could be detached from the building. It could be placed in proximity to the highway, 100 sq. ft. maximum,, said Hickey.

Hickey said the concept of landscaping was added based on earlier discussion. What it really provides is that the applicant will have to submit a landscape plan to the Department. The plan would include both planting and maintenance schedule. Final inspection by the County Building Inspection Division would not be given to any winery until the plan has been completed. A temporary certificate of occupancy may be granted when landscaping work is delayed because of bad weather.

Beckstoffer asked in regard to Signs, if they could put more than a name and address on the sign. Hickey said they could put the name of the winery on the sign. Beckstoffer asked if they could put "no tours and tasting - open from 10 to 4," for instance. Crundall said they can hang a little "open and closed" sign on. Hickey said there are no off-site signs permitted. Beckstoffer said he felt it was appropriate to apply the County standard ordinance requirement for on-site signs. It would be appropriate to have the name of the winery and the address on the sign. He would like to limit it to the name and address of the place.

Fershko said on Construction Standards, Page 4-B, if a Butler Building is constructed that it would have to be sided by redwood, stucco or rock? There will be no metal siding allowed? Hickey said that is the way it reads.

In regard to landscaping, Fershko asked if there was any way they could put in it is the intent of the landscaping section to try to promote as best as possible the integration of the winery with the surrounding environment. That is what he is looking for in landscaping, added Fershko. The landscaping plan should have a motif - something that would dress it up. 3.

so it blends in with the environment. Fershko added given the right builder or winery, the County would not have to impose any of these conditions as it would be done by the applicant himself. But, there are examples of people less sensitive to such things. It is those builders he worries about. When they dispense with the use permit, he would be concerned with the person who will not build an attractive winery. Hickey said there was no problem in putting some kind of an introductory statement in that would clarify the Commission's intent in regard to the requirement.

Hawkley asked where Public Works stood in regard to road requirements. Hickey said the Board's direction was that the Commission should recommend what they felt was appropriate. In the discussion with Harry Hamilton his feeling was that County standards should apply, and until the Board modifies those standards they have no option.

Lilleberg said in regard to road requirements, she would like to completely delete that dead-end road section - whether it is #5 or part of #1. Hickey said that came from the Environmental Protection Section as that section of the highway is shown as exceeding capacity. Therefore, if you are going to introduce additional traffic the concern is it should be through a use permit process where mitigation measures could be introduced for the purpose of providing traffic safety. Hickey said the question is, do you want to exempt small wineries and not have to do the environmental impact report. Dead-end roads and traffic safety was discussed at length.

Lilleberg asked about Access Roads, 2-B, provision for installing acceleration and deceleration tapers on the public roadway at the proposed facilities entrance. Hickey said because of the fact you are having a winery and bringing in equipment facilities and having people come in, the entranceway provisions would remain the same. That would include acceleration and deceleration tapers. That would include "C" as well. Just a regular residential driveway might not be sufficient, said Hickey.

Beckstoffer said the feeling he had was this winery use would not really intensify traffic. Hickey said his understanding was the Commission's concern was with the tremendous expense involved in left-turn lanes. Beckstoffer asked who paid for the acceleration and deceleration tapers. Hickey replied, the property owner. Lilleberg felt with a 16 ft. entranceway they could do without acceleration and deceleration tapers. Hickey said it was the Commission's recommendation. Beckstoffer said he would like to cut down the paving. He would like to drop 2-B. Lilleberg agreed. Beckstoffer said he almost sees it as reducing the traffic problem, especially in harvest season, as it keeps the gondolas off the streets.

W. Selleck of the Environmental Protection Section said he went through and took some average trip generations from several different situations and it appears that an existing parcel and vines, with no house, on the average might generate a half a trip a day. Most of that would be concentrated in the crush. You get four to eight trips a day for a period of a month. Beckstoffer said if anybody is working there you have two trips a day, plus harvest. Selleck said so they are up to 2½ trips a day average. With an existing parcel with a house you are talking about probably ten trips a day. On an existing parcel with a winery you are talking about some place between eight to sixteen trips a day. An existing parcel with a house and a small winery you are talking between 14 - 26 trips a day. If you end up with a parcel with a house and a winery, you are getting between 40 and 260% more traffic, said Selleck.

Beckstoffer said if the owner works the winery and has his house and winery on the parcel, he felt the traffic, the trips per day, would be cut down. Selleck said in talking with people regarding a winery this size, the estimate

12-19-79

was that it would take a owner/winemaker; secretary/bookkeeper; salesperson/purchasing agent and two cellar hands and two more helpers during the crush. Selleck said there is nothing in the Ordinance that says that you have to live on the parcel to have a small winery. So, you could just build a small winery and all the traffic would be coming in and out. The range comes about because you could assume it takes two trips per day or four trips per day for employees.

Beckstoffer said the probabilities are that a small winery would have the same traffic load as a single residence. If it is ten for a residence, he did not see how you could get away from ten for a small winery. There is 2.8 people in a single-family residence today. He did not think you would have anything different than that in a winery situation. He did not see how Selleck could argue it was different.

Hickey said if it was the Commission's feeling they wanted to eliminate the acceleration/deceleration tapers, that is fine. If they reach the point where the Department feels that that is really jeopardizing a negative declaration from an environmental standpoint, they will say so. It is the Commission's decision, said Hickey.

Beckstoffer said he would like to see this be as unobtrusive as possible. Let us just have it like a residence.

Hickey said they are going to have to provide the 16 ft. wide 30 ft. long paved entrance, etc., and if they want to make it just like a residence he suggested they drop 2-C, also. Then there are no road improvement requirements at all different from a residence. Are you talking about compromise with the existing standards or elimination of the existing standards?

Beckstoffer said his feeling is when they talk about a 20,000 gallon winery you are talking about something small. Most of the wineries you see around here are much bigger than that.

Fershko felt it was all right to treat a small winery as a single-family residence in regard to road improvements. He agreed with Beckstoffer.

Lilleberg suggested leaving "C" and dropping "B". Beckstoffer said perhaps they could keep "C" except it would not need to be paved. Hickey felt paving for 30 ft. would be reasonable.

Cliff Lober, Chief Deputy County Counsel, said County Counsel is interested in this particular requirement. The County is self insured for public liability and property damage. The connection with the road has to recognize site distances and necessary safety factors. There are lawsuits regarding entrance on to roads. There should be some control on the actual entrance for safety purposes, said Lober.

Beckstoffer said having entranceway regulations for safety factor was reasonable - but he did not think it had to be paved.

Chairman Snowden invited speakers to address the Commission in regard to this matter.

Bob Dwyer, speaking for the Napa Valley Grape Growers, addressed the Commission. He complimented the Commission on what they had done so far. He felt the 20,000 gallon figure was much more reflective of the size winery they are talking about than the 10,000 case winery originally talked about. It is a small operation. The generation of traffic is not going to be that much more than a large family living on the property. Even in a residence you get heavy use of a driveway in terms of going in and out, said Dwyer. You have a propane truck that comes in that probably weighs a lot more than the average gondola and pickup truck. There is a considerable amount of traffic to a rural residence - garbage trucks and service trucks, etc.

Dwyer said if the Commission had gone out and looked at a couple small wineries, they would see a 8500 case winery is a very small operation. Mike Robbins started out the Victorian House original Spring Mountain Winery probably doing several thousand cases in that basement. Dwyer said economics are going to limit the excessive use of this permit exemption. There aren't too many people who can afford to go in and put the sort of capital up front that the Commission is talking about, and justify it with a 5,000 case winery. Generally, it is a marketing alternative for a grower. It is an ag processing plant on the property of very small scale to give him an option in terms of his sale of his commodity. As soon as you go in and invest the kind of money that it takes even to do 5,000 cases, it has to be somewhat of a commercial operation. It is a large scale commercial operation that generates traffic. He has the same concerns the Commission does about setbacks. He felt the Commission had addressed that. He agreed that the winery built on Silverado Trail that you look down on and there is only maybe 75 ft. off the shoulder of the road is not aesthetically pleasing. The use permit process has not solved that problem. The use permit process has not solved the liability problem of pulling down that roller coaster into that parking lot off of Silverado Trail with a traffic pattern there of 55 miles per hour. He did not think they were creating problems for themselves that weren't existent under use permit process.

Dwyer said he was a little concerned about the dead-end road problem. What if somebody comes in for a use permit on that dead-end road? Will the first two be all right and will everybody else be stopped because of the traffic generation? Snowden said frequently there are deferred improvement agreements and that sort of thing. Dwyer said the Commission will have use permit applications and perhaps that is the proper way to handle it. It does bother him a little because they are thinking in terms of that grower trying to utilize his crop on his property. There are a number of vineyards on those dead-end roads and he can see the problem with the traffic there, said Dwyer. It does deserve the careful consideration of the Commission.

Dwyer said in regard to Access Road, B and C, he felt the Commission was correct in wondering about it. The idea was to make them unobtrusive.It's true that most of the operation was going to take place on the property, that there were not going to be tours and public tasting. They were trying to minimize the road standards. They should not have a left turn stack lane for an 8,000 case winery. He did not think they should keep B and C. This would add a tremendous amount of cost to somebody trying to put in the size operation they are talking about. He asked what the residential requirements were in terms of a driveway. Are there any? Hickey said there were none.

Dwyer said the 16 ft. wide, 30 ft. long paved entrance would solve the acceleration/deceleration taper problem. Either/or might be a better solution. He mentioned using his own driveway off Silverado Trail with a horse trailer behind the car and where the traffic is running 55 miles per hour. That is a problem. He could see that as possibly a problem for the gondola. He understood the County Counsel's concerns about liability. He did not feel they needed both B and C.

Dwyer said he was concerned about the setbacks and density. It is wise of the Commission to concern themselves with the setback and 400 ft. is more than adequate.

Dwyer said the 2000 ft. minimum road frontage separation causes some questions for him. What the Commission is telling the grower or the individual who wants to set up a winery is if his parcel has 2000 ft. of road frontage, he can process some of the grapes on his property. If

12-19-79

your parcel is pie shaped and you have only got 100 or 200 ft. of road frontage, you can't build a winery without a use permit. Snowden said that was not it. Dwyer said you would have to have a combination of 1000 ft. on either side of the drive. Snowden disagreed. Staff's intent is that wineries be 2000 ft. apart. That is measured by taking perpendicular lines from the roadway up.

Beckstoffer said should it say 2000 ft. between the access roads on the highway rather than the winery itself? Dwyer said the first person who gets a winery holds everybody off for 2000 feet.

Beckstoffer suggested they use two different standards - B is 2000 ft. between the access road and "C" is 500 ft. between buildings. You have to abide by one or the other of those. If you qualify under either one, said Snowden, you get it.

Hickey said the Commissioners should keep in mind this is supposed to be ministerial, not discretionary action by the County. Snowden said it would be ministerial. If the answer to both is no, you get a use permit. Dwyer said you could have entranceways closer than 2000 feet but the wineries, due to the topography and the direction that the entrance roadway goes, could be 2000 feet apart.

Dwyer said the road requirements in terms of two or three or more parcels, is good. That makes sense. He was concerned about the not firm, optional April 15th to October 15th building site construction period. If it isn't firm, let us not make it firm in the Ordinance. He did not like to see abritrary dates, said Dwyer. Hickey said the reason for arbitrary standards is to get out of the requirement for an EIR and to issue a building permit. How else are you going to identify a standard? What is a better date? In order to get out of the problem situation of ground disturbing activities and environmentally issuing a negative declaration you have to have some dates. Dwyer asked to what other non-use permit do they attach those dates? Selleck said parcel maps require using those dates.

In regard to the Butler Building, said Dwyer, he is sensitive to the way they look when they are right up next to the highway. However, he wondered if with landscaping in front of one with it being set back 400 ft., if the Commission was not being too fussy in terms of what is allowed for ag processing. Why redwood? Why not Fir? He felt the Commission was really locking people into some things and they will then have to come in for an EIR and use permit just to get a building up.

In regard to landscaping, said Dwyer, Commissioner Fershko brought up the point that they have a problem in terms of its integration, etc. He said the escape clause for them there is the fact that it does have to go through a review and approval. He would assume if it doesn't integrate the winery properly into the surrounding environment, it is not approved. (through the review process). We have use permits now and it is not happening, he added. Perhaps the Commission should think more carefully about the review and approval program under both the exemption and use permit process, added Dwyer.

Beckstoffer said if you are promoting the processing of agriculture, the Butler Building has to be allowed. A Butler Building is an agricultural building. As much as you would love to see it all be very rural and historic, he did not see how they could get away from allowing Butler Buildings.

Bob Long, Sage Canyon area, said he has a small winery there. He was not speaking in favor or against this small winery exemption but came to find out what the Commission was doing and to keep current with what is going on. He said he has about a 2,000 case winery. It is located on Prichard Hill next to Chappellet Winery. In their use permit proceeding they have visitor limitations and the use permit reads that they are permitted five visitors a week. He did not object

to that at the time. He did not know how many visitors they would have. As a matter of fact they don't get five visitors a week! He said if you have a winery that is closed to the public and is not open for public tours and tasting, and the only way to get there is by phoning, etc., you are not going to have a problem with road access. Long said where the winery is not visable from the public road it is sort of out of sight, out of mind. He shared Fershko's concerns about some of the wineries right up against the main highways. However, on wineries that are not visable from a public roadway, do they really care what the landscaping and construction material is? (As long as there is proper adherence to the building codes). He was speaking of wineries "totally not visable from the public road." Fershko said that was a completely different matter. Long said he had several friends who were interested in building wineries and they did want to use a metal building because it is much cheaper. If they apply for use permit can they use them? Snowden said yes, they have negotiated trellis and wood siding, etc. Long said the Commission does not want any Butler Buildings unless they have control over what they are going to look like after they are finished.

Fershko said yes. Dwyer made a good point. They haven't applied adequate landscaping requirements on buildings that have gotten use permits. Fershko said without use permit they will not know where they are going to be located. It is so hard to say 400 feet would be adequate. So, you have some landscaping requirements. Long said if you cannot see the building site from a public road, does the Commission really care about the requirements?

Long asked about the separation between wineries. Is it going to be the policy of the County to have 2000 feet as a basic standard between the wineries whether they are from the roadway or not? Hickey said that was what the original thought was, that there would be a separation between them on the road frontage. Long asked if they were looking for 2000 feet whether it would be under use permit or not. Snowden said nobody has proposed there be a hard and fast rule that wineries not be closer than 2000 feet from one another. This is talking only about the exemption from use permit said Snowden.

Long asked if it was possible to incorporate in the thinking of the Commission the situation where property owners agree to get together and say it is all right that a person builds one 1866 feet away. The issues are avoiding multiple entrances and traffic safety, said Fershko, as well as visual impact.

Long suggested the Commission consider one entrance for more than one winery for access purposes. The number of driveways on these highways is a concern to him, also.

Snowden said it is important to distinguish the fact they are talking about what gets you out of use permit requirement and not what gets you into a winery. Long said he understands that.

Commission Discussion:

Lilleberg felt if she had a residence, she would want a winery 2000 feet away, whereas if she had another winery she would not care if it was 500 ft. as opposed to 2000 ft. She felt the numbers are reversed.

Beckstoffer said if you had a winery and a residence on the same parcel you could do what you want. It is just that if you are building a winery and there is a residence on an adjoining parcel, you have to keep the winery a minimum of 500 ft. from that adjoining home. Snowden said some roadways create such a line of demarcation that that kind of a line doesn't make sense. (such as Silverado Trail and Highway 29). Apart from those situations, what is

wrong with just saying to get an exemption you have to be 2000 ft. away from another winery? Hickey said maybe what they need to do is add another dimension that says "if you are located within 1000 ft. from a roadway, you have to be 2000 ft. from a winery? Commissioners agreed that would be a good idea.

Snowden said he is concerned about insurance liability. They are talking about standards and not part of the Ordinance. Could they have something in there providing for access safety review? Hickey said the more discretion they get the more problems they get. Beckstoffer said if they had "C" but do not require paving, it is no problem. Beckstoffer said a winery is now a building or a portion thereof used for the crushing of grapes; the fermenting and processing of grape juice; the aging, processing and storage of wine; on-site disposal of winery waste generated on the site; etc., etc. Would that be better said, "A winery means a building or a portion thereof used for the crushing of grapes; the fermenting and processing of grape juice; the aging, processing and storage of wine and as required on-site disposal of winery waste generated on the site; etc.,etc." His point was they should not have to do all those things, but they should do the basic winery processing. What he would like to do is say at the winery you must crush the grapes and you must ferment and process them. Then you can do these other things if you want. But, you can't, for example, just do the other things and not do the crushing and fermenting. Hickey suggested they add "and may include." The Commissioners agreed.

Action:

MOTION BY BECKSTOFFER, SECONDED BY HAWKLEY

that they recommend as the Staff has presented, with the following changes:

Paragraph #1, Definition: "Winery means a building or a portion thereof used for the crushing of grapes; the fermenting and processing of grape juice; the aging, processing and storage of wine and may include on-site disposal of winery waste generated on the site; bottling of wine; the warehousing, shipping of wine plus related office and laboratory activities as accessory uses. Retail and wholesale sales activities conducted within the winery shall be limited to wines produced on the site or wines produced by the winery at other locations."

Small Winery Design Criteria: 2. Access Roads: A. Access shall be off a road other than the following: 1) State Highway 29 between Yountville and St. Helena. 5) be combined with 1. Eliminate "B" and take the word "paved" out of C.

Paragraph 4, Setbacks and Density: B should read: "Maintenance of minimum road frontage separation between wineries located within 1000 feet of a major road."

Paragraph 7, Signs: Sign should include only the name and address of the operation. (Beckstoffer said he did not want signs to include tours and tasting and the hours. Hickey said that would be impossible to administer. He had not heard of a requirement that limited what you could say. Lober said the on-site sign requirement is that it can only refer to things on the site, as well as being physically on the site. He did not think there is any first amendment rights problems here. Their other ordinance is not that restrictive. Hickey said what the County is saying is that they are subject to the same requirements of any other business activities. Beckstoffer agreed).

Paragraph 8, Landscaping: Have a preamble stating the intent to integrate with the environment. (Hickey said "for the purpose of blending the winery with the agricultural character of the surrounding area," or something 9.

to that effect. Beckstoffer agreed.)

Paragraph 6-B: Should say, "Installation of wood, stucco or rock facing on any non-historic structure."

Lilleberg said she wanted to make an amendment to Paragraph 5, Building Site. She would change B to read: "Erosion control measures shall be installed" instead of installation of. She would like C to read: "Reseeding shall be done with a grass mixture acceptable to the Napa County Resource Conservation District to all areas disturbed by winery construction including the cuts and fills along the access road required and around the sewage disposal system installed. Said reseeding shall be done prior to the first winter rains after facility construction."

Lilleberg said she would like Paragraph 5-B to read: "Any ground disturbance or vegetation removal is prohibited."

Lilleberg said on Page 2 of the Ordinance itself, the last word of the second line should be "of" instead of "or."

Beckstoffer said those changes Lilleberg mentioned were acceptable changes. Hawkley agreed. Snowden said he questioned the change to 5-E. Lilleberg clarified it. It should read: "Any ground disturbance or vegetation removal except in accordance with the provisions of the County's Watercourse Obstruction/Riparian Cover Ordinance, is prohibited." The Commissioners and Hickey agreed with this wording.

This motion carried on the following vote:

RECOMMENDED FOR APPROVAL

AYES: Beckstoffer, Lilleberg, Fershko, Hawkley, Snowden
NOES: None
ABSTAIN: None
ABSENT: None

INTERIM GROWTH MANAGEMENT ANALYSIS (IGMA)

CEQC Tape, Track #6

Interim Growth Management Analysis (IGMA) Revised Draft incorporating Commission recommendations and reflecting data requested by the Board of Supervisors at a joint meeting with the Commission on November 26, 1979.

CONTINUED

Commissioners scheduled discussion on IGMA for the next meeting, January 9, 1980, at 1:30 P.M.

NAPA COUNTY GENERAL PLAN - PLACEMENT ON THE BALLOT

CEQC Tape, Track #6

Napa County General Plan - Placement on Ballot. Requested by Commissioner Fershko.

CONTINUED

Commissioners scheduled discussion on General Plan for the next meeting, January 9, 1980 at 1:30 - to be discussed along with IGMA.

STANLEY RANCH

CEQC Tape, Track #6

Stanley Ranch Development Impact. Requested by Commissioner Fershko.

Chairman Snowden suggested that Commissioner Fershko work with the Staff to see what they can get done between now and January 9th; contact the four members of the Commission directly who would be involved in discussion if they think something can profitably be done before the meeting of the 9th of January.

Action:

MOTION BY FERSHKO, SECONDED BY HAWKLEY

12-19-79

that the County of Napa through it's Planning Commission ask for a meeting with the City Planning Commission to discuss the Stanley Ranch and proposed modification to the General Plan of the City, as well as the City's Growth Management Plan and how it relates to the number of units per year they allow for and as it relates to the County General Plan.

Fershko added that each jurisdiction is working totally independent of the other. He would like to invite the City Council to attend this meeting as well as the Board of Supervisors. He would like to arrange an evening meeting as soon as possible.

This motion carried on the following vote:

APPROVED

AYES: Beckstoffer, Lilleberg, Fershko, Hawkley
NOES: None
ABSTAIN: Snowden
ABSENT: None

Note: Snowden abstained as the City of Napa is a client of his.

MINUTES OF MEETING OF NOVEMBER 7, 1979

Note: The Minutes of November 7, 1979 will be continued to the next meeting, January 9, 1980.

MAJOR FREEWAY AND HIGHWAY IMPROVEMENT PROJECT PRIORITIES FOR THE 1980 FISCAL YEAR

CEQC Tape, Track #6

Major freeway and highway improvement project priorities for the 1980 fiscal year.

The Planning Director said the Commission had indicated it's concern they were not given the opportunity to comment on highway facilities. He asked if the Commissioners have any comments to make that can be forwarded to the Board of Supervisors, at their January 8, 1979 meeting. The Commissioners decided that interested members would attend the meeting and make their comments in person.

ADDENDUM

CORRESPONDENCE: JAMES O. SULLIVAN USE PERMIT U-107879

CEQC Tape, Track #6

Correspondence from James O. Sullivan dated December 2, 1979, regarding reduction in ultimate production capacity relative to Sullivan Winery Use Permit #U-107879 - reduction to be from 100,000 to 22,500 gallons.

Chairman Snowden directed that the communication be made a part of the file.

ADJOURNMENT

There being no further business, the meeting was adjourned at 12:08 P.M.

W. SCOTT SNOWDEN,
CHAIRMAN

JAMES H. HICKEY,
Secretary to the Commission