# Exhibit 5

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF NAPA

HONORABLE MARK S. BOESSENECKER, JUDGE, PRESIDING, DEPARTMENT 5

---oOo---

| | |
|---|---|
| NAPA COUNTY and THE PEOPLE OF THE STATE OF CALIFORNIA ex. rel. THOMAS ZELENY, as Interim Napa County Counsel, | |
| Plaintiffs, | |
| vs. | No. 22CV001262 |
| HOOPES FAMILY WINERY PARTNERS, LP, HOOPES VINEYARD, LLC, LINDSAY BLAIR HOOPES, and DOES 1 through 10, inclusive, | VOLUME 8<br>PAGES 1200-1372 |
| Defendants. | |
| AND RELATED CROSS-ACTION. | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Tuesday, February 6, 2024

COURTHOUSE, NAPA, CALIFORNIA

Reported by: VALERIE PRINCE, CSR #7946, RPR, CRR, CRC

With the use permit exemption, and I knew one of the people that was presenting that to the County, and he told me about it, and it just simplified the whole process for us.
Q. And so it sounds like the small winery exemption really helped you out as a small family-owned winery, right?
A. Yes, it did.
Q. Did you know Mr. Coleman, who owned the winery that is now at 6204 Washington Street?
A. No.
Q. Now, when you said that the use permit was too expensive, was that just the cost of the use permit, or were there other costs that went into that expensive part of it?
A. This is more in talking to other wineries and winemakers that were in the process of or had gone through the process of just the tremendous cost for everything, directly as, you know, paying the County or -- and then complying with all the other restrictions, whatever they were. I'm not really sure exactly what they were but ...
Q. So it sounds like you didn't actually price out what it would cost you to do a use permit. You relied on other people telling you it's an expensive process.
A. That's pretty much correct, yes.
Q. Okay. And so you were happy that you had the exemption, right?
A. Yes.
Q. Okay. And so I'd like to actually take a look at that. There's a bunch of dark binders up there behind you, Mr. Brakesman.

1325

A. Um-hmm.
Q. And if you look at Exhibit it's 1297.
Maybe Nicholas -- oh, thank you very much.
MS. BARTHOLEMY: 1297 you said?
MR. SPELLBERG: 1-2-9-7.
THE COURT: That's a cross-complaint for intervention?
MR. SPELLBERG: It's Exhibit A to that, Your Honor. That's where I'm taking him too. It was the only one I think that was in a binder. It's Exhibit A to that.
THE COURT: Yeah. And actually, it hasn't really been asked, but Mr. Brakesman what's the name of your winery?
THE WITNESS: Summit Lake Vineyards. Summit Lake Vineyards and Winery.
Q. BY MR. SPELLBERG: So, Mr. Brakesman, we've put a document in front of you --
A. Yes.
Q. -- it's Exhibit 1297, Exhibit A, but is that your application for the small winery use permit exemption?
A. Yes, it is. It's my handwriting.
Q. That's what I was gonna ask you. And you filled this out as the owner of the property, right?
A. Correct.
Q. And I notice if you go down about halfway on the box that says Shipping, you say, "Via truck, UPS," right?
A. Yes.
Q. And what was that? What were you -- how much -- what were you shipping? How were you shipping?

1326

A. Well, it would have been case wines or bulk wines, but we didn't know how we were gonna do it, maybe we phone up a truck or phone up UPS, however we had to ship it.
Q. And who would you ship it to?
A. Usually people that we had met, say, through this private tasting. Oftentimes, they may have been from out of state or something like that, and they want the wine shipped to them rather than try and carry it with them.
Q. And so when you filled out the form for the exemption, you identified you were gonna either ship your wine by truck or UPS, right?
A. By whatever means it took. We weren't exactly sure what it was going to take.
Q. Okay. And then you saw as you go across from the Shipping that it says no tours and public tastings, right?
A. Is that on here?
Q. If you go right, continue on the line that says, "Shipping via truck."
A. Okay. Yeah, no tours/public tastings.
Q. Okay. And you understood that limitation when you signed up for the small winery exemption, right?
MS. FALACE: Objection; vague.
THE COURT: Overruled. You can answer.
THE WITNESS: Yes, we understood that public tastings and tours were not something we could do without a use permit for that, but private tastings would be allowed.
Q. BY MR. SPELLBERG: Did anybody at the County ever say that to you, or was that your presumption because of the way

1327

this small winery exemption is written?
A. I don't believe we had any communications with the County except for returning this page, and after that, I don't remember any communications until maybe fairly recently.
Q. Okay.
A. No instructions were given by the County or restrictions.
Q. Okay. And you didn't go to the County and ask, "Can I have private tastings since this says no public tastings?"
A. We just assumed that private tastings were okay.
Q. Okay.
A. Only public tastings without a use permit wouldn't be allowed.
Q. And then my question is, did you ever check that assumption with the County?
A. I don't really recall. I don't think so, but I really don't recall.
Q. Okay. And then if you go down to the bottom of the first page of the document there, you identified the number of visitors anticipated, and you wrote two per week?
A. At this point, I am totally confused by these questions. Number one, it goes back to the number of shifts. Well, there's no shifts in a family winery, you know. I go to work at 8:00 in the morning or 7:00 in the morning and work all day, or I don't work that day, and we don't have any full-time permanent employees.
So in this area where it says employees and full-time and part-time, I don't know. And with the idea of anticipated

1328

visitors, I didn't know. We don't know.
Q. Sure. But that's your handwriting on that bottom section where it has the numbers of -- number of employees and number of visitors, right?
A. Yeah, per day it's blank and then per week it was two.
Q. And do you recall why you anticipated you would have two visitors per week?
A. I think I was just so confused because we didn't know how many tastings and tours we were going to have.
Q. Okay. And you told us a little while ago that when you were having people to the winery to taste wine, you said that you weren't -- you couldn't advertise. Remember that?
A. Yes.
Q. And why did you understand that you couldn't advertise?
A. Because I think that would be going something where if you were a public -- or having public tours and tastings, you would be advertising, you know, that your doors are open, come visit us, and we didn't want open tastings. Private tastings were fine as long as they were by appointment and fit into our schedule. And that's still true today.
Q. I get it. So I think what you're telling us is that you felt that advertising would be the same as public tasting.
MS. FALACE: Objection; misstates testimony.
THE COURT: Overruled. You can answer.
THE WITNESS: That's really -- could you say -- or express that ...



Q. BY MR. SPELLBERG: Repeat it?
A. Sure.
Q. I'm just trying to summarize your last answer, but I think you told us that one of the reasons you felt you couldn't advertise was because that would be part of a public tasting, which was prohibited.
A. Yes, and also advertising would cost money whereas our private tours and tastings, you know, were by word of mouth, and we just didn't have money for advertising.
Q. Sure. And so it sounds like you were able to -- the people that would come for your private tastings heard about you through word of mouth.
A. Mostly, yes.
Q. Okay. And was it mostly your friends that initially came to the winery to try the tastings?
A. In very early years, it was just friends --
Q. And then --
A. -- and college roommates and high school roommate and then that expanded. And also we would go out -- my wife, Sue, would go out and try and sell wines, find a distributor, but with a small winery it's so difficult to find a distributor that can represent you well and handle such a small volume also.
Q. And that makes sense to me. So just to sort of summarize, your early customers were almost exclusively friends, colleagues, people you knew; is that fair to say?
A. Yes. You know, within reason but yes.
Q. Okay. And then that expanded because they liked --



your friends and colleagues liked the wine, they told other people, and so that was the word of mouth that brought people to your winery?
A. Yes.
Q. Okay. One moment, please.
MR. SPELLBERG: That's all the questions I have, Your Honor, thank you.
THE COURT: All right.
Go ahead. You have redirect?
MS. FALACE: I don't, Your Honor.
THE COURT: I have some questions.
MS. FALACE: Sure.
THE COURT: So, Mr. Brakesman, I just have a few questions for you as well.
THE WITNESS: Sure.
THE COURT: So approximately how many cases a year of wine does your company produce?
THE WITNESS: We're currently at about 2,000 cases, 4 to 5 thousand gallons. And that is all also strictly estate wines. These are grapes that we grew on the property and make wine from there on the property.
THE COURT: Okay. And do you have any employees on the property other than you, your son, and your daughter?
THE WITNESS: Well, occasionally we might have somebody out there mowing the lawn, or I've got grandkids that we'll hire.
THE COURT: Okay.
THE WITNESS: The major work, say, in vineyards work



where I do most of the spraying and discing and things like that, but major work is done by a contract -- a vineyard management contractor, say for harvest, pruning, because that's just beyond our home use.
THE COURT: Right. And so during harvest, you may bring on additional people to do additional work.
THE WITNESS: Yes.
THE COURT: Okay. How frequently over the course of the last 40-odd years in the course of a week would you host a private tasting?
THE WITNESS: Now, my daughter --
THE COURT: Can you give me kind of an average?
THE WITNESS: Ask me again, please.
THE COURT: Sure. I'm curious as to how frequently you would have a private appointment for someone to come up and have a tasting, whether it's on a weekly basis, monthly, daily, whatever.
THE WITNESS: I would say in a week we might do 15.
THE COURT: 15 tastings?
THE WITNESS: 15 groups arriving, you know.
THE COURT: 15 separate appointments?
THE WITNESS: Yes.
THE COURT: Okay.
THE WITNESS: Yeah, that's a good way to say it.
THE COURT: And in the course of all those years, has the County ever issued you a citation or any kind of notice that would suggest to you that maybe you weren't allowed to do that?

THE WITNESS: Later on we received a notification from the County that the County wanted all the small wineries the County wanted to inspect for mainly safety hazards, making sure that, you know, it was safe for the public to be there since we were hosting stuff.
THE COURT: Okay.
THE WITNESS: At that point, we invited the County up, and they arrived with the fire marshal, four or five inspectors; they looked at the place. We didn't have exit signs, illuminated exit signs over the exits, and I think there were eight different items, which we corrected, but they were kind of these minor things, or I think they're minor.
THE COURT: How long ago was that?
THE WITNESS: Let's see, would have been '80 --
THE COURT: In the 1980s?
THE WITNESS: No, it would have been 19 -- 2018.
THE COURT: Oh, 2018.
THE WITNESS: Yeah, 'cause this is, you know, 5 or 6 years ago.
THE COURT: Sure. And so were any of these contacts with the County having anything to do with you conducting tastings on your property?
THE WITNESS: No.
THE COURT: No, okay. Thank you.
Any redirect or recross?
MR. SPELLBERG: No, thank you, Your Honor.
MS. FALACE: Thank you, Mr. Brakesman.
THE COURT: All right, Mr. Brakesman, thank you very



much. You're excused.
THE WITNESS: All right. Thank you.
MS. FALACE: Your Honor, is it okay if Mr. Brakesman stays?
THE COURT: Well, he's been excused, so I take it there's no objection.
MR. SPELLBERG: Not from us, Your Honor.
THE COURT: Yeah, that's fine. I think Ms. Falace said he's done testifying.
Who is your next witness?
MS. FALACE: Heather Brakesman Griffin.

HEATHER GRIFFIN

called as a witness by the Defendant, having been duly sworn, testified as follows:
THE WITNESS: Yes.
THE CLERK: Thank you.
(Bailiff directs witness to state and spell their first and last name.)
THE WITNESS: Heather Griffin, H-E-A-T-H-E-R, G-R-I-F-F-I-N.

DIRECT EXAMINATION OF HEATHER GRIFFIN

BY MS. FALACE:
Q. Good afternoon, Ms. Griffin.
A. Hi.
Q. We were just speaking to Mr. Brakesman. Is he your father?
A. Correct.
Q. So are you both -- why don't you tell me a little bit



about your background, you and your dad's, as it relates to the wine industry?
A. So I was born and raised on our family property. I was born in '72 and grew up in the house that we're still -- my dad's still currently living in, same property that our winery is built on.
I had zero intentions on coming back to the family business and being in Napa, but my mom passed in 2003, and I decided to come back full-time and help my dad continue our family business.
Q. And tell me a little bit about the winery when you were growing up?
A. It's -- I mean, we've always been fully family owned and operated. We -- I mean, I think one of my earliest memories there was dragging a bucket full of fertilizer pellets at probably 3 or 4 years old.
We've always had -- I mean, you know, Saturday morning cartoons, we had people in the kitchen tasting wine, and there were evenings where, you know, our tastings would roll into -- turn into friendships, and people would hang out and have dinner, and we've had people spend the night, and, you know, it's just -- I mean, it's a family operation. I think we've always attracted people coming up and hanging out.
Q. And are you now an owner in the winery?
A. Not in the winery but in the vineyard portion, yes.
Q. And when did that ownership start?
A. 2003, when my mom passed.
Q. At some point did you receive a letter from the



County?
A. We received a generic letter in -- I think it was in February of '18 saying that the County was running a new program -- '18 or '19, I'm sorry, I can't remember which date it was -- that they were offering a winery compliance program that would -- there were two options, from what I remember, that you could apply for a new use permit or a -- I can't remember the other term, a winery compliance portion of it.
Q. And did you take part -- did you respond to the letter?
A. We did.
Q. What did you understand that you were doing when you responded?
A. We, my brother and I, had had multiple conversations on trying to keep our family business sustainable and about -- you know, we'd been discussing the possibilities of expanding the business.
You know, we're a small -- our building is very small, and my brother says there's never enough room, and so we had been discussing expanding the physical building and as well as production, and so we pretty quickly jumped on the opportunity to apply for a new use permit.
Q. And so part of that use permit was to expand the winery space and expand production?
A. Correct. Yeah, we had full intentions on doubling our winery size and capacity.
Q. Did you start spending money on that endeavor?
A. Oh, immediately. It takes, you know, full building

septic tank, things of that nature.
Q. And so did you have to make upgrades to the septic system on the property to comply with the County requirements?
A. No, because this was all new construction.
Q. Oh, so when you put in the new construction, you just did what the County asked.
A. Yes.
Q. Got it. And you gave some testimony about Barnett Vineyards, right?
A. That's right.
Q. Are you aware that they have a use permit that was issued in 1989?
A. I'm -- no.
Q. Okay.
A. I talked to Fiona Barnett a week or two ago, and she thought she -- they were a small winery exemption but -- so I -- if I'm wrong, I'm wrong.
Q. Right. And you've never actually checked with the County about whether they have a use permit or a use permit exemption, right?
A. I probably have looked at it, but I don't remember the issue. They're two separate in my mind. The winery database is voluminous.
Q. Okay. But you never talked to anybody at the County, you didn't call up --
A. No, I did not.
Q. Okay. And you talked about you had a marketing event during the Democratic Convention in San Francisco. Remember

1369

that testimony?
A. That's right.
Q. And I recall that. I lived in San Francisco then. It was in 1984; does that sound right?
A. Could well be.
Q. And Mondale was --
A. Long time ago.
Q. Right. And that's when you had the marketing event.
A. That's right.
Q. Okay. Now, the winery database, you saw in there, did you not, that it has a disclaimer about its accuracy when you looked at it?
A. That's right.
Q. It says, "This document may have omissions or errors," right?
A. That's right.
Q. And you found many, correct?
A. Yes.
Q. Okay. And wouldn't you agree that nobody in the County has ever said to you words to the effect the winery database is accurate?
A. I've not spoken to anyone in the County about it.
Q. Okay. And just to confirm, you've never been cited or received a notice of violation of any kind by the County for your operation of the winery, right?
A. Yes, that's right.
Q. Okay.
MR. SPELLBERG: That's all I have. Thank you,

1370

Your Honor.
THE COURT: All right.
Any redirect?
MS. HOOPES: Nothing further.
THE COURT: One question, Mr. -- oops. One question, Mr. Smith. What's your case production per year?
THE WITNESS: Probably under 4,000 cases.
THE COURT: Got it. Thank you. You're excused.
THE WITNESS: Thank you.
THE COURT: All right. So we are going to recess for the evening. How many witnesses do you have lined up for tomorrow?
MS. FALACE: I think three, Your Honor, and I'll give notice this evening to opposing counsel, as they did for me.
THE COURT: And in terms of how much time we're gonna utilize tomorrow, what do you think?
MS. FALACE: Certainly the morning, maybe into the afternoon.
THE COURT: Okay. All right. Okay. We'll be in recess till 8:45 tomorrow morning.
MS. FALACE: Thank you, Your Honor.
THE COURT: Thank you.
(Court recessed, 4:25 p.m.)
---oOo---

1371

STATE OF CALIFORNIA )
COUNTY OF NAPA )

I, VALERIE PRINCE, Certified Shorthand Reporter, do hereby certify that as such I took down in stenotype all of the proceedings in the within-entitled matter, NAPA COUNTY, et al., Plaintiffs, versus HOOPES FAMILY WINERY PARTNERS, LP, HOOPES VINEYARD, LLC, LINDSAY BLAIR HOOPES, et al., Defendants, Superior Court Action Number 22CV001262, heard before the Honorable MARK S. BOESSENECKER, JUDGE, and that I thereafter transcribed my stenotype notes into typewriting through computer-assisted transcription, and that the foregoing transcript, pages 1200 through 1372, constitutes a full, true, and correct transcription of the proceedings held before me at the aforementioned time.

IN WITNESS WHEREOF, I have hereunto subscribed my name this day, 25th day of March, 2024.

_______________________
VALERIE PRINCE
Certified Shorthand Reporter #7946, RPR, CRR, CRC

1372