# Exhibit 6

NAPA COUNTY
CONSERVATION, DEVELOPMENT AND PLANNING COMMISSION
1121 First Street
Napa, California

MINUTES
August 15, 1979

The NAPA COUNTY CONSERVATION, DEVELOPMENT AND PLANNING COMMISSION met in regular session on August 15, 1979 at 10:08 A.M. in the Board of Supervisors' Meeting Room, Carither's Building, Napa, California, with the following members in attendance: W. Beckstoffer; V. Fershko; L. Hawkley; S. Snowden, Chairman. Ex-Officio and Advisory Members present: J. Hickey, P. Crundall, C. Lober, A. McClimans, T. Cave, J. Stewart, W. Selleck.

Commissioner Hawkley led the salute to the flag.

Minutes of the meeting of July 18, 1979 were approved as published.

NAPA NORTHEAST AREA REZONING PARCEL LIST

CDPC Tape #107980, Track #5

Napa Northeast Area Rezoning Parcel List - List of Parcels for purpose of public noticing.

A. McClimans presented a review of the list of parcels for public hearing on August 29, 1979 at Vichy School at 7:00 P.M. Hickey said Commission approval of the list of parcels would trigger notification to the individuals on the rezoning as discussed with the Board of Supervisors. The parcel listings will be sent to the Commissioners prior to August 29th.

McClimans described on the maps the proposal plus those changes that came about as a result of the joint meeting between the Commission and the Board of Supervisors. Maps used by McClimans in his narration were Proposed Zoning Map; Existing Zoning Map; General Land Use Map. When the Planning Department and the Board of Supervisors had their joint meeting on August 7th and looked at this proposal, they changed five parcels to agricultural watershed. (Benson, Goodwin, Schneider, Steiger, Brown) These parcels total approximately 300 acres. Since that time the Department has come to the conclusion that in order to avoid the necessity of an EIR on the entire rezoning, it is necessary to delete six parcels on the southwest corner of the rezoning area. These parcels are adjacent to the next area to be rezoned, the Coombsville area. There are three conditions that affect these parcels that do not affect other parcels in the area: 1) Subject to flooding 2) Difference in whether they can or cannot have animals presently. Hickey said the animal aspect is if it were RC, for example, they could put stables in and would require an EIR whereas as it is currently zoned R-1:A they can't have stables but can have animals. 3) Somewhere in the vicinity there is a supposed archaeological site. The archaeological issue will have to be resolved, a determination will have to be made as to the County's role in regard to archaeological sites triggered by the rezoning.

Hickey said in regard to the floodplain zoning they are told by the Corps of Engineers and Federal government that it has to be resolved by February 1st.

Action:

MOTION BY BECKSTOFFER, SECONDED BY HAWKLEY

that Commission direct the Department to proceed with the zoning changes as indicated on the Proposed Zoning Map, which will trigger notification going to individuals on the parcel list.

This motion carried on the following vote:

AYES: Beckstoffer, Fershko, Hawkley, Snowden
NOES: None
ABSTAIN: None
ABSENT: None

SMALL WINERY - USE PERMIT EXEMPTIONS

Public Hearing:
CDPC Tape #107980, Track #5

Proposed Ordinance Amendments to permit the construction of "small wineries" without use permit approval in all AP (Agricultural Preserve) and AW (Agricultural Watershed) Districts.

The Planning Director reviewed the Department Report and Recommendation.

Recommendation: That the Commission proceed with the hearing. The Department will have comments next meeting in regard to the environmental aspects of this proposal.

Speakers:

Richard A. Murray
1289 Thompson Avenue
Napa, California

Neil Sevangi
Oakville, California

Warren Bean
6020 Monticello Road
Napa, California

Public hearing opened at 10:29 A.M.

Richard A. Murray, 1289 Thompson Avenue, Napa, California, said his concern was the five-acre limitation. Someday he may want a small winery and his property is 4.9 acres. He said five acres was a bit large for 16,000 gallon winery. He would like to see something in the Ordinance that limits it to a plot plan for a person proposing something less than five acres. They could submit a detailed plot plan to show the buildings, required setbacks, sanitation facilities, etc. He said it could be done on a 2½ - 3 acre piece of property, in his opinion.

Snowden said it was important that the speaker understand that the effect of having 4.9 acres, even if this were adopted as is, would not be that you could not put a winery on it, but that you would have to get a use permit.

Beckstoffer said in regard to 16,000 gallons and 20-acre vineyard that computation is not realistic. You might have 10% waste. The average yield in Napa County is 3.2 tons per acre. Very few varieties in Napa County will yield 5.5 tons per acre.

Neil Sevangi, Oakville, California said the parcel he was concerned about is owned by his father-in-law. They have 17 acres off Money Lane in Oakville. There is an existing barn on the property. The rest is in grapes. There is a drainage ditch that is quite wide and divides the property. He asked if in two years from now would they be able to by-pass the use permit and convert the barn into a small winery. What is the reasoning behind the 200 ft. frontyard setback? This barn happens to be 100 ft. off Money Lane. If it were 200 ft. it would be in the middle of the ditch. When you start putting in a road on an old vineyard site it is difficult. You have to pack it down. The economics of going in 200 ft. would be that much more expense and work. Their particular place is the perfect setting for a small winery. Can this barn be converted to a winery, asked Sevangi? Money Lane is a public road off Oakville Cross Road.

Hickey said the concern which had been expressed by a number of individual agencies such as the City of St. Helena is that the County is creating a corridor of wineries up and down Highway 29 and Silverado Trail. The Board of Supervisors has been concerned about the numbers of wineries that are developing in the current setback, which is 90 ft. They felt additional setback was desirable and proposed 400 ft. from Silverado Trail and State

Highways and 200 ft. from minor roads. The potential economic impact of having to build additional driveway or access roads to those wineries was discussed. It was pointed out there is no magic in 200 and 400 ft. any more than there is in 90 ft. as far as solving problems are concerned, but general proposal by the Board was if there is to be exemption on the use permit provisions, that kind of setback was desirable.

Snowden said what we are talking about is not whether you will be able to put a winery in the barn, but whether you would be able to put a winery in the barn without obtaining use permit to do so. If the Board were to adopt the Ordinance just the way it is and the barn on the property did not fall within the conditions of that ordinance, you could still get a use permit to put a winery in cheaper than you could build that road. 40 to 50 wineries that have been built in the last five years have been built with use permit, so you would not be under any greater burden than those wineries.

Hickey explained the concept of use permit, saying it was not intended as a negative, punitive action but rather was a positive step and was intended to resolve questions such as Sevangi brought up. A use permit could be used to fit the conditions to a site as opposed to saying 200 ft. everywhere in the County.

Fershko said the County is losing more and more control in regard to creating a corridor of wineries by deleting use permit control. He was concerned with having more stringent landscaping requirements and would like to see some kind of standards other than just saying "the applicant shall submit a landscaping plan to be approved by Staff." He felt the owners of these wineries would be just as happy to put money into landscaping to screen it from the road than to build a paved road. Fershko said perhaps the Commission should consider coming out with a landscaping ordinance or policy or standards that may be written into this ordinance where they "may be exempt if they do the following in terms of landscaping."

Hickey said in the definition concept they have to be fairly precise - otherwise your definition is so undefined that it is impractical and unworkable. Therefore, if they start spelling out landscaping requirements you are putting every winery into the same box. You would get into the questions of administration. Other places have an ordinance that says "shall meet the landscaping requirements of the County." Fershko asked if they could incorporate that into an ordinance. Hickey said the Department would look into the matter and see what they could come up with that was more specific before the next meeting.

Sevangi said he felt that a grove or a landscape setting that would be perfect for a small winery would be preferable to having restrictions of 200 ft. setbacks. Fershko said what he was talking about would also apply to wineries that would require use permits, as well. Beckstoffer agreed with Fershko, but said he thought the setback was important. In the general situation where you are looking at the whole of Silverado Trail and Route 29, the setback is most important, as well as landscaping requirements. Hickey said the purpose of this is not to encourage wineries but to reduce the Commission and Staff work load.

Sevangi asked if "by appointment only" was considered a private tasting? Hickey said yes. Site improvement requirements are less for "appointment only" wineries.

Warren Bean, 6020 Monticello Road, Napa, California, asked what the significance of the word "declared" as a modifier of "annual production capacity" (in the definition of small winery) meant. Hickey said the applicant in filing an

application for his proposal would identify what the capacity of the winery was to be. The responsibility to identify the gallonage would be on the applicant, not on the County. Bean felt it was a weak provision. Administratively, how is the question of compatability with surrounding land use to be determined? If that is in connection with a building permit, added Bean, it seemed to him they were running the risk of making their building permit process discretionary and thereby potentially subject to CEQA. Without it you follow the rule of ministerial act on the part of the building inspector. Hickey said that is one of the environmental questions that needs to be resolved on this matter and is one of the reasons the Department does not have a specific recommendation today.

Hickey said if the Commission is satisfied in terms of the testimony they have had previously and what they have received today, he recommended they close the public hearing and agendize this matter for consideration and action at the September 5th meeting. The Department will have thee environmental recommendation prepared for that meeting. This matter has now been discussed at three Conservation, Development and Planning Commission meetings. Snowden suggested the public hearing be continued so the recommendation of the Department will be a part of the public hearing. Beckstoffer said he was not satisfied with the Ordinance as it is today and would like the opportunity to discuss that. He agreed with Fershko on the mature landscaping standard but would like to see two main points included. 1) Need to get into some definition of what a winery is, a definition that says a winery crushes grapes or other agricultural products...maybe the Commission won't go so far as to say grown in Napa County. If they don't at some point define what a winery is, anything that processes an agricultural product becomes a winery and becomes acceptable to the AP and AW. That is not the intent. So, he would like to see something about crushing grapes in the definition of winery. 2) Signing is important. We are trying to assist Staff in processing that legitimate agricultural processor. We are trying to exempt from use permit process that legitimate processor of agricultural products in Napa County (not the glass salesman, or the cheese salesman or the man who brings wine in in bottles who puts a sign up and has basically a retail store). He suggested in regard to the signing that signs be located only on the wineries.

Hickey said the Commission has to make the definition specific enough so they don't raise too many issues and get into question of CEQA. If there are discretionary aspects in the definition, then it is not exempt from use permit. It is the building permit which in essence is exempt from CEQA as a ministerial act but if attached to that building permit there are five or six discretionary decisions, then it is questionable. Landscaping standards could be set up in a different provision and cross referenced by definition. When you get into the question of what is a legitimate appointment scheduling, etc., he did not see how that could be determined or enforced. What works for one winery in terms of appointments and scheduling might not work for another winery. He did not think you could make that uniform. Hickey said if a winery is open 5 - 7 days a week for tasting, and it is advertised and a known fact, then it is a different category than a winery which basically is closed, except for tasting only by appointment.

Hickey agreed signing on the building only would be reasonable. He said the signing question could be resolved easier than the landscaping.

Road requirements were discussed. Fershko asked J. Stewart of Public Works, in terms of road requirements for "small winery" what will they be? Stewart said there would be no road requirements. Stewart said that was one of their concerns. In use permit process today they look at health, safety and welfare, as well as aesthetic considerations. Now that it is dropping into only building permit, they are still attaching aesthetic considerations. Fershko said a wide, paved road leading into a winery attracts the public more than a basic country road leading to a winery. Stewart said he thought that at a minimum as a safety consideration they would want to mention something about the first

20 or 30 feet of the driveway being wide enough to accept two cars so if one is turning out the other doesn't have to hang out in the traveling lanes. The rest of the road is no problem. It can remain gravel, dirt, dust, whatever. Safety is more important to the Department of Public Works than aesthetic considerations.

Snowden said the definition of a small winery should include "such wineries as are set back 200 or 400 ft. and which have a driveway which has 20 - 30 ft. of double lane access to the nearest public road," or something like that. Hickey said basically that is the approach being used. Beckstoffer felt they should have the same requirements as a residence. A residence does not have this double lane requirement. Hickey said a winery does have more traffic, does have deliveries, people coming and going. You could say it is no greater than a residence, but the assumption is it is a non-residential use. It is a business use.

Prospect of widening Silverado Trail and Highway 29 was briefly discussed. Commissioners agreed they did not want to see a widening program.

Commissioners decided September 5th Agenda was full and September 19th would be a better date.

CDPC Tape #107980, Track #6

Action:

CONTINUED

Chairman Snowden ordered this matter continued to September 19, 1979, morning session (10:00 A.M.) Public hearing remained open.

INDUSTRIAL BUILDING EXPANSION - USE PERMIT EXEMPTION

Public Hearing:
CDPC Tape #107980, Track #6

Proposed Ordinance Amendment to allow expansion of any industrial zoned industrial buildings up to 50% of the size of the existing building without use permit approval subject to certain criteria.

The Planning Director reviewed his memorandum to CDPC dated August 1, 1979 with the Commission.

Recommendation: That the Commission set August 15, 1979 at 10:00 A.M. as the time for a public hearing to consider the proposed amendment to Chapter 9, Section 12291 of the County Zoning Ordinance regarding the permitted expansion of approved buildings in an industrial zone.

Speakers: None

Public hearing opened at 11:20 A.M. No one in the audience wished to speak in regard to this matter.

Commission Discussion:

Snowden said as a permitted use, expansion of an existing industrial building is allowed under the proposal so long as the expanded use will in general conform to the conditions of approval of said use permit. He asked: 1)What does "in general" mean? 2) How is that determined? Does that raise the same kind of question about being discretionary in nature? Hickey replied it could. Obviously, the evaluation would have to take place at the Building Permit stage. When the applicant has submitted plans for a building permit, it requires that the Planning Department sign off the zoning. At that time the addition would be reviewed in relation to the existing building and

existing use permit conditions.

Snowden asked if there should not be something such as a provision that upon the grant of a building permit of this sort, the initial use permit will be administratively amended to show the new size and to impose the existing conditions on the entire building.

Hickey said the use permit covers the land use aspect - what it is approved for. If you are approved for storing wine, your expansion can not be for storing other things. Snowden said at that point the County would say they were in violation of their use permit. Hickey said the use permit determines the use of the property and the expansion would have to be consistent with that use.

Snowden asked if the language about the expanded building should at least be "the expanded building and the uses therein," will in general conform to the....Snowden said something ought to say that in the expanded area you are subject to the same conditions you are subject to in your original building. Lober asked what was meant by "expansinn of existing." Does that mean as it existed in the use permit, or could you every year expand another 50% as long as you met parking requirements? Crundall said it means you pick up where you left off on the use permit. Lober said "existing" doesn't say that. It should be cleared up. 50% of the existing building or 50% of what exists every year?

Hickey said it is the use. You don't approve a general site plan, but the use permit relates to land use primarily - more than the building. Snowden said it should then read "expansion of up to 50% in area of an existing industrial use," provided the use is located on a site that has previously received use permit approval. Hickey said the intent is expansion of industrial use that is in a building. It is a building expansion and not a change in land use. Hickey said if the intent is you can only expand once, it ought to say you can expand once. The Commissioners agreed that it would be a one-time 50% expansion.

Hickey said on the third line, 1-b, what might be added to "previously received use permit approval by the County," add "and all conditions of approval have been met." Commissioners agreed.

Hickey said the Department could make those amendments and have the revised description and the environmental recommendation at the next meeting.

Action:

CONTINUED

Chairman Snowden ordered this matter continued to September 19th morning session.

TIMBER HARVEST PROPOSED CHANGE TO ORDINANCE

Public Hearing:
CDPC Tape #107980, Track #6
Continued from: August 1, 1979

Proposed changes to the Timber Harvest Ordinance regarding application fee, performance bond, exemption from rules, conversion and scenic highway specifications.

Public hearing was reopened at 11:30 A.M.

Speakers:

Alan Silvius
220 High Street
Calistoga, CA.

Bill Lyon
4175 Heitz Way
Calistoga, CA.

Robert Haggard
5249 Dry Creek Road
Napa, CA.

Ruby Bickford
5271 Dry Creek Road
Napa, CA.

Olga Gracey
1320 Tucker Road
Calistoga, CA

Charles Swanson, Forester
Santa Rosa,
California

Warren Shaw
Forester
Santa Rosa, CA.

Alan Silvius, 220 High Street, Calistoga, said the people in Calistoga have been concerned about water problems. To bring in water from other watersheds is extremely expensive. For this reason they are looking seriously at ground water control and the protection of watersheds. The Upper Napa Valley Democratic Club has already presented a Resolution to this Commission and to the Board of Supervisors, in which they held that timbering should be held to the very minimum. They feel that the tightening up of the language for exceptions to the timber regulations is extremely important. They are in support of that tightening and the guidelines are finally being established to govern the Board of Supervisors. Silvius said a weakness is they talk about the 100 ft. scenic avenue along the highway. He has been along highways where timbering has taken place in back of these narrow strips. In all cases it fails to perform the scenic effect when there is only 100 ft. You can look through and see the slash lying around and can see the meadow getting started, etc. He felt the scenic corridor should be 200 ft. wide.

Fershko said they had talked about 400 ft. for wineries off major highways and 200 ft. off smaller roads. The difference between a scenic corridor along roadways and the setbacks for wineries was discussed. Fershko said he would support a scenic corridor akin to the winery setback. Hickey said it would depend upon the geometrics of your highway, what you would see along a scenic corridor. Hickey added that one of the items the Commission will be adopting as a part of the General Plan is the Scenic Highway Element. That will give Commissioners the opportunity to examine those issues.

Bill Lyon, 4175 Heitz Way, Calistoga, California, said he is interested in the preservation of the County Timber Regulations and he is happy to see that the public hearing is open toward that end. As a member of a group of public proponents of the County Timber Regulations and their frame of reference being the Bosc Timber Proposal, they were seeking improved County Regulations. Without getting into final specifics on the Bosc Timber Harvest, he could say that the County Ordinances, in essence, were overridden and that the more liberal cutting standards and timbering standards of State Regulations were upheld.

With respect to the conversion provisions, for two and a half years they were making their arguments on the basis of having a conversion based on vineyard. Rather than the wineyard conversion, they learned to their dismay that after the public hearings were closed and Supervisors were introducing the language changes, that on the first reading they lost the vineyards and got unspecified agricultural use on the 40-acre clearcut area. One of the Supervisors asked what happened to the vineyard. One week later further language changes attenuated and reduced and weakened the agricultural use to a mere requirement to seeding to rye grass. Lyon said he only brought this up because he felt the minimum protection the people should be expecting should be the upholding of the County Regulations. These Regulations were adopted in 1973.

In regard to changes proposed today, said Lyon, Section 65, Exemption from the Rules: He said he felt this is cause for the greatest concern. When they had reviewed the Timber Harvest Regulations they had taken considerable comfort in Section 4.1 of the County Resolution 73107. Section 4.1 states "all the provisions except as specified herein of the following acts, statutes, ordinances, rules and regulations adopted thereunder are incorporated herein by reference, and shall apply to all timber harvesting operations unless stricter provisions are contained in these County Forest Rules." It went on to enumerate enabling acts such as the

State Forest Practice Act, the State Fish and Game, etc. Lyon said his reading of this 4.1 seemed to imply that the State Forest Practice Rules would not apply if indeed the County Regulations were stricter. Therefore, they felt this was completely turned around on the final decision on the Bosc Timber Harvest by the Board of Supervisors. For this reason Lyon recommended that on this draft of the proposed changes as enumerated by Hickey, with regard to Section 63, Exemption From The Rules, Section 63-a, "The Applicant may request exemption from compliance with one or more forest practice rules or modification of one or more such rules, etc." He suggested a final sentence under this 63-a be added:"However, nothing in this section shall be construed as overriding intent of Section 4.1 of County Resolution 73107." He believed that without this proviso the people of this County do not have County Timber Regulations, but a framework of general intent that can be weakened by exemptions.

With respect to Section 63-b, Lyon recommended that the statement where practical difficulties or unnecessary hardships or results inconsistent with the purpose and intent of this ordinance may result from the strict application of certain exemptions and such requirements may be granted as provided, unless there is a compelling reason for granting such exemptions he would recommend either that section be deleted or again, a reference be added that would provide for the standards of Section 4-1.

Section 63-4: There has been a change that the application fee is increased from $30 to $100. He had no particular quarrel with that.

With respect to 63-c, noticing the great amount of Staff work required, he said he would recommend that serious consideration be given to increasing that fee. He believed an applicant who is seeking to alter the land or unduly profit from the land, can help defray the cost of administration costs.

Hickey asked if Lyon had a figure recommending what the increase would be, instead of the $100.00. Lyon said he did not, but his perspective is influenced by the fact that at earlier hearings a figure like $100.00 pales into insignificance. What is being derived from these harvests, frankly, is big money and he feels that serious consideration should be given to requiring that the applicant for these harvests make a fuller participation in the administrative costs. An increase of any amount would be very much in order. Lyon said his experience indicates that the appeal process can be time consuming and expensive to County government and the taxpayers. A person seeking the financial rewards of a timber harvest should be agreeable to participate in his or her fair share of the cost.

In regard to Section 70: He said he felt that the terminology and the changed terminology is quite acceptable. However, he cautioned that these provisions must meet the test of law. One of the changes under Section 70 is the timberland conversion - the addition wording is "the prime consideration in determining the bona fide is of a timberland conversion shall be the practicality of the proposed conversion and the economic viability of the resultant agricultural operation." He said he believed all of them in good faith could live with that. As a matter of fact, the attorney for the applicant last December pointed out that the bona fide is a concept of, in essence, a good faith declaration. Therefore, a later change with respect to the bonding would reinforce the concept of the good faith declaration. However, with respect to the fact that it is possible that a Board of Supervisors would look kindly on an agricultural operation as a substitute for vineyard conversion or even look kindly on a grass seeding operation as fulfilling the requirements of the conversion, he would recommend that Section 70 be somewhat strengthened. With respect to the first sentence "Any application for a permit to engage in a timber operation which shows by satisfactory evidence that the timberland to be cut are to be devoted to bona fide uses such as a vineyard or for other agricultural activities may be approved for removal of substantially all trees but shall otherwise comply with the Forest Practice

Rules." He suggested adding this terminology: "Not inconsistent with the provisions and intent of Section 4.1 of County Resolution 73107." He said he felt the bottom line always should be the County regulations. With the new wording, prime consideration in determining the bona fides of a timberland conversion shall be the practicality of the proposed conversion and the economic viability of the resultant agricultural operation very well staged, but perhaps a qualifier along these lines should be added: "The economic viability of the resultant agricultural operation thus stipulated shall be determined to contribute to the Napa County economic base to approximately the same degree as a commercially producing vineyard. Livestock grazing in lieu of a commercial cattle husbandry operation is an example of an agricultural operation that does not meet the requirement of a timberland conversion as called for in this section. He strongly urged that the Commission add these qualifiers. The timberland conversion is a final act. Unless there is an exchange involved, something of value ; to an environment, the regulations may in fact be encouraging a bonanza type harvesting.

He said he would agree that the Ordinance of 1973 had a very good intent. It provided as the bona fides a vineyard or other agricultural use. From experience they know an agricultural operation would in fact be a good use - particularly if it is a vineyard conversion. The latest studies reveal that.

He would hesitate to accept anything less such as grazing of family pets such as horses or cattle. The requirement should be for a legitimate agricultural operation.

Section 93 - Bonding: We have to assume there is a reason applicant applies for a select cut. It is to harvest timber for profit.

Action:

Chairman Snowden ordered this matter continued to 1:30 P.M. (not to exceed 30 minutes).

The morning meeting adjourned at 12:04 P.M.

The meeting reconvened at 1:44 P.M. Chairman Snowden was noted absent.

APPROVAL OF RECOMMENDED AGENDA

CDPC Tape #107980, Track #6

The Planning Director said there are four items for approval listed on the recommended agenda. These items have been reviewed by the Department and considered to be routine in nature. There will be no separate discussion of these items unless a member of the audience or the Commission requests a separate hearing or discussion. If there is a request for a separate discussion, the item will be considered in it's normal sequence on the agenda.

Ralph S. Hughes Watercourse Obstruction/Riparian Cover Permit Request (#WR-197879)

Public Hearing:

Request to install paving and curb, gutter and a sidewalk within 50 feet from top of bank of the Napa County Flood Control and Water Conservation District Channel (Salvador Outfall Channel) located on the southeast corner of El Centro Avenue and By-Way East within a CL District.(Assessor's Parcel #38-091-02).

Public hearing was opened at 1:45 P.M. by Vice-Chairman Hawkley.

In the absence of anyone in the audience or Commission objecting to this application, public hearing was closed.

Note: Chairman Snowden present at 1:46 P.M.

8/15/80

Public Hearing:

Guida and Goode Tentative Parcel Map (#2057-PM)

Request for a resubdivision and transfer of property involving lots 21 and 22 of Silverado Unit #5-A located on the north side of Burning Tree Court approximately 600 feet west of St. Andrews Drive within a PD District.(Assessor's Parcels #40-620-09 and 10).

Public hearing was opened at 1:46 P.M.

There being no one in the audience or Commission who objected to this proposal, public hearing was closed.

Action:

MOTION BY HAWKLEY, SECONDED BY BECKSTOFFER

for approval of Agenda Items #9 and #10.

This motion carried on the following vote:

AYES: Beckstoffer, Fershko, Hawkley, Snowden
NOES: None
ABSTAIN: None
ABSENT: None

Non-public Hearing

Claude Rouas request for a one-year extension of time to act on Use Permit#U-207778

Request of Joseph G. Peatman on behalf of Claude Rouas for a one-year extension of time to act upon Use Permit #U-207778 approved by the Commission on September 20, 1978 to redesign and expand an approved restaurant and inn located on 12 acres on the south side of Souverain Road approximately 2,800 feet northeast of its intersection with Silverado Trail within a PD District.(Assessor's Parcel #30-120-35).

Charlene Steen request for a one-year extension of time to act on Use Permit#U-477677

Request of Charlene Steen for a one-year extension of time to act upon Use Permit #U-477677 (Walter Helmuth) approved by the Commission on September 20, 1979 to establish a winery and maintain an existing farm labor dwelling on a 25.37 acre parcel located on the northwest corner of State Highway 29 and Whitehall Lane within an AP District.(Assessor's Parcel #27-100-12).

Action:

MOTION BY BECKSTOFFER, SECONDED BY HAWKLEY

for approval of Agenda Items #20 (Rouas) and #21 (Steen).

Commission Discussion:

Hickey said in regard to Rouas he would call attention of the applicant's attorney that there was a permit issued, extension was granted on that permit, a revised plan was submitted and a permit was approved on the revised plan. This is an extension on the revised plan. Any additional requests for additional extensions could raise a question as to the feasibility of the project. Peatman said construction would begin within a week.

This motion carried on the following vote:

AYES: Beckstoffer, Fershko, Hawkley, Snowden
NOES: None
ABSTAIN: None
ABSENT: None

TIMBER HARVEST ORDINANCE - PROPOSED CHANGES

Public Hearing:
CDPC Tape #107980, Track #6
Continued from: morning meeting

Bill Lyon, 4175 Heitz Way, Calistoga, California, said he would recommend that Section 4.1 of the basic Ordinance be upheld as the shield to provide for County Timber Regulations being the minimum standard. On Section 63 with reference to exemptions, they accepted the principle of exemptions for minor mechanical or topographical matters. They do not believe exemptions should go beyond the provision of Section 4.1, therefore upholding

County Timber Regulations which they feel is the shield of 1973. With respect to fees, they feel that the untoward potential revenue to be derived from timber harvesting should warrant the fact that applicants for said permits pay their fair share of administrative costs; namely, increased fees for filing, reasonable fees to defray the costs of appeals which are initiated by applicants after decisions have been made by the Board of Supervisors. He recommended that sufficient fees be levied to provide for a sufficient oversight function. He said he believed the present oversight function is grossly insufficient.

At the present time as he understands the section, it is possible that when a massive timber harvest is underway, and you have independent contractors doing the cutting, not employees of the timber company or the lumber companies and not employees that are under supervision of the licensed foresters, not employees who are under supervision of even the applicant, but independent operators, there are possibilities for problems. He therefore believed fee should cover more than the one inspection visit that County regulations now provide for during the course of the harvest. He said he felt that is grossly insufficient. They need fees that will provide for a number of supervisory and advisory visits during the harvest.

With respect to bonding, the increased fees for bonding for selection cut are sufficient. He did not want to address himself to that. However, the fees with respect to the clear cut operations that involve what is known as the conversion, the recommendation that the fees be increased to "up to $1,000 per acre" is grossly insufficient. Bear in mind an untoward amount of potential revenue from these drastic timber harvests that would come in the neighborhood of $150,000 or $200,000 or more warrants a much more realistic bonding figure. He felt at least $1500 per acre would be minimum. Ideally, the bond should be possibly 40% or 50% of the expected gross revenue from the harvest.

Robert Haggard, 5249 Dry Creek Road, Napa, California, said he has been a resident of the area for approximately seven years. He was glad the Commission was chnnging the Ordinance on timbering. On July 30th he gave the Commission a letter, as they were leaving the area for a while. After viewing California, Oregon, Washington, and all the way to Alaska from the air in the daytime, he thought Napa County has a chance to take hold of what's been happening. There are vast areas of this country that cannot be timbered again for at least 100 years. Replanting of these trees in California due to the strange weather climate here is like throwing money into the air. Seven years ago he planted 100 redwood trees on his property on a half acre. There is not one of them growing now. This property is adjoining the timber harvest project in the Dry Creek area.

One method of control for timbering should be the shelterwood system. This has been a tried and proven method used in other States. He did not think it had been used in the State of California. This method is available as far as facts and figures go, in any library. He felt this was the only true method that proves itself insofar as removing trees and not affecting all the neighbors in the surrounding area. It is a method of high percentage of leave tree. They put two people to work on 100 acres of property and they cut trees for an extended period of time - they only have a certain number they can cut per year and they almost have a permanent job. They do not induce silting in the area and the fuel load does not increase. Haggard said we have such a high danger of fuel load in this area, which was proven out by the one fire they had on Dry Creek right across the road from his place. He said he saw by the Minutes of the July meeting that the fuel load danger was extremely important in the Commission's consideration for property acreage size for property owners. It doesn't matter what you do as far as limiting the number of acres

11

for if they are going to cut those trees off the land, the fuel load is going to increase. You could only have one house per 1000 acres and that would burn tremendously. The one high point he saw on the Agenda items is the bond regarding County roads. The amount of such bonds would be $400 per acre of the area of timber operation but may be increased for such additions as may be deemed necessary by the Commission to secure repair of County roads. He did not know of any road that could be repaired at $400 an acre. The lowest price he got was 50 cents a square foot for repairing County roads. There is quite a few County roads in this area. He felt each timber harvest should be taken at it's own merits as far as how many acres they are going to cut, how many miles or hundred feet of County road they are going to use. They should be repaired extensively afterwards.

Ruby Bickford, 5271 Dry Creek Road, Napa, California said she has lived there 14 years. She was a little bit bothered by the fact that she might want to harvest her crop. What she is hearing today is backlash from the Bosc Timber Harvest. She wanted to be sure that she would have a right to harvest and be able to do it and realize profits from her crop. It is a crop of trees. It seems as though the fees that are being recommended although it was placed before the Commission as meeting the cost of inflation, is really much more than that. She has been advised that the $200 an acre is more than ample to meet the cost as far as bonding. $400 would be excessive.

Olga Gracey, 1320 Tucker Road, Calistoga, said she agreed with Mr. Lyon about the fees, not because she felt that private property owners should be forced to pay exorbitant amounts of money to do what they want to do, but because she watched with the Bosc decision the many hours that were spent by the Planning Department, and hours are money. The Staff had to spend all this time and because of Proposition 13 they could not hire more help. Because of this, everyone else was getting backlogged. As a taxpayer she is paying the Department too, and she feels other people should have a chance. So, the fees they are talking about are to discourage people a little bit from numerous appeals and exemptions - especially when they are useless - which happened two or three times in the Bosc Timber Harvest conversion. To ask for fees to appeals and also for exemptions is fine. She did not believe that laws were made to be exempted. She knew people disagreed with her, but if you are going to exempt a law then you should have good cause and not just suddenly do it and make people in the Department spend hours of time. There should be some provision about that. She had no recommendation as to the amount, but felt it important that it be done.

Gracey agreed with Mr. Lyon about Section 4.1. She referred to the Bosc conversion again. This was set up as County regulation and the State regulation was not supposed to supercede the County regulation. It did! We are a unique County. We are not like every other County in the State and we should not be considered that way.

As to the forest management issue, Gracey said she believed in forest management. She did not believe you should never cut trees down. She also believed they were talking about County ordinances. We have to stick by those ordinances. You are only weakening the timber harvest ordinance by exemptiong it constantly, and by going back to the State.

The other important thing to her was the scenic corridor. Because we are a tourist County, it is very important that we maintain the beauty that we have. She felt 100 feet was not enough. She suggested 200 feet. She felt there should not be exemptions in scenic corridors - no reason for it. If anyone could point out to her why they were allowed to cut trees on the scenic corridor on the Bosc project that made sense, she would listen. It was not necessary for good forest management and it was just a money-making project.

Agricultural use in regard to the Bosc project upset her. They started out with vineyard and it was stated by the Supervisors

that it would be vineyard and they ended up with grazing land, or grass. That is not viable agricultural use. There should be some provision for deciding what it will be. Cutting down a lot of trees, just to plant grass and not be forced to do anything else for years and years was not sensible.

As to bonding, she felt it cannot be less than half of the expected revenues from the harvesting. That is important, said Gracey. She realized every case is different but felt you have to be careful about holding on to the County regulations.

Charles Swanson, Forester, Santa Rosa, California, said he had worked up and down the State on harvest plans and conversions. He said Mr. Haggard flew up and down the coast and saw large areas of land that had been devastated. That is true. Back in the old days oldtimers did a lot of bad work and devastated a great quantity of timber land. However, since 1973 - 1974 when the Forest Practice Act was established, things have changed a lot. Furthermore, when you are flying up and down the coast you can't tell whether the land is burned and then logged over, or otherwise. For instance, 150,000 acres have just burned in Idaho in the last three weeks. How can you tell whether an area along the coast was burned off first and logged, later, or otherwise?

As far as redwood tree planting is concerned, it is difficult and the State will never recommend that you plant redwood trees. (Only in certain areas where you can water the trees) This last season he planted a lot of Douglas Fir and Pine on top of Diamond Mountain since it was cut last fall. At least 50% of the trees are already dead. He will plant it again next winter and perhaps the winter after that to finally get a good stand of trees. You almost have to water your trees every 30 days (deep watering). You cannot plant redwood trees and make them grow unless it is in an area where you can irrigate or water. There are places in Mendocino where you can provide some shade and water where they will grow Douglas Fir, Pine, many species. Planting trees is one of the jobs a forester takes on when he completes the timber harvest plan and signs that plan. His responsibility goes for five years. They have yet to complete all the timber harvesting of this area up here. Five years from now he will still be working on that ground, making sure that those trees come up.

Swanson said the performance bond is sufficient. You can raise a performance bond if you want for special provisions. That bond is hard to get. To get it you either have to be in business (and then you pay 12%) You must provide either a cash bond or go through a long waiting period in order to get that bond. He felt the bond was sufficient. He said he would go along with the applicant's fees.

Warren Shaw, Forester, Santa Rosa, California, said if the fees get increased too high there would be a reverse reaction. A person puts up a major amount of money and fees and they are going to want to protect that moreso than with lesser fees.

The other thing he wanted to speak of was what is a shelterwood system. This is a shortcoming of the ordinance by allowing basically one harvesting method, and that is tree selection. Someone here mentioned leave tree. Leave-tree is not quite synonymous to selection. He explained the shelterwood system. Shelterwood is in simple terms, a clearcut in strips where a place, over a period of years, is cut in narrow strips. It generally starts towards the bottom of a watershed area in narrow concentric strips, working towards the top. In actuality it could be defined as clear cutting in strips. On this basis alone Shaw said he would find it very difficult to accept clear cutting in any form and basically in the long run, he questioned the idea of clear cutting for conversion.

Fershko asked what Shaw meant by reverse reaction to higher fees.

Shaw replied in the general fee schedule, the increasing of fees to handle costs in some reasonable way is fine. However, if you make the fees too substantial, and there are major conflicts or problems, etc., then the applicant will have a tendency to want to protect that investment he has already put into it. Snowden said applicants, in other words, are less likely to abandon their application and substantiality of their investment and secondly, less likely to be conciliatory because of how much they have had to pay in exchange for whatever permission they are going to get. Shaw said that was right. His basic feeling on the bond is that the $200 was extremely high when it was originally established, but currently it would be sufficient to meet those criteria of a selection logging timber harvest.

Haggard said to clarify the method of cutting, the one he suggested was leave wood and in this method you leave the borders as dense as possible - which would be the scenic corridors - and watershed areas adjacent to streams - and cutting of woods and open areas, limiting that cutting so it would not encourage the growth of wood such as manzanita, brush, etc. In their area, this method would be far superior than selective cutting, as selective cutting does not take into consideration the fire load that would be increased.

Public hearing was closed at 2:15 P.M.

Commission Discussion:

Fershko said although the intent of this ordinance is a good one, perhaps some of it needs to be tightened up. He wanted to see some changes. Section 63-b, Exemptions From The Rules: He was not sure that the intent of the exemption section is adequately expressed. He felt an additional phrase or two was needed in Section b. where it reads, "may be granted as provided in this section". He would add some reference that would require that any exemption that is applied for and granted be conditioned on (he was looking at #3 on the next page)" will not under the circumstances of the particular case materially effect, adversely, the health or safety of persons residing or working in the neighborhood of the property of the applicant and will not under the circumstances of the particular case be materially detrimental to the public welfare or injurious to property or improvements in said neighborhood." The reason he would like to repeat this sentence in this section is because under "c" it simply talks about what the applicant needs to do in his application. It isn't clear that the criteria under "b" be considered prior to granting any exemption. All "b" talks about is the hardship imposed on the applicant who is applying for the exemption. It should be made very clear in "b" that no exemption should be considered that will detrimentally affect the health and welfare of the general public and the neighborhood and those who reside near the project, said Fershko.

Snowden suggested saying "may be granted upon the showing required by sub-section "c" thereof. Snowden said to put that whole revision in context, it arose because the attorney for Mr. Bosc argued with some degree of success that the exemptions provided for in the timber harvest permit were to be granted not in the manner of a variance but rather because in this particular property he agrued the requirements would not effect the overall purposes of the timber harvest ordinance. In other words, those requirements did not set county-wide standards which could be varied only upon a showing of hardship on the part of the applicant, but rather that those standards were intended to effect certain erosion control and other kinds of circumstances. This is to assure that those are countywide standards that do apply countywide and only because of the peculiarity of a given piece of property would exemption from those would be granted. Fershko said he would add that is also comply with Section 4.1 of Article 4, in that sub "b" paragraph.

Snowden said "What about having an ordinance incorporate a resolution?" Lober said why not? Snowden replied because you

could change the resolution without the formalities requisite changing the ordinance. The words incorporated in the resolution would remain, said Lober. If the resolution changes - you are speaking of incorporating actual words as opposed to referring to a section in the resolution.

Fershko said under timberland conversion, Section 70, Page 2, this does not deal with exemptions so maybe they should clarify in this section what criteria it is we will be looking for, when an application comes before us, or the Board of Supervisors. At the end of the first paragraph where it ends "but shall otherwise comply with forest practice rules," right there it should also state that it shall not be inconsistent with provisions of Section 4.1 of Article 4 and that it not under the circumstances of the particular case materially effect, adversely, the health or safety of persons residing or working in the neighborhood, etc," of Section c-3.

Going on to the scenic highway corridor, said Fershko, he had a question and an addition he would like to suggest. He said he wanted to add, akin to small wineries where it talks about 400 ft. setback from the centerline of Silverado Trail and State Highways and 200 ft. setback on all minor roads, a similar requirement for scenic corridors that exist for timber harvesting. He would insert a similar specification that we have under small wineries; instead of "It shall be at least 100 ft. wide," he would like to see 400 and 200. In Section 6.2 it says "within the scenic corridor which shall be at least 100 ft. wide." 100 ft. wide from where, asked Fershko? Where is the starting point? Where is the finishing point? Is it from the centerline of the road? Median strip? The property line? What was intended by this 100 ft.?

W. Selleck of the Environmental Protection Section said in Bosc they measured from the property line. (200 and 400 ft. from the front property line, said Fershko). Selleck said the intent of the ordinance although he was not around when the ordinance was written, was that you have 100 ft. buffer, 100 ft. selectively cut trees cut to a standard higher than the remaining land.

Fershko said perhaps Staff can come back with the final draft and keep the 200 ft. and 400 ft. in mind.

As to the bonding requirement, he did not know if it was adequate, or not. If the requirement is raised at all, it should be a reflection of what it actually cost to make the conversion and repairs necessary by the County. It should not be based on the applicant's profit but should be based on what it costs the County to repair something the applicant has damaged (roads, for instance). Snowden said the County is not going to go in and make vineyards. Hickey said it could take five years if you reforest, to make sure it took. Fershko said it might cost quite a bit of money to do that if the applicant strips the land. Beckstoffer said the question is leaving it at a rate per acre, for example, rather than going to a percentage. Is $1000 enough?

Selleck said one clarification could be made on the bonding. For the timberland conversion, $1000 an acre is what it would cost on the Bosc Timber Harvest to meet all the requirements of the County Code. It did not include conversion to vineyard. It just included making sure there wasn't any erosion problems, making sure it was reforested. Hickey said it was never the County's intention to plant vineyard for the owner if he defaulted.

Beckstoffer asked Selleck if $1000 covered the reforestation? Selleck said yes. In regard to the scenic corridor, Beckstoffer said he would support 200 ft. everywhere. The Commissioners agreed.

Action:

CONTINUED

It was decided the Department would make the changes that were suggested and bring them back before the Commission at the next meeting.(Scenic corridor - Section 4.1)

PROPOSED AMENDMENT TO SECTION 12400 OF THE COUNTY CODE TO INCREASE MINIMUM LOT SIZE IN AW FROM 20 TO 40 ACRES.

CDPC Tape #107980, Track #6
Continued from: August 1, and August 8, 1979

Proposed amendment to Section 12400 of the County Code to increase the minimum lot size in the Agricultural Watershed (AW) Zoning District from 20 acres to 40 acres.

PROPOSED AMENDMENT TO SECTION 12400 OF THE COUNTY CODE TO INCREASE MINIMUM LOT SIZE IN THE AP FROM 20 TO 40 ACRES.

Proposed amendment to Section 12400 of the County Code to increase the minimum lot size in the Agricultural Preserve (AP) Zoning District from 20 to 40 acres.

The Planning Director said the public hearing was closed on August 8, 1979 on the AW and AP. One piece of correspondence was received from Warren Bean asking the Commission to consider a grandfather clause relative to those parcel map proposals which are being considered currently by the County. A letter was received from Mr. Sattui who is recommending in favor of the 40 acre minimum.

In regard to Bean's request for a grandfather clause, the Department reviewed the status of the number of items being processed currently by the County that would be impacted by such a provision. Currently there are 29 applications on file that would produce 67 additional lots or parcels in the 20 to 39-acre size. Of the 67 parcels, 61 were submitted since that April date and 6 parcels were being processed at the time of the announcement by the Board of Supervisors. There were 7 or 8 parcels at last meeting that do not show up in either Staff's Report or in the 67 parcels.

Lengthy discussion took place on the question of grandfathering. Bean said his concern was the principle of elemental justice. It was brought out that April 24th the Board of Supervisors indicated interest in increasing minimum lot size in AW from 20 to 40 acres and directed the Planning Commission to thereafter specifically and strictly enforce provisions of Ordinance 472. The Board of Supervisors had heretofore a tendancy to show leniency toward those proposals which had been in the mill prior to the Board's announcement. Discussion included fact Commission could have declared a moratorium and did not, and consideration of possible dates for start of grandfather clause.

Hawkley said she oould support 40 acres or better in some areas but a blanket rezoning in the AW to 40 acres she could not support. She considered 20 months not a great length of time to have switched from 20 to 40. On the positive side she would like to see a way they could restore that Midas concept. In the AP she would support a 20-acre minimum.

Fershko said he would support 40 in the AW and 40 in the AP. It looked to him like April 24th was the grandfathering date. He said he would like this Commission to explore the possibility of a higher minimum acreage in the AW, than 40 acres.

Sonoma County has 100 plus acres. On those lists of neighboring counties none had the minimum acreage Napa County has. All had greater minimum lot sizes, except Yolo County. If we are serious about preserving our agricultural base, said Fershko, the agricultural watershed should be higher than 40 acres and certainly as high as neighboring counties that are also serious about their agricultural base. At the very least AW should be 80 acre minimum, with a Midas as that would allow for some flexibility for specific circumstances. If an applicant came in and showed an extraordinary situation that would qualify him for a so-called variance from the 80-acre minimum, he should be able to take advantage of it. A high blanket minimum with a Midas

approach to allow for exceptions to it is the way to approach it, Fershko felt.'

Snowden asked Fershko what he felt about the :FR as a vehicle by which to effect that kind of higher acreage? Fershko said he appreciates the :FR and thinks that he did not want to use the :FR for that purpose. It has it's place and purpose elsewhere.

In the AP he thought 20-acre minimum was too little. He would support 40 acres. They have had very few applications under the 20. Therefore, there should be very little concern for the net effect on the AP zone. He felt they should start from a high point rather than a low point waiting for the same problem to arise. Meet it now, take pre-emptive measures, raise it up to 40 acres, and if that becomes a problem later on deal with it then. Start high, build in a Midas even into AP to deal with exceptional cases. It is not fair to have a competitive edge where someone has AP property who can say he could always go to residential country estates in 20-acre parcels. It is still feasible today, 20 acre parcel with a home on it in the AP may be very attractive and not necessarily for raising grapes. If that is the case, all the more reason why the minimum acreage should be made 40! One realtor said it is starting in American Canyon area and there is a great deal of demand for twenty-acre parcels up and down this valley for home sites. A 40-acre minimum would deal with that problem.

Beckstoffer asked Staff if they had a statistic as to how many parcels in the AP were 40 acres plus? Hickey said no. Beckstoffer said they did not know how many parcels splits they'd be denying should they go from 20 to 40 in the AP. Hickey said that is Attachment G, the potential parcel splits in the AW and AP District. The Planning Division treated them as a total and did not break them down between the AP and AW. Beckstoffer asked if he was correct that there are not many large parcels remaining in the AP? Most of the AP is now divided into parcels of 40 acres or less that you would not be able to divide whether the minimum was 40 or not. If you look at agriculture in Napa County, he said, and you look at what has happened to other areas that were available and attractive for urbanization, history says you won't maintain agriculture for very long.

With regard to the AW, Beckstoffer said the change from 40 acres to 20 was a mistake on the basis there would not be a significant environmental impact and that the change in itself would not be contrary to the General Plan. There was a significant environmental impact. He would support in the AW, going back to the 40 acre-minimum and to recognize the situation was more correct prior to October of 1977.

Beckstoffer asked McClimans how many parcels in the AP are greater than 40 acres. McClimans said he did not know. If they would try to give the Commission the same kind of numbers that they gave them in the computer print-out, it would be impossible. Beckstoffer asked if he had an idea of the number of large parcels in the AP. McClimans said his guess would be 100 parcels. There is roughly 25,000 acres in the AP Zoning District, he added.

Beckstoffer said when you go from 20 to 40 in the AP you do affect some people but it is not a substantial amount of people. People have said they understand why the AW is changing, but they do not understand why it came up in the AP. He wondered too. Most of them were satisfied with the 20-acre minimum lot size in the AP as preserving agriculture. There is no great sentiment that he can see in the public in going from 20 to 40 in the AP. He thought there might be much more than the Commission suspected. He had the problem as Hawkley had the problem, of switching back and

forth. Beckstoffer said 20 acres was good in the AP and he thought 40 acres is better when it comes to preserving agriculture in Napa County. He agreed with Snowden that the AW is very clear going to 40 acres. He would support 40-acre minimum in the AW and in the AP. He added, going to 40 acres is not going to be as popular as they would like. There will be a lot of opposition. It is a situation where the Commissioners at this time are forced to make the decision to go a little bit farther in terms of preserving the agricultural land in Napa County. Going to 40 acres in the AP, a move he would support, is at best a long nail in the coffin of urbanizing Napa County and at worst a decision that will not prevail. On that basis it is worth a try.

Chief Deputy County Counsel Lober said he was not quite sure on this grandfather date back in April. Do you mean the Commission is going to state that any application after April will not be considered? Snowden said no. As the applications come before the Commission he intended to give a good deal less deference to someone who sought to speculate after the announcement was made and before the ordinance went into effect, than he would on an application of someone who filed prior to the April 24th announcement. Lober said he was having some problems in that the General Plan supported a reduction to 20 acres a few months ago. Ordinance 472 that the Supervisors talked about does not talk about lot sizes. It talks about lots conforming to all of the needs. The Board made an announcement without any public hearings or public notice. These applications have been accepted. Fees have been paid. The people have completed it. They are doing whatever they have to do in the way of surveys. He has a lot less problem with a grandfather clause today after extensive public hearing. The date back in April gives him a problem. 42U.S. Code 1983 is the 1871 civil rights action and if you read what the Congressman said in the 1871 debates, that particular law was to prevent government from taking land without paying for it. Since then there have been many cases that say that depriving a person of the right to use property under a color of law, is a taking. Lober said if the Commission goes ahead and sets an April 24th date and that is accepted by the Board of Supervisors, he wanted to go on record as saying it could invite quite a few actions akin to the inverse condemnation. Those actions have been wiped out by Akins versus Tiburon and as a result people are starting to make use of U.S. Code 42-1983. He was not so sure what the law is. Every 20 acre split that comes here has been granted. He said he meant the practical results through the Board. What the public knows is what the Board of Supervisors ends up doing. Beckstoffer asked if an application comes to them at their next meeting to split a property in the AW, to 20 acre parcels, that was initiated in May of this year, can the Commission vote to deny it on the basis that the Commission recommendation for the AW is 40 acres? Lober said they can deny it on the basis of not meeting Ordinance 472 conditions - which have nothing to do with lot size. It has to do with the General Plan and what is good for that area, the fire loading, topography, etc. To turn it down just because the Board may inact in the future a 40-acre minimum is the weakest reason. He wanted the Commissioners to know that a retroactive date of April is a dangerous way to go as far as inviting potential claims. Lober said starting today they should not accept any more applications and let that be tested by the court. He would prefer that rather than have it back to April 24th.

Snowden asked if it was necessary for this Commission to take any kind of an action on this. Isn't it something that each Commissioner can vote upon as applications come before them? Lober said he would be content with that. Lober said the Board of Supervisors would really set the grandfather date so this is all speculation. What he was saying, added Lober, is if the Commission sets that April 24th date what are they going to do? That means every matter that comes before the Commission that was filed after that date they are going to examine to see if the person was a speculator and all kinds of subjective things which he was not sure was a part of their right to turn down a land use Snowden asked if they could not leave this to be decided on a case by case basis. Lober said yes. Hickey said the Commission

had received Mr. Bean's letter and they had filed it. They will not take any action.

Action:

MOTION BY BECKSTOFFER, SECONDED BY FERSHKO

RECOMMENDED FOR APPROVAL

that the Commission recommend to the Board of Supervisors that the minimum lot size in AW be increased from 20 acres to 40 acres.

This motion carried on the following vote:

AYES: Beckstoffer, Fershko, Snowden
NOES: Hawkley
ABSTAIN: None
ABSENT: None

MOTION BY BECKSTOFFER, SECONDED BY FERSHKO

RECOMMENDED FOR APPROVAL

that the Commission recommend to the Board of Supervisors that the minimum lot size in the AP be increased from 20 acres to 40 acres.

This motion carried on the following vote:

AYES: Beckstoffer, Fershko, Snowden
NOES: Hawkley
ABSTAIN: None
ABSENT: None

Note: New Education Development System did not send written comments on this matter.

The Planning Director recommended that the Staff reports be held to recommendation only in order to expedite the balance of the agenda. Commissioners agreed as they have read the Staff Reports and are familiar with the contents.

WILLIAM RODDIS
USE PERMIT REQUEST
(#U-487879)

Public Hearing:
CDPC Tape #107980, Track #6
Continued from: July 5, 1979 by the Commission

Request to establish a 2,500 gallon/year winery within an existing structure located on a 35.81 acre parcel on the north side of Diamond Mountain Road approximately 1,700 ft. north of Pacheteau Road within an AW District. (Assessor's Parcel #20-400-13).

Public hearing was opened at 3:30 P.M.

Senior Planner Crundall read the Department Recommendation.

Recommendation:

Environmental: Negative Declaration.

Planning: Approval, with findings and subject to conditions of approval #1, #3, #4, #9, #10, #11

Speakers: None

Applicant left word he had been present for 1½ hours but could wait no longer. In the absence of anyone wishing to be heard in regard to this application, public hearing was closed.

Action:

MOTION BY BECKSTOFFER, SECONDED BY FERSHKO

for approval, with findings and subject to Conditions of Approval #1, #3, #4, #9, #10, #11; Issue Negative Declaration.

This motion carried on the following vote:

APPROVED

AYES: Beckstoffer, Fershko, Hawkley, Snowden
NOES: None
ABSTAIN: None
ABSENT: None

JAMES J. PECHENINO WATERCOURSE OBSTRUCTION/RIPARIAN COVER PERMIT REQUEST (#WR-187879)

Public Hearing:
CDPC Tape #107980, Track #6
Continued from: August 1, 1979 by the Commission

Request to construct an addition to an existing residence located adjacent to the west bank of the Napa River on the east side of Milton Road approximately 1.6 miles south of Las Amigas Road within an RR:B District.(Assessor's Parcel #47-360-10). To be considered with Agenda Item #8.

JAMES J. PECHENINO APPEAL TO SECTION 4551 OF THE COUNTY CODE

Appeal by James J. Pechenino to Section 4551 of the County Code to allow construction of an addition to an existing dwelling within 50 feet from the centerline of Milton Road located on the east side of Milton Road approximately 1.6 miles south of Las Amigas Road within an RR:B District.(Assessor's Parcel #47-360-10).

Senior Planner Crundall said public hearing was opened on August 1st on Agenda Items #6 and #8. At last meeting the concern was the recommendation was for denial because there was problems from Public Works and Environmental Health that could not be resolved. Commission requested it be sent back and parties involved get together to resolve their problems. There are letters in the packet of material indicating the problems have been resolved.

Recommendation: Planning: Approval, with the condition that applicant sign indemnification contract with the County to remove the structure on call by the County; to comply with all applicable building codes and zoning standards and requirements of various County Departments and Agencies.

Speakers:

Proponents: James J. Pechenino, applicant

Opponents: None

Other: None

The applicant, James Pechenino, said he had asked for a 25 ft. addition that was going to be going into the road setback area. Now he is going to come out ten feet which will clear him with the setback area and get him away from the leach lines. He might not have to go into the setback area with the carport at all as he was measuring the wrong way and picked up four feet by measuring the way he was told. The resolution outlined by Crundall is acceptable to him.

Public hearing closed.

Action:

MOTION BY BECKSTOFFER, SECONDED BY FERSHKO

for approval of Agenda Items #6 and #8, with the conditions that the applicant sign indemnification contract with the County to remove the structure on call by the County and that he comply with all applicable building codes and zoning standards and requirements of various County departments and agencies.

This motion carried on the following vote:

| | |
|---|---|
| APPROVED | AYES: Beckstoffer, Fershko, Hawkley, Snowden<br>NOES: None<br>ABSTAIN: None<br>ABSENT: None |

RON AND JEAN SOELAND TENTATIVE PARCEL MAP (#2075-PM)

CDPC Tape #107980, Track #6
Continued from: March 7, 1979 and March 21, 1979 by the Commission. April 18, 1979 and May 2, 1979 at the applicant's request, and May 16, 1979 at the request of applicant's attorney.

Request for a division of property into two (2) parcels of 21.18 acres each located west of Soda Canyon Road approximately 0.75 miles north of its intersection with Loma Vista Drive within an AW District (Assessor's Parcel #39-630-11).

Senior Planner Crundall said he talked to the Soelands yesterday and Mrs. Soeland indicated she had jury duty and might not be present today. Applicant was going to try to submit a letter of withdrawal of the application. Cost of pursuing this further is becoming excessive. A letter was not received from the Soelands.

Action:

CONTINUED — Commissioners decided to continue this matter to one more meeting, September 5, 1979, to permit applicant to send letter of withdrawal.

DAVID S. CLARK, ET AL USE PERMIT REQUEST (#U-697879)

Public Hearing:
CDPC Tape #107980, Track #6

Request to reactivate a winery on a 26.65 acre parcel located on the east side of Deer Park Road at its intersection with Sanitarium Road within a recommended AW District. (Assessor's Parcel #21-400-02).

The Planning Director presented the Department Recommendation.

Recommendation: Environmental: Issue a Negative Declaration.

Planning: Approval, with findings, subject to Conditions of Approval #1, #2, #3, #4, #9, #10, #11.

Speakers: None

Public hearing opened at 3:40 P.M.

After determining no one in the audience wished to be heard in regard to this matter, public hearing was closed.

Senior Planner Crundall said in regard to the rezoning, it will be before the Board of Supervisors on August 21, 1979. The Board indicated to the Commission that this was an expedited item and Staff recommended that any approval be subject to approval of the rezoning by the Board.

Action:

MOTION BY BECKSTOFFER, SECONDED BY FERSHKO

to recommend for approval with findings and subject to conditions of approval #1, #2, #3, #4, #9, #10, #11; issue Negative Declaration. Any approval is subject to approval of the rezoning by the Board of Supervisors.

This motion carried on the following vote:

| | |
|---|---|
| RECOMMENDED FOR APPROVAL | AYES: Beckstoffer, Fershko, Hawkley, Snowden<br>NOES: None<br>ABSTAIN: None<br>ABSENT: None |

8/15/80

CAROL GHOTBI - USE PERMIT REQUEST (#U-807879)

Public Hearing:
CDPC Tape #107980, Track #6

Request to expand a non-conforming dwelling located on a 2.81 acre parcel on the northwest corner of Trubody Lane and Washington Street within an AP District.(Assessor's Parcel #36-130-37).

The Planning Director presented the Department Recommendations.

Recommendation: Environmental: Categorically Exempt. None required.

Planning: Approval, with findings and subject to Conditions of Approval #1, #9, #10.

Speakers: None

Public hearing opened at 3:42 P.M.

Public hearing was closed after determining no one in the audience wished to speak in regard to this matter.

Action:

MOTION BY BECKSTOFFER, SECONDED BY HAWKLEY

for approval, with findings and subject to Conditions of Approval #1, #9, #10.

This motion carried on the following vote:

APPROVED

AYES: Beckstoffer, Fershko, Hawkley, Snowden
NOES: None
ABSTAIN: None
ABSENT: None

NORTHGATE COTTAGES USE PERMIT REQUEST (#U-747879)

Public Hearing:
CDPC Tape #107980, Track #6

Request to construct a living unit and office space for a resident manager for the homeowners association to be located on the open space area adjacent to Atlas Peak Road approximately 200 feet south of Hardman Avenue within a PD District(Assessor's Parcel #40-10-Block 2).

The Planning Director presented the Department Report and Recommendation.

Recommendation: Environmental: None required. Categorically exempt.

Planning: Approval, with findings and subject to Conditions of Approval, #1, #4, #9, #10, #11

Speakers:

Proponents: Bill Bramstead, President
Board of Directors
Northgate Associates

Opponents: Randy DiVoto
3550 Divisadero Street
San Francisco, California

Public hearing opened at 3:44 P.M.

Commissioners determined that this matter was not related to Amfac-Silverado except it is in the same PD. Land is owned by Homeowners Association and not Amfac.

Randy DiVoto of 3550 Divisadero Street, San Francisco, CA., spoke on behalf of his Mother, who was present. His mother has a

two-bedroom unit at Northgate Cottages at Silverado, purchased in 1966, 30 days prior to the ground breaking. They purchased this particular unit as it was close to open space. Now they are faced with the proposed Manager's Building that will fill the open space. He passed out a sketch showing the proximity of his mother's unit to the proposed building, as well as the Master Site Plan, with pedestrian paths, landscape berms, open space, focal points. He said the berm was designed to screen cars and create a view corridor and this will be eliminated if the building is put where proposed. He felt further investigation would reveal adequate and alternate sites for the building, with less of an influence on adjacent owners. DiVoto added they considered themselves part of the Silverado family and had made many friends.They recognize the need for a Manager's Unit and feel it will add a great deal of help to all of them in terms of being able to attract quality managers. Although they are not ecstatic about the location of the proposed site, they would not stand in the way of the proposed location as they recognize the value of the Manager's building in regard to all the owners. They requested the Commission to review certain aspects of the application in an attempt to limit it's affect on the DiVoto Unit. This request pertained to three areas: 1) the size of the proposed unit, 2) use, 3) placement on the site.

Bill Bramstead, President of the Board of Directors of Northgate Associates said their discussion with Randy and Mrs. DiVoto has been initially in regard to the justification for building the building at all. They convinced the DiVoto's that there should be a Manager's residence. Bramstead said their Articles of Incorporation require that for any project like this they need 75% approval of the registered owners. They polled the registered owners with a plan that showed this size and this location, asking them to authorize the Board of Directors to do the financing and to go ahead with construction. The response was 93% in favor and 1.4% against, which was the DiVoto residence. The value of votes depend upon the size of the apartment. He said they understood the reasons for the DiVoto's disapproval. However, they had not been approached as yet with a proposal to move the location or cut down the size. He said their Board would undertake to listen to the DiVoto's at their annual meeting on September 1st and will give it circulation among the owners. If the Commission would leave this matter in the hands of the majority of the owners of Northgate Association, they would put it up to a vote.

The Commissioners agreed to a continuance and Chairman Snowden said they could notify the Planning Department on the 4th of September the results of that meeting so the information could be relayed to the Commission by the September 5th meeting. Bramstead and DiVoto agreed. Mr. Bramstead said they wanted to get this construction under way and a roof on before the rainy season.

Action:

CONTINUED

This matter was ordered continued to September 5, 1979 by Chairman Snowden.

REMCO, INC.
USE PERMIT REQUEST
(#U-657677)

Public Hearing:
CDPC Tape #107980, Track #6

Request to construct a 21,000 square foot structure to be utilized for office, storage, maintenance and fabrication for a contractor and commercial glazier located on an 1.18 acre parcel approximately 900 feet southwest of the intersection of State Highway 29 and Kelly Road within an I:H-35 District (Assessor's Parcel #57-020-19).

The Planning Director presented the Department Report and Recommendation.

Recommendation: Environmental: Issue a Negative Declaration.

Planning: Approval, with findings and subject to Conditions of Approval #1, #2, #4, #5, #7, #9 #10, #11 (Exhibit "A", #1 through #7).

Speakers: None

Public hearing opened at 4:00 P.M.

After determining no one in the audience wished to speak in regard to this matter, public hearing was closed.

Action:

MOTION BY FERSHKO, SECONDED BY BECKSTOFFER

for approval, with findings, subject to Conditions of Approval #1, #2, #4, #5, #7, #9, #10, #11 (Exhibit "A", #1 through #7); Issue Negative Declaration.

This motion carried on the following vote:

APPROVED

AYES: Beckstoffer, Fershko, Hawkley, Snowden
NOES: None
ABSTAIN: None
ABSENT: None

SECURITY OWNERS CORPORATION (NAPA MEADOWS) REZONING REQUEST (#R-67879)

Public Hearing:
CDPC Tape #107980, Track #6

Request to rezone 140.69 acres from R-1:B-1 (Single-family Residential with a Special Building Site Combining District) to a PD (Planned Development) District in order to develop a 449-unit subdivision of mixed single-family residential units located on the west side of State Highway 29 south of American Canyon Road west. (Assessor's Parcels #58-050-25, 26P and 32). To be considered with Agenda Items 16 and 17.

SECURITY OWNERS CORPORATION - USE PERMIT REQUEST (#U-717879)

Request to develop in six (6) annual phases a 449-unit subdivision containing 307 single-family detached residential units, 102 zero lot line units and 40 duet lot units with a related recreation area on 140.69 acres located on the west side of State Highway 29 south of American Canyon Road West within a proposed PD District. (Assessor's Parcels #58-050-25, 26P and 32). To be considered with Agenda Items 15 and 17.

NAPA MEADOWS (SECURITY OWNERS CORPORATION) TENTATIVE SUBDIVISION MAP

Request to subdivide three (3) parcels into 449 single-family residential lots on approximately 103 acres, a related recreational area of approximately 36.7 acres and remaining lands of approximately 46.2 acres located on the west side of State Highway 29 south of American Canyon Road West within a proposed PD District. (Assessor's Parcels #58-050-25, 26P and 32). To be considered with Agenda Items #15 and #16.

The Planning Director presented the Department Report and Recommendation. This is a multiple-action proposal. He said the Commission procedure provides for them to act on the rezoning and not act on the Use Permit or subsequent action until the Board of Supervisors has cleared the zoning issue. That procedure is the result of a direct request from the Board of Supervisors that Use Permit conditions not be set before the Board has considered the initial action, which in this case is the rezoning.

Recommendation: That Commission recommend to the Board of Supervisors, approval of the proposed rezoning from R-1:B-1 to PD, said rezoning to be translated into Ordinance form by the County Counsel's Office for ratification by Board of Supervisors.

Note: Considerations regarding statements of overriding conditions and mitigation measures, conditions of approval and project phasing will be considered under th Use Permit portion of the application.

Environmental consideration was previously considered. No action necessary. In regard to the EIR environmental findings will be required and handled at Use Permit stage.

Speakers:

Proponents: Barry Whitaker, Security Owners Corporation, Martinez, CA.

Opponents: None

Other: None

Public hearing was opened at 4:08 P.M.

Barry Whitaker, Security Owners Corporation, Martinez, CA., said this was originally a three-year project, 150 units per year. During the process a revised proposal was submitted, changing that to a 4-phase proposal. That 4-phase proposal was rejected with comments by some Supervisors that over a longer period of time it might be acceptable.

With respect to the EIR, the Board seemed to indicate to them they would be open for phasing negotiation or discussion. However, they were out of time so they acted to deny the project. Whitaker said Security Owners resubmitted right after that.

Hickey read the memo from himself as Secretary of the Commission to the Board of Supervisors saying that at the September 6, 1978 meeting the Commission review the proposed PD rezoning Use Permit and Tentative Subdivision Map of Napa Meadows. Considerable discussion centered on alternate programs of construction schedules that might mitigate the potential impact of the subdivision on the immediate area and County at large. The majority of the Commission members indicated that if building construction schedule of seven to ten years might make the project acceptable. Applicant indicated such a buildup period was not economically realistic. Applicant requested a decision by the Commission on his request as opposed to continuance to discuss alternate subdivision plans, or development phasing programs. Commission's action for recommendation of denial was on a separate 5-1 vote. Commissioner Hawkley voted no. This is a new application, said Hickey.

Barry Whitaker said they have worked carefully on it to come up with a viable first phase and the major change is to spread it out a longer period of time. Because of the nature of the site and the project they feel a six-year program can be managed. They ask the Commission to support the Staff recommendation. They were disappointed they cannot discuss the Use Permit and Tentative Map.

Hickey said as he understands the phasing it will be cumulative. If there were not 75 units built in 1979, starting in 1980 there could be 150. Whitaker said yes. The application was accepted as complete in May. Initially, it was not accepted as being complete due to an Ordinance change of the Commission that required a boundary survey. This had to be accomplished. The period the Commission had for review of the application for determination of whether or not it is complete took about a month. At the time they applied with a certified EIR, it looked not unreasonable to foresee a process that would result in their being able to commence

construction this year. Obviously, right now that looks less and less reasonable. Whitaker said it is his understanding on just the PD zoning, they are not acting on the specific proposal. Is that correct? Hickey said he understood that. An action to approve the rezoning and then reject the proposal might raise some questions. His concern was that the Commission understand what is before them to act on. Hickey asked if there would be an objection from Whitaker to slipping the whole schedule one year so the first 75 units would be in 1980? Whitaker said if that is what it takes to get the project approved, that is what it would be. The key to it is that they jumble the first phase. That is how it is laid out and how they can manage it....to be allowed to put on record two phases at one time, even though they build them out over two years. That allows them to finance the kind of front end cost this project has. 67% of the unusual improvements - the park, the off-site roads, bridge, etc., 67% of those must occur in the first phase to really make the project work. They need those 150 units as lots in one phase. They can build them over two years by scheduling their own program. They would rather have it begin in 1979, said Whitaker. However, if in the end it is going to have to be 1980, so be it!

Hickey said the action today is the rezoning and if it is approved and goes to the Board of Supervisors, the Commission action would imply some favorable consideration or some consideration of the proposed schedule. Without the phasing program it is the same proposal that was denied before.

Whitaker said what they indicated at the last meeting with the Board of Supervisors that caused them to reapply and be present today is they felt at that point they had never been able to have a serious conversation about what kind of phasing is acceptable. The Commission indicated there might be some phasing that would make the project acceptable. They have never arrived at what that phasing is with the Commission or with the Board, or Staff. They believe they can make it work at six years. Their main ambition is to get this project approved, said Whitaker.

Hawkley said in looking this over as against the EIR she could not see any change - everything is as before - only it is phased. Whitaker said it was in every way identical except for the timing and configuration of the phases. The boundaries between phases have been completely readjusted and redrawn and divided into six years instead of four years.

Hickey said the only other alternative would be for the Commission to consider the rezoning but then initiate and get into the Use Permit discussion until they are satisfied that the phasing is acceptable and then recommend the zoning when they reach that point.

Snowden said to him this puts them right in the middle of a growth management question. He felt the rezoning is clearly geographically appropriate in view of the General Plan which clearly provides for urban growth in urbanized areas in American Canyon. The temporal appropriateness is what the Commission was grappling with last time. Last time the developer was more interested in trying to get the entire project. He asked Staff how close they were to being in a position to talk about growth management? Hickey said they were not close in terms of the priority the Department has as established by the Board of Supervisors. He called to the Commission's attention that while Napa Meadows has taken the approach of resubmitting with a phasing program, Napa Glenn has filed a lawsuit against the County.

Hawkley said she had read the grand jury report of the American Canyon County WaterDistrict and it brought up the fact that the Water District has always had a very good bill of health. They had acted and built the water system with the idea that there was no growth limitation. They acted in a perfectly ethical way when they "overbuilt" as it is now seen. These houses are valuable and will be valuable to American Canyon area. They have had much time now to come up with a growth management plan and do not have it yet. They did not have it when this matter was

discussed before, or when they discussed Silverado. She recommended they proceed with this rezoning.

Fershko said as it is presently zoned, R-1:B-1, it is a 1-acre minimum. The most that could be built on this project is 140 units. Hickey said that means 1-acre minimum if you don't have sewer and water - if you have that you can go down to 8,000 square feet. They do have water, etc. Road rights-of-way and so forth would have to be accounted for. They could build it under current zoning with a subdivision map.

Whitaker said the application is for 307 single family and 102 houses on 50 ft. lots. They would lose about 1/3 of those 102, approximately 40 units, assuming that the rest of the plan was unchanged. The Napa Glenn project was a proposal directly under the zoning. The key difference between their plans was as a PD they are asking for lot size variations which are not an effective density increase but to create some space to provide some amenity - to provide open spaces to do some things with the creek other than just make it a minimal channel. The amenity of their plan is very much associated with the PD zoning.

Hickey said the Staff recommendation for approval is predicated on the assumption that the determination of the Commission is that a workable phasing program will make the subdivision acceptable. He said they were assuming that will be worked out between the Commission and the applicant in the subsequent applications.

Fershko asked Hickey if he was satisfied with a six year period even if they start in 1980? Hickey said he was not satisfied that it would be six years - or 8 or 10 - but he was satisfied that the Commission's action was such that they clearly indicated in regard to their earlier review that one of the problems was a question of phasing. Therefore, if that can be resolved, and it is before you in the Use Permit, it would be an acceptable project.

Fershko said his concern has always been the General Plan and the projected population of 115,000 by the year 2000. He felt if the Commission allowed phased programs of this magnitude, over a five year period or for that matter, 10 years, by 1989 you have several projects of this size. Where are you in 1989? Where are you in the year 2000? He said they would be far beyond 115,000 population. That is what he is concerned about.

Beckstoffer said if the Commission acts consistent with what they did last time, they would send this back with denial and say that 7 to 10 years is what they had suggested before. Snowden said Hickey is not making a recommendation at this point as to the appropriateness or inappropriateness of proposed phasing schedule, that the PD might be approved because it is appropriate for the site. Then, in connection with the Use Permit for the PD, the phasing program would be an element of the discussion. In other words, he is not saying that the Commission should go one way or another on it. Hickey said the Commission had suggested 7 to 10 years and the applicants have come back with counterproposal of 6 years.

Beckstoffer said it seemed to him appropriate that before they approve the PD zoning you see what the applicant's ideas are in terms of the phasing.

Snowden asked Whitaker for discussion purposes, how he felt about 7 - 10 years? Whitaker said at last meeting Fershko had said he was favorable to this project but there was a question of timing. Fershko had said this was a good site in Napa County for this kind of development. You need to deal with that issue, said Whitaker. There are two procedures that are commonly followed and one is to consider all the applications simultaneously.

One is to act sequentially. Basically, you have a sequential recommendation, said Whitaker. That spreads it out in time. If you have a sequential application, you also have to deal with it sequentially. The first issue is not over what period of time is the PD acceptable. The first issue is land use and planning issue. Is a PD acceptable on the site? If the zoning is granted and Security Owners walks away from the property, the PD zoning will stay. The Commission needs to deal with thePD zoning as an issue separate from their project.

Snowden said he felt their discussion was suggesting that sequential handling doesn't benefit the County in this proposal. Mr. Whitaker said they would be willing and prepared to have a discussion on phasing, whether it is six or seven to ten years. Each has implications. It is difficult on this site, given what they are trying to do with it, to work effective phasing schedules other than what they are doing. The biggest effect of course, is to raise the price of the houses because it raises the carrying cost. They can talk about the first year being 1980 instead of 1979.

Fershko said he did feel the location of that project is ideal for a subdivision. His concern is the magnitude of it. It comes down to a question of levels.

Hickey said the question in part may be that this proposal, could be interpreted as the County's growth policy, (there would be other proposals he was sure that would come along) Until the Commission is satisfied with the question of the growth increment or the phasing,Dept.is not prepared to recommend on the zoning. Perhaps the Commission wants to hold on to the zoning until they are satisfied that the zoning is not an idle act in the sense that what is behind it is an acceptable growth increment to both the applicant and to the County. It would appear that there is the possibility here for negotiation on an acceptable growth increment plan, as far as this subdivision is concerned. He said he did not think it would constitute an all-time commitment to anybody with any property that they are entitled to 60 - 70, 80, 90, 100 units because you did it once. You will have that pointed out to you time and time again if the Commission goes in that direction, said Hickey.

Hawkley said he is suggesting that they wait until the three of the Commission are satisfied that a certain number of units over 10 years is acceptable to them. She has the impression their concern is that simply recommending the zoning without having reached some kind of an agreement or understanding of what is happening in the Use Permit is not an acceptable way to go. The Commission wants to have some sense of agreement on the Use Permit in this case before they recommend the zoning. If that is the case she did not see how they could proceed with the zoning today, unless you get into the details of the Use Permit. It could be in this instance you would change your procedural steps and look at the two or three of them together and recommend to the Board and point out the reason for that change. Snowden said he would be more comfortable doing it that way. As far as he is concerned, they do not need to take formal action on the Use Permit before the Board sees the rezoning. But, he would want to have some kind of understanding reached as to what the phasing proposal alternately will be and the understanding would go two ways.

Whitaker said they would have to negotiate the phasing with the Staff, then the Commission and then the Board of Supervisors. Whitaker said he did not understand the Commission's reluctance to speak out directly on their own as to how they feel about the phasing and what it should be. From the standpoint of Security Owners Corporation, they would like to see the project move ahead. They filed an application in March. Here they are in August and talking about continuing it to work out with Staff for a phasing they don't know will be acceptable to the Commission and then working out a phasing with the Commission they don't know will be acceptable to the Board. They may get back to the Board and find they don't have three votes for PD zoning. He asked that the Commission recommend that the issue may be one of quantity over time rather than planning at that site and

address it that way. He asked that they recommend to the Board that it be rezoned PD and speak to the issue of phasing as specifically or as generally as they are prepared to do.

Fershko said he agreed with Whitaker. It should be resolved. Snowden did not agree. The Commission's prerogatives in terms of reviewing the Use Permit are quite different than their prerogative in terms of reviewing the rezoning. Whitaker has correctly pointed out that if Security Owners Corporation walks away from the project, the PD zoning sticks. Snowden said he did not know what County Counsel would say but he thought the County's legislative powers in deciding whether to grant or deny a PD rezoning are quite different. than the County's qua si judicial powers in reviewing a specific PD Use Permit proposal.

Fershko said he did not mean they should rezone now but to get on to the next two items on the Agenda. Not today, but sometime really soon to talk about the ground rules and then go back to the PD, and decide that.

Hickey said perhaps they could shorten Mr. Whitaker's task by having him negotiate jointly with Staff and Commission at the same time and work out an acceptable scheduling program. Set up a session with the Commission to discuss the Use Permit and phasing. Staff will make their recommendation known to the Commission and to Whitaker. Whitaker asked that this be done as soon as possible.

Commissioners agreed they wanted to accomplish this before their meeting on the 19th.

Whitaker said assuming they would act favorably or negatively tonight, they could make a Board meeting somewhere around the end of August. So they are talking about something that is going to cost them a minimum of two months. He asked again that the Commission act on the zoning. In the end they need a ruling from the Board of Supervisors. They need three votes at the Board. If they meet late in August or early September, somewhere in October or November they will find out whether they have three votes. Snowden asked if he meant he preferred to have a denial of the rezoning just to get it to the Board? Whitaker said if that is what they had to do, yes. However, he would much prefer that they recommend it favorably and make their statements about the phasing still needing to be worked out and suggest a date to work it out. In the end, the phasing will not be attached to the zoning. They are two different issues. It is probably not a legal condition of the zoning, added Whitaker. Let the PD zoning go ahead, said Whitaker, preferably with a favorable recommendation. Snowden said he felt the Commission understood the issues.

Beckstoffer said he would be happy to vote to send it up as they did before. He would not vote to send it up any other way.

Note: Hickey advised that the Board of Supervisors has said on the 21st of August they will provide another Commissioner. Snowden said that Commissioner will have to read the Environmental Impact Report and be familiar with that and familiarize himself (or herself) with the contents of the hearing that was just held.

Fershko said he really did not intend to rezone now and leave everything open ended. It is not possible because of the time, to discuss it fully today and then go to the rezoning. That is not possible. He would not vote for supporting the rezoning. There are all sorts of question marks as to over what period ot time, if at all, and where and when, etc. He suggested that if Security Owners Corporation wants

a decision today rather than wait for a special meeting..... Whitaker said he would clarify his statement. At the last time they reached this point with the Commission they were a companion project with Presley and they felt urgent need to go ahead. He said they feel an urgent need to go ahead, but if the Commission feels it is absolutely essential to deal with this issue before deciding on the rezoning, do that. Take time to look at the phasing. 1979 isreally out the window and they are talking about 1980 for sure. In other words, he has changed his mind and instead of asking for the denial recommendation to move it along, he wants them to take the time to look at phasing.

Action:

CONTINUED

Commissioners agreed to continue Agenda Items #15, #16, #17 to 9:00 A.M. on September 19, 1979 for joint study session and regular session. Hawkley suggested inviting the Board of Supervisors to the meeting in the interest of expediting this matter. Hickey felt the procedural step would be for the Commission to satisfy themselves as to scheduling, take whatever action is necessary, and then forward it to the Board of Supervisors.

Snowden noted all three public hearings would be continued, but action will only be taken on the rezoning.

LESTER B. HURD
TENTATIVE PARCEL MAP
(#2129-PM)

CDPC Tape #107980, Track #6

Request for a transfer of property involving two (2) parcels of 3.30 (Sonoma County) and 61.48 (Napa County) acres resulting in two (2) parcels crossing over the County Line of approximately 15.7 and 49.1 acres located along Langtry Road on the Napa-Sonoma County Line approximately 1.6 miles south of Spring Mountain Road within an AW District. (Assessor's Parcels #22-140-25/Napa and #28-270-26/Sonoma).

Senior Planner Crundall read the Department Recommendation.

Recommendation:

Environmental: None. Categorically exempt.

Planning: Denial, based on Finding #6. Note: Department feels better approach would be for applicant to forget Sonoma County and look at the 61.48 acre parcel in Napa County. However, this would entail a new application, as it would be considered a division of property instead of a transfer.

Speakers:

| | |
|---|---|
| Proponents: | Jim Thompson<br>St. Helena, California |
| Opponents: | None |
| Other: | None |

Jim Thompson, St. Helena, California, representing the applicant, said a year ago regarding this application, they consulted Sonoma County and were told there would be no problem, as far as they were concerned. Then in consulting Napa County Staff, they had never processed this type of application. The idea is to make the allowable building site in Sonoma County extend up on to the ridge. He was sure the applicant would be willing to enlarge the 12.4 acre parcel to a 20-acre parcel and to somehow encumber the three acres so it could not be built on in Sonoma County. Staff is suggesting increasing the 12 to 20. They really have no jurisdiction over Sonoma County, said Crundall.

Thompson said applicant would be willing to enlarge the 12.4 to 20 acres. There was no consideration given to area on the transfer basis. They were taking a substandard and making it

more standard. The only problem with this lies in submittal of another application and then they get locked into the 40-acre minimum problem.

June 19th is the date this was filed. It was presented over the counter May 21st, said Crundall. Thompson said they prepared the map in April.

Snowden said at worst the applicant can be sent on to the Board of Supervisors with no action by the Commission because of the deadlocked 2 - 2 vote with two members indicating they would support approval of the map if you would increase the 12.4 acres to 20 acres. Thompson said they would take enough of the Napa County property to make a whole 20-acre parcel. Crundall noted they had received a recommendation from Sonoma County that said deny the application. Their areas of concern are steep slopes, fire hazard, lack of public services, energy consumption and geological hazard.

Discussion followed on differences of processing transfers and divisions of property.

Hickey suggested they refer it back to the Department and resubmit it as a division of property. Crundall said there are two ways they can go: 1) Applicant can withdraw and resubmit and pay the fees and take it as a division. 2) The Commission can recommend denial.

Fershko felt they should approve the parcel split of 20 acre minimum, but that is not before them. If the applicant prefers it be denied, he would deny it just to get it sent to the Board of Supervisors.

Thompson asked that it bereferred back to Staff and applicant would resubmit as a continued application. It was decided they could not do this. Alternatives were as Crundall had stated.

Action:

MOTION BY FERSHKO, SECONDED BY BECKSTOFFER

DENIED

for denial, based on Finding #6

This motion carried on the following vote:

AYES: Beckstoffer, Fershko, Hawkley, Snowden
NOES: None
ABSTAIN: None
ABSENT: None

KATHLEEN GRIFFIN TENTATIVE PARCEL MAP (#2089-PM)

CDPC Tape #107980, Track #6

Request for a division of property into two (2) parcels of 20.00 and 35.97 acres located on the west side of Mt. Veeder Road approximately 4.7 miles north of its intersection with Redwood Road within a WR District. (Assessor's Parcel #34-360-16).

Senior Planner Crundall presented the Department Recommendation. Reading of the Department Report was waived.

Recommendation:

Environmental: None Categorically exempt.

Planning: Approval, by the Board of Supervisors, subject to compliance with all requirements of various County departments and agencies.

Speakers:

Proponents:

Leslie Stewart, representing her mother, Kathleen Griffin
Mt. Veeder Road
Napa, California

Opponents: None

Other: None

Leslie Stewart, representing her mother (applicant) Kathleen Griffin, said they entered into an agreement to take the kitchen out of the house as they were originally going to make it into a guest house. They did not understand that one meter meant they had to extend the electricity from one house to the other house and there is 625 feet between. They went to a lot of expense to put electricity underground for the new house and in order to put it underground to the other house involves a lot of money. With the rising cost of building and the comment of a friend that when they get older they will not want to take care of this huge piece of property, they decided it would be best financially for them to divide the parcels. At that point, in December of 1978, they put in their application for a parcel split. They did not know if you have a landlocked parcel you must have to improve the road up to the new parcel. That would be over 700 feet. There is a paved 12 ft. road that has a bank on one side and a gulley on the other and would be too expensive and would involve an environmental disturbance. They have no way of meeting those kind of expenses, said Ms. Stewart. She asked that the Commission waive the requirements for the road improvement. For financial reasons she added they would like to divide the parcel at this point in time.

CDPC Tape #107980, Track #7

Beckstoffer asked if they changed that configuration she could eliminate the road requirements. She said she understood that after she started this process that if they got a 60 foot frontage on Mt. Veeder Road, then no improvements would be required. She was reluctant to resubmit a map because of the 40-acre minimum business and she would lose her place on the Agenda. Beckstoffer suggested this matter be referred back to Staff. Stewart said she had talked to Will Selleck and John Stewart and they felt it was a good way to approach it. The acreage would be 28 and 28 rather than 20 and 35.

The Commissioners agreed to refer this back to Staff and the applicant will submit an amended plan.

Action:

REFERRED BACK TO STAFF

Chairman Snowden order this matter referred back to Staff for recalendaring upon completion of resubmission.

CORRESPONDENCE:

GLENN HANNA

CDPC Tape #107980, Track #7

Request via letter from Glenn Hanna regarding construction and operation of small breweries in AW or AP zoned areas.

The Planning Director presented the Department Recommendation.

Recommendation: That this matter be referred to the Department and County Counsel's Office for review and report.

Speakers:

Proponents: Glenn Hanna
Santa Rosa, California

Opponents: None

Other: None

Glenn Hanna of Santa Rosa said he was not talking about the AP zoning on the valley floor. He was asking a question in his letter about general concept in the County in AW and AP, at 20 or 40 acres. He specifically does not want to be on

the valley floor. Snowden explained that, generally speaking, AW was in the hills and AP on the valley floor. Hanna said he would be more interested in AW. He said he would 1 like to see a map before he amended his proposal to AW only. If the valley floor is all AP he would not have objections to AW only.

Commissioner Beckstoffer said he has been trying to get a definition of winery in terms of a facility that processes agricultural products. Hanna's letter speaks of a facility that processes agricultural products. It is not defined in a winery whether you have to grow those products in Napa County, or not. Same thing with hops. It brings them back to that issue of a clear definition of a winery. They should have that as a background for considering whether or not you can have a facility to process agricultural products in Napa County in the AW. If you can have a facility in the AW to process agricultural products, if that facility happens to be called a winery and that agricultural product happens to be called grapes, said Beckstoffer, As he read Hanna's letter he would like to put a facility in the AW that processes agricultural products. That is the question.

Hanna said since writing the letter he has read the zoning ordinance and it does say without limit agricultural processing plants are permitted in AW zones. The real issue is, is a brewery an agricultural processing plant? This is a serious question, said Beckstoffer.

Action:

REFERRED BACK TO STAFF — Chairman Snowden ordered this matter referred back to Staff for review and recommendations.

ADJOURNMENT — The meeting adjourned at 5:17 P.M.

W. SCOTT SNOWDEN,
CHAIRMAN

JAMES H. HICKEY
Secretary to the Commission

33.